Pursuant to Fed. R. Civ. P. 26(a)2(B), Thomas D. Fowlkes, M.D. submits the following Expert Report on behalf of ARNP Andrea C. Lewis (NP Lewis), Lawrence Mobley, M.D. (Dr. Mobley) and Escambia County.

**(i)     A complete statement of all opinions the witness will express and the basis and reasons for them.**

**Scope of report:** (I.) The appropriateness of the medical care provided Mr. Alfred Wesley (Mr. Wesley) by the Escambia County healthcare personnel during the time he was incarcerated at the Escambia County Jail (ECJ) in December 2015 through January 2016 and (II.) How Mr. Wesley's past medical history and autopsy findings influence those opinions and (III.) Whether the Policies & Procedures regarding medical care at the ECJ were reasonable and appropriate. (IV.) I have also been asked to comment on the degree to which I agree or disagree with the Plaintiff's expert reports. My opinions are limited to those that I can offer to a reasonable degree of medical probability.

**Factual Summary:** 1. Mr. Wesley was a 63 year-old male with a past medical history significant for:

a.     A long history of mental illness. The available prior records indicate that Mr. Wesley had a history of Chronic Paranoid Schizophrenia (CPS) dating to the 1970's around the time of his military service. He had several prior psychiatric hospitalizations.



EXHIBIT
**11a**

At the time of his prior incarcerations at ECJ earlier in 2015, he was found to have primarily residual symptoms of CPS. He had signed informed consents for Atypical Antipsychotic Medications (Wesley 001003) and Anxiolytics/Sedatives/ Hypnotics (Wesley 001004) in March 2015. He had a baseline electrocardiogram (EKG) in March 2015 which showed a normal QT interval. (Wesley 000636) (N.B. The QT interval is a measure of time on the EKG from the start of the Q wave to the end of the T wave.) He was maintained on Risperdal 2mg orally once a day and Vistaril 25mg orally twice a day for CPS at the time of his last release from ECJ on 8/19/2015. His compliance after this time is unclear. It does not appear from the records that he followed up at the Veteran's Administration Medical Center (VAMC) after his August 2015 release.

b.      Mr. Wesley's primary care provider was the VAMC. Those records indicate that he had not been seen since early 2015. His diagnoses included Paranoid Schizophrenia, Generalized Anxiety Disorder, Urethral Stricture, Essential Hypertension, Chronic Hepatitis C, Anemia, Gastro-esophageal Reflux, Osteoarthritis, Prostatitis, Hyperlipidemia, Sickle Cell Trait, Tobacco Use, and Homelessness. He was non-service connected disabled.

2.      On 12/9/2015 at approximately 11:11 a.m. Mr. Wesley was booked into the ECJ on a trespassing charge. Significant information in the record includes:

a.      The arresting officer noted that Mr. Wesley was "confrontational" at a business, "refused to exit the property" and "began to curse at other visitors." (Wesley 000033)

b.      Upon arrival at ECJ a Pre-Screening was done as well as a Mental Health Screen and an Intake Screening. As a result of these screens it was determined that Mr. Wesley had a history of schizophrenia, was treated with unknown meds at the VA and had not taken meds in three weeks. His blood pressure (BP) was 175/78, pulse (P) 84 and his weight 150 pounds.

c.      A plan was made to house Mr. Wesley in general population with low bunk. He was referred to mental health and the medical department. A release of information was obtained for the VAMC. Daily BP checks for five days were ordered.

d.      The next day he was taken to court, given a $1000 bond and a court date of 1/20/2016.

3.      Mr. Wesley was seen by a Mental Health Professional (MHP) on 12/10/2015 and seen by the psychiatrist, Dr. Mobley, on Friday, 12/11/2015. Dr. Mobley noted that Mr. Wesley was chronically mentally ill with CPS. Mr. Wesley was psychotic. His AIMS score (N.B. a rating scale to follow the development of tardive dyskinesia) was zero. Dr. Mobley re-started the Risperdal 2mg orally at night and

Vistaril 25mg orally twice a day, which was the same regimen at the time of Mr. Wesley's last incarceration, and planned to see Mr. Wesley again in four weeks.

4.    That evening Mr. Wesley was noted to be cursing and disruptive in his pod and urinating on the floor. He was moved to an Infirmary cell with 15 minute checks pending Mental Health (MH) review on Monday. Infirmary Mental Health notes were written over the weekend.

5.    The healthcare staff documented difficulty completing vital signs because Mr. Wesley was uncooperative or refused. The two BP readings recorded during the five-day period were both normal (102/66 and 144/78).

6.    On Monday, 12/14/2015 he was seen by a MHP. Mr. Wesley was noted to be "uncooperative, argumentative" and "incoherent at times." (Wesley 000891) There was a notation by the MHP that Mr. Wesley's prescribed medications were given for one day and then were out of stock. The Medication Administration Record (MAR) shows that Mr. Wesley received the Risperdal on 12/11/2015 and 12/12/2015 but not on Sunday, 12/13/2015 or Monday, 12/14/2015. The Vistaril was given on 12/11/2015 but then not on 12/12-14/2015.

Mr. Wesley's chart was flagged indicating that he met Baker Act criteria. He was kept in the infirmary in Mental Health Housing and was placed on one hour checks. Over the next week he had progress notes recorded and his BP's were noted to be 169/77 and 145/78.

7.     On 12/21/2015 Mr. Wesley was again seen by a MHP. He was noted to have normal behaviors and no mental health distress. His meds were continued and he was discharged back to general population housing.

8.     In the early morning hours of 12/23/2015 Mr. Wesley was "eating trash, hollering/preaching at others and being delusional." (Wesley 000880) Mr. Wesley's BP was elevated to 214/97 during this episode but decreased to 182/85 on re-check. However, at the time of this episode he was also "agitated....by the older guys. I'm ready to fight them." (Wesley 000884) He was returned to Mental Health Housing in the infirmary where he would remain for the rest of his incarceration. One hour checks and weekly BP checks were implemented.

9.     On the morning of 12/23/2015 Mr. Wesley was seen by a MHP and re-admitted to Mental Health Housing. That morning Mr. Wesley "refuses to engage in this session," but he "does not present with any objective evidence of acute MH distress." (Wesley 000880)

10.     On 12/23/2015 NP Lewis attempted to see Mr. Wesley in the Chronic Care Clinic (CCC) to assess his history of Unspecified Hyperlipidemia and Benign Essential Hypertension. Mr. Wesley was uncooperative. Vital signs and the exam could not be completed due to security concerns. NP Lewis notified the mental health team, continued current medication and planned to attempt CCC assessment the next week.

11.     On 12/28/2015 a Mental Health Treatment Plan was completed by a MHP. It was noted that Mr. Wesley's symptoms had been more residual in nature during his last incarceration but now he was having an acute exacerbation. (N.B. In the Individual Treatment Plan found on Wesley 000996 it appears that the medication list is incorrect and contains meds which had been prescribed during prior incarcerations but were no longer active.)

12.     Mr. Wesley was seen by Dr. Mobley on 12/29/2015 in follow-up. "He says the meds that were restarted on his last appointment are 'working just fine.'" (Wesley 000872) Mr. Wesley appeared improved and his AIMS score remained zero. Dr. Mobley's plan was for Mr. Wesley to continue his current medications and to return to clinic in six weeks.

13.     The Mental Health housing in the infirmary and the hourly checks which begun on 12/23/2015 were continued. During this time Mr. Wesley was for the most part compliant with his medications and he refused vital signs measurements.

14.     Mr. Wesley was seen on Mental Health rounds on 1/4/2016, 1/6/2016 and 1/11/2016. The description of his condition was that he was stable, in no distress and perhaps improving somewhat. In the 1/13/2016 Mental Health note, a nurse noted (Wesley 000863):

Current Status/Plan:
WESLEY, ALFRED
01-13-2016 Wed 09:30:00 PM
INF B/P - Blood Pressure Flow Sheet
BP: 151/101
Manual - BP Re-check:
Time: 21: 30
Pulse: 55
Comments: Asymptomatic On Hypertensive medication- No Provider Notified - No

PLAN:
Continue to monitor.
Chart according to the Infirmary housing level.
Notify LMHC of any new symptoms or concerns.

ADDITIONAL COMMENTS:
P/T alert and oriented x'3 no S&S of distress, asked p/t states "I'm doing good, I'm cold" P/T had blanket around him at the time. P/T
drooling and speech is slurred, still able to understand him. Refer to ARNP Pease. Calm and cooperative able to get B/P reading.

15.     On the morning of Friday 1/15/2016 NP Lewis saw Mr. Wesley and
documented (Wesley 000859):

General Condition: Well-developed, well-nourished, and hygienically challenged b male
Mental Status: Alert.
Head/Neck: Scalp WNL. No thyroid enlargement or tenderness. Neck supple.
Eyes, Ears, Nose: Sclera white. EOMs intact.
Oral: Tongue mobile, protrudinh from mpouth at rest. Speech garbled, unclear.
Heart: RRR, S1 and S2 without murmurs.
Lungs: Clear to auscultation bilaterally.
Back: ROM is within normal limits. No curvature of spine noted. Pt able to reach out upon request. No tremors noted

ASSESSMENT:
Speech deficits
R/O tardive dyskinesia, med reaction
PLAN:

Will discuss change in speech with MH-Dr. Mobley

16.     Dr. Mobley saw Mr. Wesley later that morning at approximately 11:15 a.m.
and documented (Wesley 000861):

Date: 01-15-2016 Fri Time: 11: 15

S: Reason for Encounter: Follow up: Ask to see the patient at the request of medical. He has had an abrupt change. When seen by me in December, he was doing fairly well and conversation was superficial but he was not blatantly psychotic.

Recently he has started to mumble with a thick tongue protruding through his lips. He has also been hiding under the cover and not talking at all.

He has been eating and drinking so there is function of swallowing in tact

He is sitting on his bunk and he starts to talk in mumbles that are not comprehendible. He does appear still in his neck and shoulders. He can completely stick his tongue and it does not push in either direction, it is midline.

Medical has examined him and ordered some lab to further evaluate.

Coincidentally, it is lunch and he is observed to be eating a sandwich and drinking water.

IMPRESSION: Likely he is having EPS and muscle rigidity from the Risperdal

PLAN: discontinue Risperdal

Ativan 2 mg po bid x 3 days,
Discontinue Risperdal

Benadryl 25 mg po bid x 3 days

RTC: Monday, January 18

17.    Hourly checks were continued up through 8:00 p.m. on 1/15/2015. Each of the last seven hourly checks by correctional officers (CO) indicate that Mr. Wesley was "Awake, appears well/sound." (Wesley 000016) At approximately 9:00 p.m. Mr. Wesley was found unresponsive under his bed. Cardiopulmonary resuscitation (CPR) was initiated immediately, an automated external defibrillator (AED) was applied and EMS was called. The AED did not advise or deliver a shock.

18.    EMS arrived at the patient at approximately 9:07 p.m. The initial rhythm described by EMS was "brady wide complex idioventricular rhythm." (Wesley 000978) After intubation and epinephrine, the rhythm changed to suspected ventricular fibrillation. A shock was delivered and there was a "change for a short time to irregular sinus arrhythmia with pulse." The rhythm then changed to

ventricular fibrillation followed by a "wide-complex idioventricular rhythm." The airway was clear and the cardiac arrest etiology was "presumed cardiac." Mr. Wesley was transported from ECJ at 9:23 p.m.

19.    Mr. Wesley arrived at Baptist Hospital Emergency Department (ED) at 9:28 p.m. in cardiac arrest. The initial rhythm was "PEA." (N.B. Pulseless Electrical Activity) At two points on the resuscitation flow sheet the rhythm was listed as "Torsades." (9:36 and 9:44 p.m.) (Wesley 000987) There are three rhythm strips from the ED in the chart but none of them appear to show torsades de pointes. (p. 47 of Baptist Hospital chart) Resuscitation was unsuccessful and Mr. Wesley was pronounced dead at 9:49 p.m. on 1/15/2016.

20.    An autopsy was performed on 1/17/2016. Findings included:

    a.    The cause and manner of death was (Wesley 000117):

**CAUSE OF DEATH:**    HYPERTENSIVE AND ATHEROSCLEROTIC CARDIAC DISEASE.

**OTHER CONTRIBUTORS:** SMOKING, SCHIZOPHRENIA/PSYCHOSIS.

**MANNER OF DEATH:**    NATURAL.

    b.    Hypertensive cardiac (HCVD) and renal disease with left ventricular hypertrophy, multi-vessel coronary artery atherosclerosis with an 80% blockage of the left anterior descending artery (LAD) and 40% stenosis of the left main and other major arteries. The medical examiner noted "Evidence of terminal arrhythmia."

9

c.      Two foreign bodies in the stomach. There were also undigested potatoes within the stomach.

d.      Evidence of tobacco use.

e.      No significant trauma. There were no bony fractures aside from rib fractures which were consistent with CPR.

f.      The prostate was "moderately to markedly enlarged."

g.      The central nervous system did not have any pathology.

h.      "The tongue has no bite marks or other injuries and no lesions. A layer-by layer dissection of the soft tissues of the neck, including strap muscles and large vessels, reveals no abnormalities. The hyoid bone, epiglottis and laryngeal cartilages, and vocal cords are intact and unremarkable."

i.      Drug screening was negative for the tested substances.

**Opinions:** The following are my opinions to a reasonable degree of medical probability on each of these areas based upon my training, experience, and a review of the records in this case:

I.      The care provided to Mr. Wesley by the ECJ healthcare and security personnel while he was incarcerated at ECJ during December 2015 through January 2016 was reasonable, appropriate and well within the acceptable standard of care. Specifically:

10

1.     Mr. Wesley had appropriate screenings upon intake. His past medical history was noted, release of information was obtained, a reasonable housing and treatment plan was implemented.

2.     When Mr. Wesley's psychiatric symptoms became more severe, he was appropriately moved to mental health housing with close observation. Mr. Wesley was seen by multiple MHP's and the psychiatrist. His previously effective psychiatric medications were restarted and a plan was implemented to follow him. When Mr. Wesley improved, he was appropriately moved to less restrictive housing and when he deteriorated Mr. Wesley was returned to mental health housing in the infirmary with close observation. Mr. Wesley was continuously housed in the area with the highest level of medical care and observation available at the ECJ for the three weeks prior to his death.

3.     The level of observation and documentation by the infirmary and mental health staff was reasonable and appropriate. In addition there are more than 525 observation checks on Mr. Wesley's welfare documented by security staff in the three weeks prior to his death.

4.     Mr. Wesley had a history of unspecified hyperlipidemia and benign hypertension. There were difficulties in getting Mr. Wesley to comply with vital signs checks and clinic visits. In addition, Mr. Wesley's more urgent problem was an unstable psychiatric condition. As a result, Mr. Wesley's mild blood pressure

medication and lipid medication had not been restarted before he died. Given the severity of his psychiatric symptoms and that his BP readings did not indicate a hypertensive urgency, it would be reasonable to limit the number of medications that one is giving a psychotic inmate and to get his psychiatric symptoms under control before adding additional medications for non-urgent chronic conditions. There is also evidence in the record that Mr. Wesley had been non-compliant with his medications for some period of time prior to this incarceration and it would be reasonable to track his blood pressure trend before restarting a medication.

In addition, there is no evidence in the record that Mr. Wesley's death was related to an untreated hypertensive urgency or that had he received those medications it would have changed the outcome.

5.   NP Lewis saw Mr. Wesley when requested by the healthcare staff on the morning of 1/15/2016. She did an assessment and an exam, including a neurologic exam. NP Lewis reasonably believed that Mr. Wesley was having a reaction to his psychiatric medication and she appropriately asked the psychiatrist to see him.

6.   Dr. Mobley saw Mr. Wesley that same morning. He likewise took a history and performed a neurologic exam. He noted that Mr. Wesley was able to eat and drink. He did not find angioedema, any focal neurologic finding or any distress. He did find that "recently he has started to mumble with a thick tongue protruding through his lips." He also appeared "stiff in his neck and shoulders." (Wesley

000861) (N.B. The record has the word "still" instead of "stiff." Dr. Mobley later clarified that this was a typo and should have been "stiff.") He also noted that Mr. Wesley was able to eat and drink without difficulty. There were no symptoms of an arrhythmia or any other cardiac condition when the providers evaluated Mr. Wesley on 1/15/2016 and there was no indication for referral to an ED.

With these findings, Dr. Mobley reasonably diagnosed that Mr. Wesley had extra-pyramidal symptoms (EPS) as a result of the Risperdal. He formulated a plan to discontinue the Risperdal, treat the EPS with Benadryl, use Ativan as an alternative medication and to see Mr. Wesley again the next time he was to be at the ECJ. (N.B. Benadryl is an effective medication to treat EPS and would be expected to resolve the symptoms. Since Dr. Mobley was having to stop the antipsychotic in a psychotic patient, he was prudent to begin another medication, Ativan, which helps relax the muscle rigidity of EPS and would serve as a sedative to control his mental health distress until another antipsychotic was restarted.)

7.      The emergency actions and aid rendered by the healthcare and security staff when Mr. Wesley was discovered unresponsive on the evening of 1/15/2016 were reasonable and appropriate.

8.      Mr. Wesley's death was not causally related to any of the actions that the ECJ staff took or did not take. His death was sudden, unrelated to his prior symptoms and was neither foreseeable or preventable.

9.      There is certainly no evidence in the record that NP Lewis, Dr. Mobley or any other ECJ staff deliberately failed to provide treatment for Mr. Wesley or disregarded a known serious medical need.

II.     Mr. Wesley's past medical history and autopsy findings influence my opinions as follows:

1.      I concur with the medical examiner's finding that the cause of Mr. Wesley's death was HCVD and atherosclerosis. He had an arrhythmia which suddenly lead to his death. This was more likely than not related to his enlarged heart and the 80% stenosis of one of the main coronary arteries rather than being caused by the Risperdal.

2.      EPS is an adverse reaction to antipsychotic medications. It is not an allergic reaction. It is primarily manifested by muscle spasms or rigidity, most often of the neck, shoulders, jaw and tongue. Muscle groups can also demonstrate tremors or "cogwheel rigidity" and slowed movements which mimic Parkinson Disease. EPS is not a life-threatening condition and normally responds very well to Benadryl treatment. EPS is not known to be associated with cardiac arrhythmias and likely was unrelated to his later sudden cardiac death.

3.      Risperdal is an atypical, or second-generation, anti-psychotic. All anti-psychotic medications carry some risk of EPS adverse effects and long-term tardive dyskinesia. However, the second-generation anti-psychotics were brought

14

to market because they have less incidence of EPS and tardive dyskinesia and they are felt to be safer than the older anti-psychotics.

Tardive dyskinesia is a long-term, usually irreversible, adverse effect of antipsychotic medications characterized by abnormal body movements. The Abnormal Involuntary Movement Scale (AIMS) was developed to track the development and severity of tardive dyskinesia over time. Mr. Wesley's AIMS scores were zero meaning he was not showing signs of developing tardive dyskinesia. This did not mean that he could not or would not develop acute EPS later during his incarceration.

4.    All antipsychotics including Risperdal can increase the risk of fatal ventricular arrhythmias. However, the potential for fatal cardiac arrhythmias is dose dependent and is much more likely in patients receiving higher daily doses of antipsychotics. The usual effective daily dose of Risperdal is up to 16mg/day. Mr. Wesley was on 2mg/day. Thus, the dose he was prescribed was reasonable and the minimum effective dose. Without question, Mr. Wesley's severe psychotic symptoms required treatment with an antipsychotic medication. Risperdal at 2mg/day was a reasonable choice and would minimize adverse effects.

One arrhythmia that antipsychotics can cause is torsades de pointes (torsades) due to the prolongation of the QT interval on the EKG. Mr. Wesley was

at lower risk of this complication because he did not have prolongation of the QT interval on his baseline EKG and because he was on a low dosage of Risperdal.

Torsades was not the presenting rhythm when found by EMS and though it is mentioned on the resuscitation flow sheet at the ED, I did not see evidence of torsades on the rhythm strips I reviewed.

5.    I am not aware of any medical literature demonstrating an association between the development of EPS and the risk of torsades or other arrhythmia. Thus, Mr. Wesley's development of EPS without any cardiac symptoms or any suggestion of an arrhythmia should not have resulted in Dr. Mobley or NP Lewis concluding that Mr. Wesley was at increased  risk of an arrhythmia. The standard of care would not require that they take any other actions than those which were taken, i.e. stop the Risperdal, treat the EPS, keep the patient under observation and follow-up to ensure that the EPS has resolved and to re-start another anti-psychotic.

III.    The Policies & Procedures in place at the ECJ regarding medical care were reasonable and appropriate.

IV.    Items Within the Plaintiff's Expert Report With Which I Disagree or Which Require Specific Comment

A.    <u>Dr. Jason Adler</u>

1.      Timeline Section on pages 1-5 of the report (N.B. The pages and items are not numbered. For reference I have numbered the paragraphs in this section 1-25 and will refer to them by the paragraph and page number.)

a.      Paragraph 2, Page 2- In addition, a medical and mental health referral was done along with low bunk, blood pressure checks and a release of information for prior medical records.

b.      Paragraph 5, Page 2- Overnight on 12/11-12/2015 Mr. Wesley was moved to mental health housing in the infirmary area secondary to disruptive behavior and urinating on the floor in general population.

c.      Paragraph 6, Page 2- Mr. Wesley had been prescribed two medications by Dr. Mobley on Friday, 12/11/2015. He was administered both of those medications that evening. Later that night he was moved to mental health housing for the disruptive behavior. Over the weekend once he was housed in the infirmary, one or both of his prescribed medications was unavailable. Dr. Alder states: "As a result, Mr. Wesley was considered not appropriate for general population and was be admitted (sic) to the infirmary." There is no evidence that the availability of his second and third days' supply of the new medications played any role in his psychiatric symptoms or any subsequent events.

d.     Paragraphs 8-9, Page 3- The MAR is available (Wesley 000068-000071) and shows that he had access to and was mostly compliant with his medication during this time.

e.     Paragraph 10, Page 3- I did not see evidence in the record that Mr. Wesley ever saw or was treated by Dr. George Smith. He was to be seen that day in CCC for those two chronic conditions but the visit could not occur because Mr. Wesley was uncooperative and there were security concerns.

f.     Paragraphs 15-17, Pages 2 and 3- Mr. Wesley was seen first by NP Lewis who then asked Dr. Mobley to see him.

2.     Medical Opinion Section on pages 5-8 of the report (N.B. I have numbered paragraphs in this section 1-17 for reference.)

a.     Paragraph 1, Page 5- In addition to holding the opinion that "the treatment team and staff" were not negligent, I do not believe that any of their actions or alleged inactions have any causal link with Mr. Wesley's death. Thus, I do not agree that Mr. Wesley's death was preventable or that he "would be alive today" but for their actions.

b.     Paragraph 4, Page 5- Dr. Mobley saw Mr. Wesley on 12/11/2015. He re-affirmed his previous diagnosis of paranoid schizophrenia and he re-started the medications which had previously been effective in treating Mr. Wesley, Risperdal and Vistaril. This was a reasonable and appropriate course of action.

18

c.      Paragraph 5, Page 6- The MAR reflects that Mr. Wesley did not get a few doses of the two medications which had been ordered only the day before and were ordered when Mr. Wesley had a different housing assignment. It would not be unusual or inappropriate for it to take several days for a new prescription to be filled in a jail setting. The two additional days before his medications were re-started did not have an effect on Mr. Wesley's subsequent course.

d.      Paragraph 6, Page 6- The orders and MAR are clear on which medications were ordered and administered.

e.      Paragraph 7, Page 6- I strongly disagree that "there is no record of a neurologic exam" and that "a focused exam was not performed and a reasonable differential not considered." It is my opinion that Dr. Mobley did consider "an allergic reaction, angioedema or other causes" and finding none his plan of stopping the offending medication, adding medications to treat the EPS and the psychosis, continuing close medical and mental health observation and follow-up was well within the standard of care. The finding of EPS does not by itself mandate referral to an ED and there were no other indications for ED referral.

f.      Paragraph 8, Page 6- NP Lewis saw Mr. Wesley earlier in the day. He was not "sent away without any meaningful intervention." She did take action and ask the attending physician, whose specialty it was to deal with side effects of psychotropic medications, to evaluate Mr. Wesley.

19

g.     Paragraph 9, Page 7- As discussed above, NP Lewis saw Mr. Wesley before Dr. Mobley and "medical monitoring" was already in place in the infirmary.

h.     Paragraph 10, Page 7- Dr. Adler's statement that Mr. Wesley was "never seen alive again" implies that he was not seen alive after being seen by NP Lewis. Yet, he was on hourly monitoring and was seen, observed and recorded to be alive and well up through 8:00 p.m. that evening, less than an hour before he was found unresponsive.

i.     Paragraph 11, Page 7- I wholeheartedly agree.

j.     Paragraph 12, Page 7- I agree. It is my opinion that NP Lewis and Dr. Mobley did consider these other possibilities. There was no evidence that Mr. Wesley was suffering from an allergic reaction or angioedema. He did not display any respiratory distress or rash. On autopsy there was no evidence of angioedema or edema of the upper airway. There was no evidence of a focal neurologic finding and no reason to suspect a stroke. On autopsy no stroke was present. There was no reported or suspected head injury or trauma when NP Lewis and Dr. Mobley saw Mr. Wesley on the morning of 1/15/2016. Likewise there was no significant trauma found at autopsy. There was no suspicion that Mr. Wesley had used any other drugs while he was housed in the infirmary. The autopsy confirmed that he had not suffered an acute drug ingestion.

It is my opinion that NP Lewis and Dr. Mobley likely did consider these other possibilities and ruled them out. However, even if they did not consider each of these other possibilities, it is irrelevant because none of the listed conditions were in fact present or caused Mr. Wesley's death.

k.      Paragraph 13, Page 7- I do not follow the logic of this paragraph. Nevertheless, EPS does not require referral to an ED. There is no indication in the record that if Mr. Wesley had been present in the ED they would have diagnosed or prevented his sudden fatal arrhythmia. In addition, there was communication with the attending physician and documentation of that communication.

l.      Paragraph 14, Page 7- I disagree that a patient presenting to an ED with EPS would have been "likely admitted." Having eaten foreign bodies nearly a month before in the setting of acute psychosis does not change that. He was not in "the general population" but instead was being "medically observed" in mental health housing in a jail infirmary staffed around the clock by nurses.

m.      Paragraph 15, Pages 7-8- The noted "inconsistencies in the record" do not require specific comment as they are unrelated to Mr. Wesley's treatment or his cause of death. The last sentence articulates Dr. Adler's suspicions but I am not certain the exact nature of his opinion in that sentence.

n.      Paragraph 16, Page 8- Dr. Adler correctly summarizes Mr. Wesley's course of incarceration but then his last sentence "Mr. Wesley's condition

21

worsened while detained and there was no medication to give him" is not borne out in the records I reviewed. To the contrary, his condition improved with the medications he was given daily.

      o.     Paragraph 17, Page 8- I disagree that NP Lewis and Dr. Mobley did not recommend "close medical observation." I also disagree that they did not "perform a reasonable history or exam" and that they failed "to intervene, denied him the opportunity for the appropriate diagnostics, therapeutics and interventions he needed."

B.    <u>Dr. Larry Kirstein (Psychiatry)</u>

1.    Opinion section, Paragraph 1, Page 2 (N.B. I have numbered the paragraphs 1-6 in the opinion section on pages 2 and 3) - I disagree that the care fell below the standard of care and I certainly found no evidence in the record that Dr. Mobley "showed a disregard for the health of Alfred Wesley."

2.    Opinion section, Paragraph 2, Page 2- The ECJ staff absolutely did do this as evidenced by his housing in the infirmary, 24 hour per day nursing presence, mental health infirmary rounds and hourly observation by staff.

3.    Opinion section, Paragraph 1, Page 2- I disagree that the standard of care required that Mr. Wesley have constant blood pressure monitoring. The infirmary at ECJ was certainly equipped to perform blood pressure checks, but constant blood pressure monitoring was neither feasible for a mental health housing unit in

a jail nor required for EPS. I know of no medical literature which links EPS with elevated BP. In addition, it is difficult to measure blood pressure in a person with muscle rigidity and the readings are likely to be inaccurate.

4.      Opinion section, Paragraph 4, Page 3- I disagree. The ECJ staff had Mr. Wesley's prior ECJ medical records which included records from the VAMC. In addition, the ECJ treatment records were more current than his last visit to the VAMC and they did fill out a release of information to get those records.

5.      Opinion section, Paragraph 5, Page 3- I am unable to follow all of the language of the first sentence but I disagree that the standard of care required that Mr. Wesley be transferred to an ED for his presentation on 1/15/2015 or that such a transfer would have prevented his death. I also strongly disagree that Dr. Mobley "disregarded Mr. Wesley's serious medical condition."

6.      Opinion section, Paragraph 6, Page 3- I do not understand who would be expected to review and approve the medical decisions of the attending psychiatrist, who had treated Mr. Wesley multiple times over the preceding year.

C.      Dr. Joel Kahn (Cardiology)

1.      Opinion section, Paragraph 2, Page 2 (N.B. I have numbered the paragraphs 1-5 in the opinion section on pages 2 and 3) - I disagree that the EMS run sheet indicates that Mr. Wesley "was suffering a cardiac arrest due to a rhythm known as Torsades De Pointes."

2.      Opinion section, Paragraph 3, Page 3- The symptoms Mr. Wesley was having on 1/15/2015 were not related to any cardiac symptoms and are not reasonably suggestive that a prolonged QT might exist. Mr. Wesley did not have a prolonged QT on his baseline EKG. The standard of care for Mr. Wesley's symptoms on 1/15/2015 did not include either transfer to an ED, an EKG or cardiac monitoring. What an incidental EKG would have shown on that day is pure speculation.

3.      Opinion section, Paragraph 4, Page 3- I disagree that the staff "failed to document and reconcile Alfred Wesley's medications." I am not sure to what this refers. I believe that they did recognize an abrupt change in his condition and did provide care which was reasonable and appropriate.

These opinions are expressed as requested to a reasonable degree of medical probability or likelihood.  I reserve the right to review additional materials as noted or as they become available and to amend or modify these opinions based on the review of additional materials.

**(ii)     The facts or data considered by the witness in forming these opinions.**

To assist me in forming these medical opinions I have reviewed records in this case, including:

1. The Complaint

2. ECJ Medical & Administrative File

24

3. Medical Records from:

     a. VAMC

     b. Escambia County EMS

     c. Baptist Hospital

4. Unsworn Statements of:

     a. NP Lewis

     b. Dr. Mobley

     c. Lonnie Wesley, III

5. Autopsy Report

6. Plaintiff Expert Reports

     a. Dr. Jason Adler

     b. Dr. Larry Kirstein

     c. Dr. Joel Kahn

7. Policy and Procedures for Medical Care at ECJ

  **(iii)** **Any exhibits that will be used to summarize or support these opinions.**

None at this time other than the records set forth above.

  **(iv)** **The witness's qualifications, including a list of all publications authored in the previous 10 years.**

See Appendix A for my current CV.

**(v)     A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.**

See Appendix B for my case list from the last four years.

**(vi)    A statement of the compensation to be paid for the study and testimony in the case.**

See Appendix C for my fee schedule.

X _Thomas D. Fowlkes, M.D._
_____
Thomas D. Fowlkes, M.D.



**Thomas D. Fowlkes, M.D.**
1203 Medical Park Drive
P.O. Box 1955
Oxford, MS 38655
Cell: 662-801-7508
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with 20 years of practice in Correctional Medicine.

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters.

Areas of expertise include:   Correctional Healthcare
Deaths in Custody
Drug Abuse and Effects of Addiction
Drug testing interpretation and effects of substances
Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine)- July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Addiction Medicine)- Dec. 2010 - Dec. 2020

Certified Correctional Healthcare Professional - Physician (CCHP-P) - July 2017 - June 2019

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2022

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

1998-Present          Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015

2011- Present         Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judge Andrew Howorth

2007- Present         Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi

2018- Present         Co-owner and Physician at Right Track Medical Group, an outpatient provider of mental health services in North Mississippi

**Thomas D. Fowlkes, M.D.**

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice |
| 1999-Present | Served as Deputy Medical Examiner Investigator for Lafayette County MS from 1999-2008 after completing 40-hour Death Investigation Certification Class. Since 2008 I have served as the medical consultant to the Lafayette County Coroner. |
| 2011-Present | Medical Director for A&D Services for Region IV Comm. Mental Health Center. 2011-2014 Detox Services at Tupelo CSU. 2017-Present at Corinth (Part-time) |
| 2015- 2018 | Director of Professional & Medical Relations/Addiction Physician for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN |

# Thomas D. Fowlkes, M.D.

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of  Public Safety
Served as flight physician for STAT Med-evac helicopter program

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS/RECOGNITIONS

American College of Correctional Physicians
Fellow of the American Society of Addiction Medicine
Mississippi Society of Addiction Medicine
North Mississippi Medical Society/Mississippi State Medical Association/American Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight.* 3rd ed. Ed. Kuehl A. Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command.* 1st ed. Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services.* Vol. 23 (1990): 20-27. Print.

## PRESENTATIONS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update*
June 22, 2018, Pearl, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update*
April 13, 2018, Gulfport, MS

**Thomas D. Fowlkes, M.D.**

## PRESENTATIONS (cont.)

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* March 9, 2018, Oxford, MS

"Case Studies in Controlled Substance Prescribing" at *MPHP Prescribers' Summit: Controlled Substance Update* October 13, 2017, Jackson, MS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation Prescribers' Summit* March 31, 2017, Oxford, MS
"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

" Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit* June 24, 2016, Gulfport, MS

" Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit* April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

**Thomas D. Fowlkes, M.D.**

## PRESENTATIONS (cont.)

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit*, November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit*, October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference*, August 22, 2013, Pickwick, TN

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS (AS OF 12/05/2018)**

Angela Anderson et al vs. Marshall County MS & BMH-DeSoto Hospital
Cause # 3:12-CV-92
US Federal District Court-No. Miss

State of Mississippi v. Shawn Hunt
Cause # CR2013-167SMD
DeSoto County (MS) Circuit Court

Gallion v. Hinds County et al.
Case # 3:12-CV-736
US District Court, Southern District MS

State of Mississippi v. Kimberly Dobbs
Third Judicial Circuit (MS) Court

State of Mississippi v. Brian Adams
Cause # LK11-40
Third Judicial Circuit (MS) Court

State of Mississippi v. Mark Tutor
Cause # Rankin 24,819
Third Judicial Circuit (MS) Court

State of Mississippi v. Cileste Donald
Cause # LK12-196
Third Judicial Circuit (MS) Court

State of MS v. Joshua Blunt
Cause # 2016-060-CR
Grenada County (MS) Circuit Court

MS Board of Medical Licensure v. Ikechukwe Okorie, MD
Hinds County, MS

MS Board of Nursing v. Justin Robbins
MS Board of Nursing v. Jennifer Robbins
Hinds County, MS

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Lee v. Jackson County MS et al.
Case # 1:13-CV-441
US District Court, Southern District MS

Paylan v. Teitelbaum et al.
Case # 1:15-cv-159
US District Court, Northern District FL

Bost v. Wexford et al.
Case # 1:15-cv-3278
US District Court, Maryland

Singleton  v. Southern Health Partners et al.
Case # 15-EV-000626
State Court of Fulton County, State of Georgia

E/O Filichia v. Correct Care Solutions et al.
Case # 2:16-cv-296
US District Court, Southern District OH

Ajibade v. John Wilcher et al.
Case # 4:16-cv-82
US District Court, Southern District GA

Benoit  v. Lincoln County et al.
Cause # 12L6-CC00060
Circuit Court of Lincoln County, State of Missouri

E/O Clark v. Hamilton County, NaphCare  et al.
Case # 1:15-cv-512
US District Court, Southern District OH

E/O Hays v. Prison Healthcare et al.
Case # 2:16-cv-384
US District Court, Northern District AL

Sparks v. Tooke et al.
Civil Action # 099912-A
District Court, 7th Judicial District, State of Wyoming

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Brooks (E/O Mixon) v. Wilkinson County et al.
Case # 5:17-cv-00033
US District Court, Middle District GA

E/O Gracia v. Orange County et al.
Case # 6:17-cv-01423
US District Court, Middle District FL

Parkes  v. Jasper County et al.
Cause # 18AO-CC00016
Circuit Court of Jasper County, Missouri

E/O Leverett v. Correct Care Solutions et al
Cause # 2017RCSC00672
State Court of Richmond County, Georgia

Thomas D. Fowlkes, M.D.

**FEE SCHEDULE**

I am being paid $500 per hour for review, study & testimony in this case plus travel expenses.