In the Matter Of:

*LONNIE WESLEY vs*

*MOBLEY*

*3:18-CV-01368-MCR-CJK*

*THOMAS FOWLKES, MD*

*May 13, 2019*



ALPHA REPORTING CORPORATION

*1st in Reporting, 1st in Service, 1st in Technology*

**We Bridge the State and Cover the Nation!**

www.alphareporting.com
800-556-8974

---

2

1    The videotaped deposition of THOMAS FOWLKES, M.D.
2  is taken on this, the 13th day of May, 2019, on behalf of
3  the Plaintiff, pursuant to notice and consent of counsel,
4  beginning at approximately 9:10 a.m. at Right Track
5  Medical Group, Oxford, Mississippi.
6    This deposition is taken pursuant to the terms
7  and provisions of the Federal Rules of Civil Procedure.
8    All forms and formalities, excluding the
9  signature of the witness, are waived, and all objections
10  are reserved, except as to form of the question, to be
11  disposed of at or before the hearing.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Alpha Reporting Corporation**

---

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT COURT OF FLORIDA
                    PENSACOLA DIVISION
3
   _____
4
   LONNIE WESLEY, AS PERSONAL      )
5  REPRESENTATIVE OF THE ESTATE    )
   OF ALFRED E. WESLEY, DECEASED   )
6                                  )
7        Plaintiff,                )
                                   )
8  VS.                            )  NO. 3:18-CV-01368-MCR-CJK
9  ESCAMBIA COUNTY, LAWRENCE E.    )
   MOBLEY, III, M.D. AND ANDREA    )
10 C. LEWIS, ARNP, F/K/A ANDREA    )
   C. PEASE, ARNP,                 )
11                                 )
12       Defendants.               )
13 _____
14           VIDEOTAPED DEPOSITION
15                   OF
16            THOMAS FOWLKES, M.D.
17              MAY 13, 2019
18
19
20
21
22        ALPHA REPORTING CORPORATION
23            236 Adams Avenue
              Memphis, TN 38103
24            901-523-8974
              www.alphareporting.com
25

**Alpha Reporting Corporation**

---

3

1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4        ADRIAN R. BRIDGES, ESQ.
         Michles & Booth, P.A.
5        501 Brent Lane
         Pensacola, Florida 32503
6        850-438-4848
         abridges@michlesbooth.com
7
8  FOR THE DEFENDANT ESCAMBIA COUNTY:
9        SCOTT J. SEAGLE, ESQ.
         Coppins Monroe, P.A.
10       1319 Thomaswood Drive
         Tallahassee, Florida 32308
11       850-422-2420
         sjseagle@coppinsmonroe.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Alpha Reporting Corporation**

**EXHIBIT**
**11b**

**4**

```
1   FOR THE DEFENDANTS ANDREA LEWIS, ARNP AND
    LAWRENCE MOBLEY, M.D.:
2
3         GREGORY K. RETTIG, ESQ.
          Quintairos, Prieto, Wood & Boyer, P.A.
4         114 E. Gregory Street, 2nd Floor
          Pensacola, Florida 32502
5         850-434-6490
          gregory.rettig@qpwblaw.com
6
7   ALSO PRESENT:
8         Steve Cummings, Videographer
9         Ashley Frye, Dr. Fowlkes's Personal Assistant
10
11
12
13
14
15
16
17
18
19
20
21   COURT REPORTING FIRM:
22
23        ALPHA REPORTING CORPORATION
          AMY McCULLOUGH, CCR, LCR
24        236 Adams Avenue
          Memphis, Tennessee 38103
25        901-523-8974
          www.alphareporting.com
```

---

**6**

```
1         THE VIDEOGRAPHER:  We are now on the record.
2    Today is May the 13th, 2019.  The time is 9:10 a.m.  This
3    is the videotaped deposition of Dr. Thomas Fowlkes.  At
4    this time, the witness may be sworn in by the court
5    reporter.
6         THE REPORTER:  Okay.  I am going to swear you in.
7    Will you, please, raise your right hand?
8         THOMAS FOWLKES, M.D.,
9    having been first duly sworn, was examined and testified
10   as follows:
11              EXAMINATION
12   BY MR. BRIDGES:
13   Q.   Good morning.  Doctor, could you state your --
14   your full name for the record, please?
15   A.   Thomas Fowlkes.
16   Q.   And, Mr. Fowlkes -- or, Dr. Fowlkes -- I'm sorry
17   -- my name is Adrian Bridges.  I'm here to take your
18   deposition today regarding a claim brought on behalf of
19   Mr. Wesley against Escambia County, Nurse Lewis and
20   Dr. Mobley.
21        Are -- are you in a position to give your opinions in
22   this case today?
23   A.   I am.
24   Q.   I've got what was provided to me back in December
25   of last year as a -- approximately 35 pages that I believe
```

---

**5**

```
1              EXAMINATION INDEX
2
3   DEPONENT THOMAS FOWLKES, M.D.:
      BY MR. BRIDGES                              6
      BY MR. SEAGLE                             101
4
5
6              (NO EXHIBITS ATTACHED)
7
8
9
10             OBJECTION INDEX
11
      BY MR. ANDERSON  . . . . . . . . . . . . . . . . 25
12    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 29
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 31
13    BY MR. RETTIG  . . . . . . . . . . . . . . . . . 32
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 38
14    BY MR. RETTIG  . . . . . . . . . . . . . . . . . 38
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 45
15    BY MR. RETTIG  . . . . . . . . . . . . . . . . . 47
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 47
16    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 48
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 55
17    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 58
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 62
18    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 63
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 73
19    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 73
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 77
20    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 87
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 91
21    BY MR. SEAGLE  . . . . . . . . . . . . . . . . . 98
      BY MR. SEAGLE  . . . . . . . . . . . . . . . . .100
22
23
24   DEPONENT'S CERTIFICATE                       105
25   REPORTER'S CERTIFICATE                       106
```

---

**7**

```
1    encompasses your report as well as your CV, your testimony
2    list and then a description of the fees that you charge to
3    give depositions and such -- your fees in this case.
4         Is -- is that -- is that report that was disclosed
5    your final report in this case?
6    A.   It is.
7    Q.   You've received some additional materials since
8    issuing that report; is that correct?
9    A.   That is correct.
10   Q.   At -- if you would, I -- I was provided them this
11   morning, but just go ahead and list out, if you would, the
12   materials you've received since issuing this report in
13   December, please.
14   A.   I have received the depositions of Nurse
15   Practitioner Lewis and Dr. Mobley.  I have received the
16   depositions of the three plaintiff's experts, and I have
17   received the reports of the other defense experts.  I
18   believe -- and to the best of my knowledge, that's --
19   that's the bulk of -- oh, I'm sorry.  I also received a
20   more comprehensive VA record submission.
21   Q.   When you said you received those depositions,
22   have you read those dep- -- deps- -- depositions as well?
23   A.   I have.
24   Q.   After reading those additional materials that you
25   were provided, has that caused you to change, expound upon
```

8

1  or modify the opinions in your December of 2018 report in
2  any way?
3    A.  It does not cause me to change any of my
4  opinions, and if you want to ask me, you know,
5  particularly about any questions it might or might not
6  change my opinions of the -- of -- my opinions of the
7  experts' reports, themselves, based upon their deposition
8  testimony.
9    Q.  You were disclosed as having a -- a number of
10  opinions in this case, and -- and so I want to -- I -- I
11  -- I want to try to see if there's anything that I can
12  avoid asking you about or if we need to cover all -- all
13  of the areas.  Both sides have retained cardiologists in
14  this case.  You have offered some testimony or opinions
15  regarding some of the, what I would call, cardiac issues.
16    Is -- is it your intention to testify regarding any of
17  the cardiac issues in this case or more broadly the cause
18  of Mr. Wesley's death?
19    A.  If I am asked about them, yes, it is my intention
20  to do so.
21    Q.  There are circumstances where physicians would
22  defer, as you've probably seen in the -- in the
23  depositions you've been provided -- defer to physicians
24  with other specialties for those opinions.
25    Would -- would you intend to defer to the cardiologist

---

10

1  said more about that?  Any changes that you would make to
2  the substance or the form of the report, itself?
3    A.  Not that I'm aware of at this time.  If you would
4  like to ask me questions about specific items, I can,
5  perhaps, clarify them for you, but not that I'm aware of
6  at this time.
7    Q.  Okay.  And just so we're clear, I'm -- I mean, I
8  -- I'm going to ask you about certain sections in your
9  report.  Mine is a broad question, though, that says,
10  after reviewing the entirety of the report, is there
11  anything that -- without any questions or input from
12  myself, that you would change in the -- in any item in the
13  form or substance of that report, itself?
14    A.  I am only aware of one minor typo that I caught,
15  but it was -- it's really not substantive.  It regards a
16  -- a numbering on a -- one of the plaintiff's reports but
17  nothing of substance, that I'm aware of.
18    Q.  And could you identify that for me, please?
19    A.  Yes.  (Examining document).  It is on Page 22 of
20  the report.  My -- my Number 3 on that, it says, opinion
21  section, Paragraph 1, Page 2, that apparently was cut and
22  pasted from above.  It's actually Paragraph 3, Page 3
23  that, that references but --
24    Q.  Anything else?
25    A.  Not that I'm aware of at this time.

---

9

1  retained by the defense for opinions regarding cardiology,
2  or -- or do you stand by your own opinions?
3    A.  Well, in general, I stand by my own opinions.
4  Certainly, if you ask me a -- a particular question, I may
5  have my own opinion or I might say that it was more
6  appropriately answered by someone else, but I certainly
7  have my opinions about those matters.
8    Q.  The same type of question regarding Dr. Mobley.
9  The defense and the plaintiff have -- have identified
10  experts to specifically address Dr. Mobley and the
11  standard of care that applies to him and the treatment
12  that he provided.  Your report addresses that as well.
13    Would you -- do you intend to testify regarding either
14  the standard of care or the quality of treatment provided
15  by Dr. Mobley?
16    A.  Well, certainly, as it relates to the provision
17  of mental health services within a correctional facility,
18  yes, it would be my intention to offer those opinions.
19    Q.  Okay.  Have you had a chance to review in
20  preparation for today your report?
21    A.  I have.
22    Q.  In reviewing the report, have -- is there
23  anything in it that you -- af- -- after reading it, that
24  you think to yourself, I wish I had phrased it
25  differently.  I wish I had not said this.  I wish I had

---

11

1    Q.  Okay.  Looking at your CV now, it lists a number
2  of -- of publications and presentations.
3    In your opinion, do any of the publications have any
4  relevance or bearing on the issues in this particular
5  case?
6    A.  They do not.
7    Q.  The same question for your presentations.
8    A.  They do not.
9    Q.  I appreciated you provided us an updated
10  testimony list that's current as of February of this year
11  that has the cases you've testified in.
12    Any of those cases that you've testified in, do they
13  deal with any of the issues or any of the facts or
14  circumstances that will be relevant to the issues in this
15  particular case?
16    A.  To the best of my knowledge, they do not.
17    Q.  Could you break down for me the number of times
18  that you've testified what percentage would be on behalf
19  of a -- a plaintiff or what percentage would be on the
20  behalf of a defendant?
21    A.  So -- so you are referencing specifically my
22  Federal case list?  You would like me to look at it and
23  tell you which of -- I mean, to what extent these are
24  plaintiff versus defense on this Federal case list; is
25  that correct?

1    Q.   Yes.
2    A.   (Examining document).  Well, I'm going to limit
3  -- if you don't mind if I answer the question limited to
4  the -- limited to the civil cases which involve
5  correctional medicine.  Because the first page is related
6  to my work on behalf of Drug Court where I'm testifying
7  for the Court and then some of the other regulatory bodies
8  where I'm testifying either for the regulatory body or for
9  the defendant provider, so I'm going to exclude those, if
10  you don't mind.
11       And it appears looking at the list of cases that
12  relate to correctional medicine, that it's about 50/50,
13  plaintiff versus defense.
14       Q.   And in those -- in those cases that you've
15  testified in -- and -- and I appreciate you distinguishing
16  the types of cases you testified in -- in those -- in --
17  in what capacity are you testifying?
18       In other words, in this case, you've -- you've been
19  disclosed and have commented on the care of a medical
20  doctor, a nurse -- a nurse and causation opinions as well
21  that you're offering.
22       In what capacity, if you could, do you -- have you
23  testified before on behalf of either plaintiffs or
24  defendants?
25       A.   In that same capacity.  I mean, so most of the

1  cases are correctional medicine cases that involve those
2  same types of defendants.  Some of them also have security
3  defendants, security staff, and so there will be
4  opinions about that as well about their -- about their
5  emergency actions.
6       Q.   Now, the testimony list you've given me, that
7  includes cases that are not just either administrative,
8  I'll call them, or jail cases.
9       Are there other civil cases as well such as medical
10  negligence cases or personal injury cases?
11       A.   Perhaps, I don't understand the question exactly,
12  but the -- the cases that are on the last two pages of the
13  Federal case list are all correctional cases that involve
14  issues of either medical negligence or -- or -- or -- or
15  Federal 1983 actions or both.  I -- I don't understand the
16  question, otherwise, though.  I'm sorry.
17       Q.   Are there other types of civil cases within which
18  you have given a deposition or testified at trial?
19       A.   Yes.
20       Q.   Okay.  Are those on that list?
21       A.   They are.
22       Q.   Okay.  And in those types of cases, what types of
23  cases would those be?  Would those be medical negligence
24  cases outside the scope of a jail facility; outside the
25  scope of 1983 claims?

1    A.   (Examining document).  So the one that I
2  see that -- that stands out to me is a -- is on Page 2.
3  It's a Florida case that involves a -- a physician who
4  sued the University of Florida for civil rights violations
5  for -- essentially for having her to get a substance abuse
6  evaluation.
7       So it's a doctor who was the defendant and -- I mean,
8  I'm sorry -- the doctor was the plaintiff, and I was
9  retained on behalf of the University of Florida to -- my
10  opinion was that the substance abuse evaluation was
11  reasonable.  Does --
12       Q.   And --
13       A.   -- does that --
14       Q.   -- and do you do --
15       A.   -- does that help?  Does that answer your
16  question --
17       Q.   I'm sorry.  Go ahead.
18       A.   I was just going to say does that answer your
19  question about that type -- that case?  The other cases
20  on -- on the -- on the first page are more related to Drug
21  Court and sub- -- substance abuse test -- drug testing or
22  regulatory matters involving the Board of Licensure or the
23  Board of Nursing in Mississippi.
24       Q.   Okay.  What I want to make sure, though, is -- is
25  -- and, again, I appreciate you breaking down the types of

1  cases that are on that Federal testimony list.  What I --
2  what I want to make sure, though, is there's not a
3  separate type of case or another type of case that's --
4  that you've testified in that's not listed on that
5  testimony list; is that correct?
6       A.   Well, this is a Federal ca- -- this is my Federal
7  case list, which lists each case that I've given sworn
8  testimony either by a deposition or at trial in the last
9  four years, and, yes --
10       Q.   Okay.
11       A.   -- that is all --
12       Q.   And that --
13       A.   -- that is all of them in the last four years.
14       Q.   Okay.  So every type of case you've testified in
15  is on that list?
16       A.   That is correct.
17       Q.   Okay.  And it sounds like, then, you -- in the
18  last four years, your -- your testimony has been limited
19  to cases that are either administrative or involving jails
20  in some way, shape or form.
21       Is -- is -- am I summarizing that correctly?
22       A.   You are summarizing this -- this list correctly.
23  I have been retained on other cases that I have not given
24  sworn testimony about that are -- involve other matters
25  most specifically substance abuse.

16

1 So treatment in a drug addiction treatment facility or
2 some other substance abuse issue, so I've given reports.
3 I have not been deposed, I don't believe, except for what
4 I -- I mean, I haven't been deposed except for what I've
5 listed on this list, but I've been retained in other types
6 of cases most specifically involving substance abuse.
7    Q.   Okay.  And -- and, no, you -- you answered my
8 question, and then now we'll get onto the next one:  Which
9 is outside of your list of testifying, in what other cases
10 do -- do you -- do you provide expert services?  And it
11 sounds like you do it in cases involving addiction.  Do
12 you do any expert work in non-jail facility medical
13 negligence cases?
14    A.   I -- I have on occasion.  Within the last year,
15 the -- the bulk of my -- certainly the -- the vast
16 majority of my cases have been correctional medicine
17 cases.  But I am occasionally asked and occasionally will
18 review -- review matters that don't involve correctional
19 medicine, but the vast majority of my work is correctional
20 medicine.
21    Q.   And approximately how many cases do you review a
22 month as -- as an expert regardless of -- of -- in what
23 area your -- your review entailed?
24    A.   I -- I don't keep a list specifically of that.  I
25 would say something on the order of three -- three to

17

1 four.
2    Q.   And approximately how long has -- has that been
3 going on?
4    A.   For approximately the last 18 months.  It -- it
5 might be getting closer to two years now but the last 18
6 to 24 months.
7    Q.   Would -- what was different before two years ago,
8 approximately?  Was the number greater or less?
9    A.   It was less.  I was doing only a spattering of
10 expert witness work, and it was not necessarily involving
11 correctional medicine.  So I started doing correctional
12 medicine cases a couple of years ago, and after that, I
13 just have -- have gotten more -- more referrals for that
14 and more calls for that.  So that's the -- what I've
15 limited my practice to for the most part -- my expert
16 witness work to the most part.
17    Q.   What caused the change?
18    A.   I -- I reviewed -- I -- or I worked on a case
19 involving -- it's listed -- I believe it's the first one
20 listed on here.  (Examining document).  It's the first one
21 listed on my case list, so it's been close to four years
22 ago now.  It was a correctional medicine case.  I enjoyed
23 doing that case, and I began getting interested in it
24 and -- and -- and taking more of those kinds of cases.
25    Q.   Do you advertise on any services?

18

1    A.   I -- I do advertise in expert witness
2 directories.  I don't know -- I don't call that services.
3 I'm not exactly sure.  I don't work for any services, but
4 I -- I am listed in expert witness directories.
5    Q.   Okay.  I want to talk -- now, let's -- we'll --
6 we'll -- we'll switch and start talking about the day
7 that -- that Mr. Wesley passed away, and -- and -- and
8 we'll start with your review of -- well, actually, let me
9 ask you this:  When you issued the report, you -- you had
10 reviewed some unsworn statements; is that correct?
11    A.   That is correct.
12    Q.   Did you rely on -- in -- in reviewing your
13 report, did you rely -- or preparing your report, did you
14 rely upon any information in the unsworn statements when
15 determining the sequence of events on Mr. Wesley's last
16 day?
17    A.   I would say that, no, I did not rely upon that.
18 I relied upon the records, but the information in the
19 unsworn testimony confirmed what I had already concluded
20 from reviewing the records.
21    Q.   When you reviewed the records, in what order did
22 you confirm prior to reviewing the unsworn statements,
23 that Mr. Wesley was evaluated by either Nurse Lewis or
24 Dr. Mobley?
25    A.   I concluded that he was seen by Nurse

19

1 Practitioner Lewis first on that morning at the request of
2 one of the nurses and that he -- she saw him that morning,
3 and then at her request, she requested Dr. Mobley to see
4 him and then he saw Mr. Wesley later that morning.
5    Q.   And what information did you use to conclude that
6 absent the unsworn statements?  And -- and that's a very
7 open-ended question.  I acknowledge that.  But I'm going
8 to leave it up to you to identify every bit of information
9 you looked at on those two visits to help you conclude
10 that.  Okay?
11    A.   Okay.  I am referring to my report and I am --
12 (examining document).  I'm starting on Page 6.  At the
13 bottom, Number 14, the last sentence says, in the January
14 13th mental health note, a nurse noted -- and then I have
15 cut and pasted that note on the next page, and she --
16 he -- she says, refer to Nurse Practitioner Lewis.  And
17 then on the -- and so there was a referral to Nurse
18 Practitioner Lewis there.
19    Then on the morning of Friday, January the 15th, Nurse
20 Practitioner Lewis evaluates him and says at the bottom of
21 her note there, will discuss change in speech with mental
22 health, Dr. Mobley, so she -- she saw him and she said,
23 we're going to ask Dr. Mobley to see Mr. Wesley.
24    So then in response to that on Number 16, Dr. Mobley
25 sees him and says, ask to see patient at the request of

**20**

1 medical, so that -- that tells you the -- the sequence of
2 events right there.
3  Q.  This -- this -- this will be tough for us to do
4 because I know you -- you've read some additional
5 materials, but I'm trying to focus on reviewing the
6 records, themselves, prior to reviewing the unsworn
7 statements because at that time, the depositions haven't
8 been taken.
9  At the time you reviewed those records, would you
10 agree with me that the time indicated on Nurse Lewis's
11 records is approximately 2:00 in the afternoon?
12  A.  I -- I would agree that that is the timestamp on
13 those records, but also if I -- if my memory serves
14 correctly, that record auto-populates with the medications
15 that Mr. Wesley was on.  And so at the time she opened the
16 note, it auto-populated with the medication changes he had
17 made earlier that day.
18  That tells you that that note is being made after
19 Dr. -- Dr. Mobley has already seen Mr. Wesley, so she's
20 documenting what she did earlier that morning, which would
21 not be unusual in a jail setting to have rounded.  You
22 often would not have a -- a computer with you when you are
23 rounding in an infirmary in a correctional facility.
24  We try to keep those computers secure within an
25 office, so it would not be unusual to make rounds to make

**21**

1 notes -- in fact, it would be the routine -- and then
2 later to document that, and that's what it appeared to me
3 occurred in this case.
4  Q.  Would you agree, though, that while looking at
5 the records, themselves, it appears that the record is
6 created at approximately 2:30 that afternoon?
7  A.  I -- I agree that's when the record was created,
8 yes.
9  Q.  Okay.
10  A.  And -- and it -- I -- I --
11  Q.  Would you --
12  A.  -- agree --
13  Q.  -- agree with me that -- I'm sorry.  Go ahead.
14  A.  That's okay.  I was going to say I agree that's
15 when the record was created, but it also appeared to me at
16 the time and does now to appear to be documenting
17 something that had occurred earlier in the day, not at
18 that time.
19  Q.  Would you agree with me that -- that what it
20 appears to reflect is that Dr. Mobley has made a change to
21 the patient's medication, correct?
22  A.  That's correct.  By the time --
23  Q.  And do you --
24  A.  -- the note is created.
25  Q.  -- agree with me -- I'm sorry.  Go --

**22**

1  A.  I just said it appears that by the time Nurse
2 Lewis documents at 2:00, that the -- that the change has
3 already been made to the medication.  Dr. Mobley has
4 already seen him.
5  And, by the way, if you don't mind me stopping.  I
6 feel like I'm yelling.  Am I -- am I talking too loud?  It
7 just -- I don't know.  Can -- can y'all -- does it sound
8 like --
9  Q.  No.
10  A.  -- sound like I'm screaming?
11  Q.  You're coming across absolutely fine.
12  A.  Okay.
13  Q.  Absolutely fine.
14  A.  It -- it feels like I'm yelling on this end, so
15 I -- I don't appear -- I don't mean to be.
16  Q.  Oh, no, no, no, no.  You're -- you're good.
17 You're good.
18  You -- you would agree, though, that looking at Nurse
19 Lewis's note that has a time of 2:30 you have made -- and
20 this is prior to reviewing the unsworn statements --
21 you've made the assumption that Nurse Lewis is charting
22 later what she performed earlier; is -- is that correct?
23  A.  Well, I placed -- I placed those notes -- all of
24 those notes, each of them -- not just those but every one
25 of them -- in what I believed was chronological order, and

**23**

1 I placed Nurse Practitioner Lewis's note in chronological
2 order before Dr. Mobley's because that's what it appeared
3 to me that the record showed.  My reading of the record
4 showed that from the very first time I looked at it.
5  Q.  Did you -- are you familiar with the expression,
6 not charted, not done, in the context of medical
7 negligence cases or medicine in general?
8  A.  I have heard that before.
9  Q.  Okay.  When you say, heard it, it makes me
10 question whether or not you -- you believe or adopt that
11 statement or if it's -- if it's not something you commit
12 to.
13  A.  I -- I do not believe that is true.  Just because
14 something is not charted, does not mean it wasn't done and
15 vice ver- -- I mean, you know, that -- that does not --
16 does not hold true necessarily.
17  It, obviously, makes it more problematic if someone
18 doesn't document, but in this case, this would be a normal
19 practice within a jail infirmary.  So this is not even a
20 late entry.  This is in -- in my estimation standard
21 operating procedure for rounding on a -- jail infirmary
22 patients.
23  Q.  Have you been provided any information -- and
24 this was prior to reviewing the unsworn statements -- any
25 information on how Nurse Lewis would conduct patient

24

1 examinations and -- and relative to her charting of those
2 patients?
3    A.   (No response).
4    Q.   In other words, you've told me about the standard
5 operating procedure for jails in general.  I'm wondering
6 if specifically this applies to the Escambia County Jail.
7    Were you provided any information about that?
8    A.   I don't recall whether Mr. Seagle or I may have
9 had a discussion about that or not prior to my review of
10 the records.  I don't recall.
11    Q.   You would agree with me that when -- when a
12 specific re- -- well, no.  We'll come back to that.
13    You would agree with me that based upon the note that
14 Nurse Lewis enters at 2:30 -- you would agree with me that
15 based upon that note alone, you were not able to determine
16 whether or not Nurse Lewis examined Mr. Wesley before or
17 after Dr. Mobley on the 15th.
18    A.   Well, number one, I'm not trying to quibble, but
19 I -- I -- I recall the time being 2:15, not 2:30.  Now, I
20 could be wr- -- wrong about --
21    Q.   And that's okay.  We'll go with your time.
22    A.   But in addition to that, my -- my reading of it
23 at the time was that she was documenting that she had seen
24 Mr. Wesley this morning and he had these findings.  She
25 was concerned that he needed to be seen by Dr. -- by the

25

1 psychiatrist, and she referred him to the psychiatrist.
2    So my reading of it was that from the very beginning,
3 that she was documenting that she had seen him that
4 morning.  She had asked Dr. Mobley to see him and he did.
5    Q.   But you -- you would agree with me -- and -- and
6 what I mean -- and, well, I'll -- here, let me try to lay
7 the foundation a little better.
8    Dr. Mobley's note does -- makes absolutely no
9 reference to being asked to see Mr. Wesley at Nurse
10 Lewis's specific request; is that right?
11       MR. SEAGLE:  Object to form.
12    A.   Well, I -- no.  I disagree with that.  He says --
13 (examining document).  What he says was, asked to see the
14 patient at the request of medical, so, I mean, I -- I read
15 that to be Nurse Practitioner Lewis or at least -- at
16 least that she asked the nurses to see them.
17    I mean, I don't -- I disagree.  I think that that's
18 specifically what he says.  He specifically says, medical,
19 which would be, Nurse Practitioner Lewis asked me to see
20 this person.
21 BY MR. BRIDGES:
22    Q.   Well, and -- and maybe I need to -- I need to ask
23 this question a little more specifically.  When -- when I
24 say, based upon the note, I -- I'm trying to look at
25 simply the words that are written on the page, not -- not

26

1 with what I interpret to be your interpretation of those
2 notes.
3    In other words, you have the opinion -- and let me see
4 if I summarize this right.  You believe that after you
5 read Dr. Mobley's note, that when it says, asked to see at
6 the request of medical, that that means at the request of
7 Nurse Lewis or at the request of Nurse Lewis's request to
8 a medical staff; is -- is that correct?
9    A.   That is correct.  One of these two things
10 occurred, so they're in the same --
11    Q.   Okay.  And -- and go ahead.  Go ahead.
12    A.   I was going to say so this is an infirmary where
13 both of them are working, so, in other words, Nurse
14 Practitioner Lewis is present there and Dr. Mobley is
15 present there.
16    So it's perfectly reasonable to presume that -- that
17 the -- either they talked directly or that it -- even
18 though they might have been in separate cells or in
19 adjacent cells, Nurse Practitioner Lewis said, please have
20 Dr. Mobley see this person.
21    So, in other words, it's the same -- this is not as
22 though these are different places or you have to request
23 someone to come there.  This is an infirmary with a set
24 of -- a set of cells, and they're both working there.  So
25 Nurse Practitioner Lewis sees him and says to Dr. Mobley

27

1 or -- either directly or indirectly, please see this man.
2 I'm concerned about possible side effects.
3    Q.   Now, the -- the reason -- the reason I'm focused
4 on this is because when I look at Nurse Zadi's
5 (phonetic) note -- and this is on the 13th -- when Nurse
6 Zadi makes a referral, she specifically, refer to
7 ARNP Pease.  She's now ARNP Lewis.  And when Nurse Lewis
8 indicates a referral to a specific person, she identifies
9 that individual by name to Dr. Mobley, but in Dr. Mobley's
10 note it simply says, seen at the request of medical.
11    You would agree that Dr. Mobley does not identify the
12 individual who made the request on him, correct?
13    A.   Dr. Mobley does not, but it is my recollection
14 that Nurse Practitioner Lewis did say that Nurse Zadi, who
15 was the night shift nurse -- I believe she said in her
16 deposition that Nurse Zadi was the night shift nurse, so
17 when she arrived that morning, Nurse Zadi asked her if she
18 would please see Mr. Wesley early that morning, which she
19 did, one of the first patients that she saw.  That was my
20 understanding from her deposition testimony.
21    Q.   Corr- -- correct.  Doctor, but remember this --
22 well, hopefully I'm trying to ask the questions about what
23 you gleaned from the records prior to even reviewing the
24 unsworn statements, not clarifying based upon the
25 depositions.

28

1    And so what -- what I -- what I'm trying to understand
2  is this:  You -- you've made some possible assumptions
3  when you were reviewing these records back in October,
4  November, December prior to the report coming out as to
5  the order in which individuals were evaluated.
6    I -- what I'm trying to understand is that it appears
7  to me that there were some assumptions made upon your
8  review of the records that you believe were then borne out
9  by the unsworn statements.
10   But specifically as it re- -- relates to Nurse Lewis's
11 2:15 note, looking at the note, itself, other than the
12 medication being auto-populated, which would indicate the
13 note is generated after Dr. Mobley sees this patient,
14 there's no indication from the note, itself, that her exam
15 takes place prior to Dr. Mobley's exam.
16   Is -- is that correct based upon the note, itself?
17      MR. SEAGLE:  Object to form.
18   A.  No.  I don't believe that is the -- that is the
19 case based upon the note, itself, because of the last
20 line, will discuss change in speech with mental health,
21 Dr. Mobley.  So she specifically says she's going to ask
22 Dr. Mobley to see him.  Why would she do that if -- if she
23 was seeing him after Dr. Mobley had already seen him and
24 had made medication changes?
25 BY MR. BRIDGES:

---

30

1    Q.  And I'm not suggesting that you -- that you do
2  have a conclusion.  You may say, no.
3    A.  No.
4    Q.  What elements of Nurse Lewis's examine were
5  conveyed to Dr. Mobley?
6    A.  I don't know.
7    Q.  Have you drawn any conclusions about what you
8  believed to have been relayed?
9    A.  I believe that there was a request for evaluation
10 of Mr. Wesley because Nurse Practitioner Lewis felt that
11 it might be a medication side effect and there were some
12 speech changes and she conveyed the essence of that
13 information to Dr. Mobley and asked him to evaluate
14 Mr. Wesley, which he did, but I don't know the specifics
15 of that conversation.
16   Q.  What is -- well, let me ask you this:  What
17 information was Nurse Lewis required to convey to
18 Dr. Mobley after her examination of him that day?
19      MR. SEAGLE:  Object to form.
20   A.  I don't know that she was required to relay
21 anything, other than what she describes in her note, which
22 is will discuss change in speech with mental health,
23 Dr. Mobley.
24   So, in other words, she -- she believes he has a side
25 effect of a psychiatric medication, and she asked the

---

29

1    Q.  It -- is it impossible in your mind, then, that
2  Nurse Lewis sees this patient after Dr. Mobley does; is
3  that correct, based upon the note, itself?
4    A.  Well, rather than saying it would be impossible,
5  I would say it is my opinion, to a reasonable degree of
6  medical certainty, that she saw him prior to Dr. Mobley
7  seeing him.
8    Q.  Based upon your review of the record, which
9  individual requested that Dr. Mobley see Mr. Wesley on the
10 day he died?
11   A.  A member of the medical staff, either Nurse
12 Practitioner Lewis directly or someone at her direction.
13   Q.  Do you have any information, now that you've
14 reviewed both the unsworn statements and their deposition
15 testimony, to believe that Dr. Mobley and Nurse Lewis
16 spoke directly about this patient?
17   A.  I believe they spoke either directly or through
18 an intermediary.  I don't know which and I don't believe
19 it -- it was -- it's my recollection from both of their
20 deposition testimony, that neither of them recalled did
21 they speak directly or did some intermediary relay the
22 request.
23   Q.  Have you concluded which way you believe to have
24 occurred more likely than not?
25   A.  No.

---

31

1  psychiatrist, who is an expert in managing those
2  medications, to evaluate.  And so simply making that
3  referral, I believe, would be adequate.  I don't know if
4  there's any other specific information that would have to
5  be transmitted.
6  BY MR. BRIDGES:
7    Q.  So what -- what would be the -- in -- in your
8  opinion, what would be the least amount of information
9  that Nurse Lewis would have to convey to Dr. Mobley to
10 satisfy the standard of care after her examination of
11 Mr. Wesley?
12   A.  (No response).
13   Q.  Is it simply there has been a change in speech,
14 and would that satisfy the standard of care?
15   A.  I -- I don't know that I specifically have an
16 opinion about what information would have to be relayed.
17 I believe the standard of care would require for her to
18 ask Dr. Mobley to evaluate the patient, which she did, so
19 I believe that meets the standard of care.  I don't know
20 that any specific amount of information exchange would be
21 required beyond that.
22   Q.  So it -- I'm going to try to summarize this.  I'm
23 probably going to get it wrong.  Please correct me.  But
24 in order for Nurse Lewis on January 15th, 2016 to satisfy
25 the standard of care after evaluating Mr. Wesley, the only

**32**

1  thing she is required to do -- and, again, we're talking
2  the standard of care -- is to refer this patient to
3  Dr. Mobley.  If she does that, she satisfies the standard
4  of care.
5      MR. RETTIG:  I'm going to object to the form.
6  You can --
7      A.  Well --
8      MR. RETTIG:  -- explain if you want, or you can
9  just answer --
10     A.  -- well --
11     MR. RETTIG:  -- the question.
12     THE REPORTER:  I -- I need you two to identify
13  who is spea-- objecting and --
14     MR. RETTIG:  That's -- I'm sorry.  That's Greg
15  Rettig.  I -- I will object to form.
16     MR. SEAGLE:  And that was Greg's first objection.
17  The other ones were by me and I'm Scott Seagle.
18     THE REPORTER:  Okay.
19     MR. SEAGLE:  And I'll try to say my name, if you
20  can't see me, before I object from now on.
21     THE REPORTER:  Okay.
22     THE WITNESS:  Just -- just so that y'all
23  understand, the court reporter cannot see y'all.  I'm the
24  only -- I can -- I can see the iPad but she can't.
25  BY MR. BRIDGES:

**34**

1  should have said, I'm asking you to see him about a side
2  effect.  She shouldn't just -- I mean, or -- you know, I
3  don't know what she -- other than the referral, that's
4  really all.  It's up to him.
5      But I'm -- I would imagine that she probably conveyed
6  that she thought it was a psychiatric medicine side
7  effect, but I don't know that for certain, as we pointed
8  out before, what communication there was.
9      Q.  My question, though, is:  You -- you told me that
10  you believe that what Nurse Lewis did was appropriate, in
11  other words, when she got Dr. Mobley involved, right, and
12  so now what I'm trying to figure out is what information,
13  if anything, did the standard of care require Nurse Lewis
14  to convey to Dr. Mobley when she gets him involved when
15  she refers this patient to him?
16     Is it nothing?  Is it everything?  Is it her physical
17  exam?  Is it her objective findings on examination?
18  What -- what does she have to convey to satisfy that
19  standard of care?
20     A.  I don't know that the standard of --
21     Q.  In other words --
22     A.  -- I --
23     Q.  -- I'll use the absurd example.  She slaps a
24  sticky note on his computer that says, see Mr. Wesley.
25  Now, that might or might not satisfy the standard of care,

**33**

1      Q.  I -- and I appreciate that.  That clarifies
2  things a bit.
3      Do you -- do you need me to -- to repeat the question,
4  Doctor, or -- or did you -- did you get it?
5      A.  I -- I think that I got it, and I believe that I
6  disagree.  So I believe the answer to your -- to your
7  question is, no.  In other words, you -- you -- you made
8  a -- a supposition of what was required, which was
9  essentially only the communication.
10     I think that she did more than that and it's certainly
11  what she did, so she had -- make -- had to make an
12  assessment of what she felt the -- she had to make an
13  assessment of Mr. Wesley and make a determination about
14  what she felt most likely or what was the probable cause
15  of this, which she did.
16     And as a result of that, because it was a medication
17  -- potential medication side effect of a psychiatric
18  medicine, which Dr. Mobley had prescribed and was
19  managing, she correctly made a referral to him.
20     So there could have been other things, but she -- she
21  had to do -- she had to make an assessment, which she did,
22  and because it was a medication side effect of one of his
23  medications, she appropriately made the referral.
24     She -- in -- in order to help Dr. Mobley -- I don't
25  know this would be required by the standard of care --

**35**

1  but that's an example of communication.
2      What I'm trying to figure out is:  What is the
3  communication that satisfies the standard of care at that
4  time?
5      A.  I believe that making the referral satisfies the
6  standard of care.
7      Q.  And when you say, making the referral -- I -- I
8  want to make sure that I understand -- that requires no
9  additional information, other than the referral, correct?
10     A.  I -- I disagree because I believe a referral
11  implies that you're telling them the per-- -- the
12  consultant the reason you're asking to see the person.  I
13  mean, you -- you -- it's a -- you're using an absurd
14  example.
15     But I think that it's -- it's pretty absurd to think
16  that you would not tell the -- the consultant the reason
17  you were asking him to see somebody, but I believe that
18  the important thing is the referral.
19     Q.  Again, I -- and I apologize.  I'm not trying to
20  use words like, important.  I'm trying to use the standard
21  of care so that -- so that we stay consistent on this.
22  The standard of care is the referral.
23     Now, what I need to know, then, is what is the
24  information that Nurse Lewis has to convey in order to
25  satisfy that standard of care, in your opinion?  She makes

36

1  the referral.  If a sticky note is or is not enough, tell
2  me, but I need you to define not just the essence of the
3  communication but specifically what must be communicated.
4      A.   Well, the reason that -- the answer I would give
5  to that is the reason for the referral or what you're
6  asking the consultant to do, so you have to --
7      Q.   And --
8      A.   -- and that -- that is --
9      Q.   -- so in this case, what did that -- what did
10 that have to entail?
11     A.   I -- I -- I don't believe it had -- had to entail
12 anything more than -- well, she says, will discuss change
13 in speech with mental -- mental health-Dr. Mobley, so I
14 believe that that amount of information would be adequate.
15     Q.   Okay.  In other words, to satisfy the standard of
16 care, Nurse Lewis would be required to convey to
17 Dr. Mobley, see Mr. Wesley.  He has had a change in
18 speech?
19     A.   That was not my -- that was not my answer.
20     Q.   Okay.  What was your answer?
21     A.   That she would need to say -- or she would need
22 to give the reason for the referral.  I didn't say
23 specific language she would need to use.  There's lots of
24 different language that could be used potentially, and we
25 don't even know that she --

37

1      Q.   Okay.
2      A.   -- that -- we don't even know that she directly
3  spoke to Dr. Mobley or -- or spoke through an
4  intermediary.  So we don't know -- I did not see in the
5  depositions of either one of them that the language was
6  included or the specific intermediary or lack of
7  intermediary was described.
8      Q.   Okay.  So I know you don't -- you don't agree
9  with my phrasing, so I'm not -- I'm going to leave it
10 up to you.  What -- what I'm -- what I -- I think this is
11 a relatively straightforward question.
12     But what -- what specifically does Nurse Lewis have to
13 convey either directly or through an intermediary after
14 her examination to Dr. Mobley to satisfy the standard of
15 care?  She needs to make the referral, but what else does
16 she have to include with that?  And I will let you phrase
17 it any way you wish.
18         MR. SEAGLE:  Object to form.
19     A.   Well, I would say that my answer before was that
20 the referral is the -- is what satisfies the standard of
21 care.  I believe that most providers would also give the
22 reason for the request and that would be very useful
23 information, but the referral is I -- what I believe
24 satisfies the standard of care.
25 BY MR. BRIDGES:

38

1      Q.   Okay.  And -- and phrase the referral in whatever
2  way you believe satisfies the standard of care for me.
3          MR. SEAGLE:  Object to form.
4          THE REPORTER:  Who's objecting?
5          MR. SEAGLE:  I'm sorry.  This is Scott Seagle.
6          THE REPORTER:  Okay.
7      A.   I -- I don't know that I can answer it any -- any
8  other ways than I already have.  I'm -- I'm not certain
9  that I can -- can rephrase it in any other different ways.
10 BY MR. BRIDGES:
11     Q.   The -- the difficulty I'm having, Doctor, is that
12 I've tried to phrase it a couple of ways, and clearly I'm
13 not getting it and that's my fault.  But I -- I need you
14 to help me understand what -- you've said the referral
15 needs to be made.  I've given you the -- the facetious
16 (phonetic) sticky note example, and you've said, no.
17     And what I'm trying to understand is I'm looking at
18 these records and it says, will discuss change in speech
19 with Dr. Mobley, and then you tell me that a referral is
20 enough.  Maybe it's my use of the phrase, referral.
21     But what I'm trying to put down in bullet points is:
22 What information, based upon her examination of the
23 Mr. Wesley, which has a physical component, a subjective
24 and objective component -- what pieces of information must
25 be relayed to Dr. Mobley as part and parcel of the

39

1  referral to satisfy Nurse Lewis's standard of care?  And I
2  -- I want you, if you can, to specifically identify that
3  information for me.
4      A.   I believe that it is not necessary for any
5  information to necessarily be transmitted in order to
6  satisfy the standard of care, and I will have to use an
7  example.  But what I mean is if there were a form that she
8  sent a -- you know, a -- a -- a referral form that said,
9  please see Mr. Wesley this morning, I mean, it -- so there
10 would need to be -- as -- as a standard operating
11 procedure, you -- normally you would tell somebody what
12 the -- when you want them to see them so next year, today,
13 some timeframe and what the reason for the request is.
14 That's normal.
15     I don't know that those two items are even
16 necessarily -- I think the important thing from the
17 standard of care is the referral, so it normally would
18 include a reason for the request and some type of
19 timeframe if the -- if any was important.  Those two
20 things are usually included, but I don't know that they're
21 required by the standard of care.
22     It's only the referral, so if there happened to have
23 been a piece of paper that just -- that was a list for,
24 patients I want Dr. Mobley to see today, and she put
25 Mr. Wesley's name on there, I believe that would meet the

1  standard of care.
2      Q.   So we go back to ultimately the sticky note on
3  the computer that says, see Mr. Wesley, satisfies Nurse
4  Lewis's responsibilities under the standard of care?
5      A.   Well, especially given that Dr. Mobley saw him
6  that day.  If -- if Dr. Mobley failed to see him or failed
7  to see the sticky note, you might say it was inadequate
8  communication, but just less than -- just a couple of
9  hours after Nurse Practitioner Lewis asked for Mr. Wesley
10 -- for Dr. Mobley to see him, he does.
11     So the -- the communication was adequate for
12 Dr. Mobley to see him and note why he was seeing him, so,
13 in other words, he described who made the request and what
14 he was asked to do.  So he had been communicated that
15 information in some fashion, which was adequate and which
16 met the standard of care.
17     Q.   You got real quiet there and that's not your
18 fault, but I -- I want to --
19          MR. BRIDGES:  If -- if Court -- Madam Court
20 Reporter, could you read out the last probably four lines
21 of his answer?
22          THE REPORTER:  Okay.  Let's see.
23          (WHEREUPON, AT THIS TIME, THE RECORD WAS READ
24 BACK, AND THE PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
25          THE REPORTER:  Can you hear me?

1          MR. BRIDGES:  Yes, ma'am, I can.
2          THE REPORTER:  Okay.  So did he cut out just a
3  minute ago?
4          MR. BRIDGES:  No.  It -- it got a little quiet
5  and I was trying to write too fast, and I'm afraid it
6  didn't connect.
7          THE REPORTER:  Okay.
8      A.   I -- I think I might have been talking too fast,
9  too.  I might have been talking too fast for the court
10 reporter.  I apologize.
11 BY MR. BRIDGES:
12     Q.   No.  It's -- it's okay.  You're doing well.  You
13 -- it just -- you got a little quiet there.  You said a
14 couple of things in your answer, and I want to make
15 sure -- first, you said Dr. Mobley saw him a couple of
16 hours later.  I -- I -- I want to get an understanding of
17 -- he saw him at 11:00.
18     Do you have an opinion as to what time Mr. Wesley was
19 seen by Nurse Lewis, and -- and what's your basis for
20 that?
21     A.   I believe that she said in your deposition that
22 he was one of the first patients she saw that morning, so
23 she was told by the night shift nurse that she needed to
24 see Mr. Wesley and that she did that, that morning, one of
25 the first patients that she -- I don't -- I can -- I could

1  go to her deposition and see if I can find that exact
2  wording, but it was something along the lines of it was
3  one of the first patients that she saw that morning.
4      Q.   Okay.  That -- that's based upon her deposition
5  testimony, not the records, correct?
6      A.   I believe that what I just described is in her
7  deposition, yes.
8      Q.   Okay.  Was Mr. Wesley seen by any medical
9  professionals after either Nurse Lewis or Dr. Mobley prior
10 to his death?
11     A.   Well, he was pre- --
12     Q.   Bad question.  Prior to him being found in his
13 cell unresponsive?
14     A.   I understand.  So he was housed in an infirmary
15 with nurses present, so I -- I -- I know that nurses were
16 in the vicinity and I know that correctional officers were
17 doing hourly checks.  I don't know that there are any -- I
18 don't believe there are any documented nursing notes after
19 the time that Dr. Mobley saw him.
20     Q.   Are you aware of any tests to measure the
21 severity of EPS or extra -- the -- the EPS?
22     A.   No.  I'm not aware of tests to measure the
23 severity of EPS.  I'm aware of tests to measure the
24 severity of tardive dyskinesia but not EPS.
25     Q.   So the tardive dyskinesia, you're aware of a test

1  for those?
2      A.   Well, I'm aware of the AIMS scale, which is a --
3  a measurement to -- to track the development and severity
4  of tardive dyskinesia, yes.
5      Q.   Did -- did Mr. Wesley have signs or symptoms of
6  tardive dyskinesia?
7      A.   No.
8      Q.   Do you know why Nurse Lewis put in her assessment
9  that she was going to rule out tardive dyskinesia?
10     A.   It would be -- it would be speculation on my
11 part.  My -- I -- I -- my speculation is that she got
12 the term mixed up between EPS and tardive dyskinesia, but
13 I don't know and I don't know that I saw clarification
14 about that.
15     Q.   Prior to Dr. Mobley seeing Mr. Wesley on -- on
16 the day he died, when had Mr. Wesley received his dose of
17 Risperdal?
18     A.   If you don't mind if I refer to the MAR.
19 (Examining document).  (Short pause).  The night before on
20 the night of the 14th.
21     Q.   So he did not receive any medication on the 15th,
22 correct?
23     A.   That is incorrect.
24     Q.   Okay.  When did he receive the Risperdal on the
25 15th?

44

1 A. That wasn't the question you asked.
2 Q. I'm -- I think what I asked was:  When did he
3 last receive Risperdal prior to Dr. Mobley's examination
4 on the 15th?
5 A. That was on the 14th -- the night of the 14th.
6   MR. SEAGLE:  Adrian, let me see if -- your
7 follow-up question was:  So he did not receive any
8 medication on the 15th, and I think that's what he was
9 responding to when he said, that's not correct.
10 BY MR. BRIDGES:
11 Q. Well, that's -- that was a bad question.
12 Did he receive Risperdal on the 15th?
13 A. He did not.
14 Q. What's the ha- -- what's the effectiveness -- the
15 effective duration of Risperdal in the dosage that
16 Mr. Wesley was receiving?
17 A. I --
18   MR. SEAGLE:  Object to form.
19 A. -- I am -- I am not an expert in pharmakine- --
20 pharmacokinetics, and I don't have an opinion about that.
21 BY MR. BRIDGES:
22 Q. Okay.  You -- you mentioned just a little later
23 in your report the effective dosage of the 2 milligrams as
24 being appropriate for Mr. Wesley.
25 You're comfortable stating that, correct?

46

1 but the normal effective dose is 2 to 6 or so.  You know,
2 it can be as high as 16 milligrams.  That's very high.
3 But the usually minimal effective dose is 2 to 6 or 8
4 milligrams, so that's on the very low end of what is the
5 normal minimal effective dose.
6 Q. If Mr. Wesley was on a minimal dose of Risperdal
7 and was suffering EPS and muscle rigidity as a result,
8 would it take -- or would that impact the time necessary
9 for corrective medication to take effect?
10 A. To the best of my knowledge, no.
11 Q. How long would you anticipate corrective
12 medication -- how long would you anticipate it would take
13 for the medication that Dr. Mobley prescribed to
14 ameliorate Mr. Wesley's symptoms on the 15th, the symptoms
15 of EPS and muscle rigidity?
16   MR. RETTIG:  This -- this is Greg Rettig.  I'm
17 going to object to form.
18   MR. SEAGLE:  And I'm going to join that objection
19 as well.  This is Scott.
20 A. I -- I believe that -- that some of the other --
21 the psychiatric experts have said that they would expect
22 amelioration of those symptoms within three days, which
23 is -- I believe was also the testimony of Dr. Mobley.  And
24 I would -- I -- I don't have a reason to disagree with
25 that, but I -- I don't have another opinion.

45

1 A. Yes.  That's -- that's the clinical use.  That's
2 not pharmacokinetics, and what I was -- what I was
3 saying -- well, can you point to that -- that statement
4 and let me look at it and make sure what I was -- te- --
5 tell me where that is.
6 Q. Sure.
7   (WHEREUPON, THERE WAS A SHORT PAUSE, AND THE
8 PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
9 BY MR. BRIDGES:
10 Q. Page 15 of your report, Paragraph 4, it says, the
11 usual effective daily dose of Risperdal is up to 16
12 milligrams a day.  Mr. Wesley was on 2 milligrams a day;
13 plus, the dose he was prescribed was reasonable and the
14 minimal -- the minimum effective dosage.
15 A. (Examining document).  Right, right.  So, yes,
16 I'm very comfortable with that opinion.  That's the
17 clinical use of it, and his symptoms did appear to be
18 being controlled at that 2 milligrams.  So that -- that
19 was a very small dose and it was appearing to be
20 effective, so it was appropriate, yes.
21 Q. In the grand scheme of things, 2 milligrams, is
22 that a high, low, normal dose of Risperdal, or do you not
23 have an opinion on that?
24 A. It is a low -- it is a low dose -- a -- a
25 low-maintenance dose.  You might start lower than that,

47

1 BY MR. BRIDGES:
2 Q. How about the Benadryl; do you -- would that take
3 three days to ameliorate any of the symptoms?
4 A. Ordinarily you would expect not -- it not to take
5 three --
6 Q. How long --
7 A. -- days.
8 Q. -- would you -- how long would you expect the
9 Benadryl to take?
10 A. I don't know that I -- I don't believe I have an
11 opinion about that.
12 Q. So your opinion is that we would not know the
13 efficacy of Dr. Mobley's treatment for approximately three
14 days?
15 A. No.  I don't believe that's my -- that's my
16 testimony.  I would expect that the -- the Benadryl to
17 have an effect before then, but it -- the symptoms to be
18 cleared by three days.
19 Q. How long before the treatment would have a
20 noticeable change on Mr. Wesley's symptoms, if at all?
21 A. I -- I don't have an opinion about that.
22 Q. Okay.  In other words, if -- if I had a time
23 machine and I went back to four hours after Mr. Wesley was
24 seen, you would not have an opinion as to whether or not
25 there would be a change in his condition or an improvement

48

1  in his condition from when he was seen by Dr. Mobley,
2  correct?
3          MR. SEAGLE:  This is Scott.  Object to form.
4      A.  That -- that is correct.  I would not have an
5  opinion.
6          MR. BRIDGES:  We've been going for about an hour.
7  Let's take a -- let's take a break.
8          THE VIDEOGRAPHER:  All right.  We're going off
9  the record.  The time is 10:11 a.m.
10         (WHEREUPON, THERE WAS A SHORT BREAK, AND THE
11 PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
12         THE VIDEOGRAPHER:  We are now back on the record.
13 The time is 10:20 a.m.
14 BY MR. BRIDGES:
15     Q.  All right.  Doctor, I want to talk about --
16 moving on in your report to the opinions section.  I'm
17 going to start at Page 11, Paragraph 4.
18     A.  Okay.  (Examining document).  I'm there.
19     Q.  Okay.  You talk -- at the bottom of that it says,
20 as a result, Mr. Wesley's mild blood pressure medication
21 and -- and lipid medication had not been restarted before
22 he died, and it -- the next sentence says, given the
23 severity of his psychiatric symp- -- symptoms and that his
24 BP readings did not indicate a hypertensive urgency.
25     My question is about:  Which BP readings are you

---

49

1  referring to that do not indicate a hypertensive urgency?
2      A.  Any of -- any of them during his incarceration.
3  There was one that was elevated when he had been agitated
4  but on recheck it had gone down, so none of them during
5  his incarceration.
6      Q.  Do you know when the last time a BP reading was
7  done prior to Mr. Wesley's death?  And, well --
8      A.  I --
9      Q.  -- bad question.
10     A.  -- I --
11     Q.  Prior to him being found unresponsive in his
12 cell.
13     A.  I know the last time that I found one in the
14 record, which was January the 13th.
15     Q.  What -- in your opinion, what was his blood
16 pressure on the 13th?  Was -- was that something that was
17 indicative of a hypertensive urgency?
18     A.  The -- the reading, itself, was 151/101 with a
19 heart rate of 155 (sic), and, no, that would not represent
20 a hypertensive urgency.
21     Q.  Did you say the heart rate of 155?
22     A.  No.  Blood pressure, 151/101; heart rate of 55.
23 If I said, 155, I was in error.  It's 55.
24     Q.  Okay.  Do you know or do you have an opinion as
25 to what his blood pressure readings would have been on the

---

50

1  15th prior to him being found?
2      A.  I don't have any reason to believe they would
3  have been dramatically different from that reading, but I
4  don't have any particular opinion about a number, no.
5      Q.  Let's go down on Page 12, Paragraph 6.  You're
6  discussing Dr. Mobley's exam.  The last sentence on that
7  page, anyways, you're talking about the stiffness in the
8  neck and shoulders understanding there was a -- a typo in
9  Dr. Mobley's records.  It said, still.
10     Was that a change in Mr. Wesley's examination that day
11 on the 15th, the finding of a stiff neck?
12     A.  Are -- are you -- I don't believe it was a
13 change.  I believe it was consistent with EPS.
14     Are you referring to some other note?
15     Q.  Nurse Lewis's note.
16     A.  (Examining document).  Nurse Lewis had noted that
17 his neck was supple.  She doesn't mention his shoulders
18 but mentions that his neck was supple.  I -- I don't read
19 that as a -- as a change.  He -- he was able to move his
20 neck.  He describes him being as stiff in his neck and
21 shoulders.
22     I -- I don't know that that's mutually exclusive to
23 have a supple neck and, yet, be stiff in neck and
24 shoulders.  Those are likely referring to -- I -- I'm not
25 certain that that represents a difference in a change in

---

51

1  condition, no.
2      Q.  Are you not certain that it doesn't, though?
3      A.  I -- I am not certain that it -- it does or
4  doesn't represent a change, that's correct.
5      Q.  Going on to Page 13.  At the top paragraph,
6  you -- you -- starting with the sentence that says, there
7  were no symptoms of an arrhythmia or any other cardiac
8  condition when the providers evaluated Mr. Wesley.
9      Providers, you're talking about both Nurse Lewis and
10 Dr. Mobley?
11     A.  I -- I -- I didn't get -- I'm sorry that I didn't
12 follow the -- you said, 13?  I don't -- I didn't get to
13 that.  I'm sorry.
14     Q.  Page 13, the very top paragraph that starts with,
15 note of any.
16     A.  Okay.  There were -- I -- yes.  I'm sorry.
17 Okay.  When the providers -- yes.  The providers, I am
18 refer --
19     Q.  You identify -- I'm sorry.  Go ahead.
20     A.  Yeah.  The providers I'm referring to would be
21 Nurse Practitioner Lewis and Dr. Mobley.
22     Q.  What would be some signs or symptoms of -- of an
23 arrhythmia in a patient like Mr. Wesley on the 15th when
24 he is being evaluated by a practitioner?
25     A.  A complaint of palpitations, chest pain,

52

1  shortness of breath, dizziness or he was passing out,
2  something like that.
3      Q.   Do you know if -- do you know if Mr. Wesley had
4  any of those?
5      A.   I know that the record does not reflect that he
6  had any of those conditions.
7      Q.   Would you agree with me that when Dr. Mobley is
8  talking to the patient on the 15th, he notes that
9  Mr. Wesley is talking in mumbles that are not
10 comprehensible?
11     A.   He does say that, yes.
12     Q.   Do you believe that that would in any way impact
13 Mr. Wesley's ability to provide a practitioner with
14 information to aid in such a diagnosis?
15     A.   No.  I -- I don't know that it would or wouldn't.
16 I -- I mean, I believe that he -- Mr. Wesley had been
17 described as mumbling before or difficult to understand
18 speech for a long while, and the -- yet, the record
19 documents his symptoms.  So, no, I -- I don't see any
20 indication that that would impact his ability to
21 communicate his symptoms.
22     Q.   I -- I want to -- I want to limit that question,
23 though, to -- to when Mr. Mobley is seeing him on the
24 15th.  I understand that in the past he had had some
25 communication barriers or difficulties, but in

54

1  is that right?
2      A.   And -- that -- and/or -- yes.  That is true.
3  And/or that he did not appear to be in any distress.  He
4  did not appear to be short of breath.  He did not appear
5  to be dizzy, or he did not appear to be passed out.  So
6  all of those things -- he didn't have the appearance of
7  any of those symptoms.
8      And I don't have any indication about -- or that he
9  wouldn't have been able to communicate if his chest were
10 hurting or he was having trouble breathing, that those --
11 he -- he, quite likely, would have been able to
12 communicate those things even with mumbling speech.
13     Q.   Well, and -- but it's not just mumbling speech,
14 though.  It's -- it's not comprehensible speech.
15     Do you -- do you agree with that?
16     A.   (No response).
17     Q.   I mean, I -- the -- reason I -- I ask this
18 question, again, is because -- because your -- your
19 reading of -- of Dr. Mobley's notes, you've made some
20 assumptions about what Nurse Lewis conveyed or the times
21 it occurred in -- in the past when you've been reviewing
22 these notes.
23     But I wonder when I see that Dr. Mobley puts, the
24 speech is not comprehensible, I have to take that to mean
25 that that is a complete summary of the speech that was --

53

1  Dr. Mobley's note, as it's written, Dr. Mobley
2  specifically says that Mr. Wesley is not comprehensible.
3  You do agree with that, correct?
4      A.   Let me turn to that note and review it, please.
5      Q.   Sure.
6      A.   (Examining document).  (Short pause).  I -- I've
7  read the note, so your -- what was your question?
8      Q.   My question was did -- and I -- I understand you
9  said that Mr. Wesley had -- had had speech that was
10 difficult to understand in the past, but on the 15th when
11 he's examined by Dr. Mobley, his speech is -- his speech
12 is not comprehensible, which I take that to mean that
13 Dr. Mobley cannot comprehend what, if anything, Mr. Wesley
14 is saying.
15     Do you agree with that?
16     A.   I -- I agree that what it says is, and he starts
17 to talk in mumbles that are not com- -- comprehensible.
18 It doesn't say that he is not able to communicate
19 anything, but it -- that is -- that's the wording -- you
20 -- you ad- -- adequately described the wording that is
21 there, yes.
22     Q.   Okay.  It -- it seems like you're -- you're not
23 satisfied, though, that -- that that phrase excludes the
24 possibility that Mr. Wesley was communicating signs or
25 symptoms or complaints to Dr. Wes- -- I mean, Dr. Mobley;

55

1  that was able to be produced by Mr. Wesley.  In other
2  words, if Mr. Wesley was partially comprehendible or
3  difficult to understand, Dr. Mobley would have stated it
4  as such.
5          MR. SEAGLE:  Object to form.
6  BY MR. BRIDGES:
7      Q.   I mean, you -- you would agree with --
8          MR. SEAGLE:  This is Scott.
9  BY MR. BRIDGES:
10     Q.   Will you agree with that, Doctor?
11     A.   I -- I was -- I was listening for the question
12 and so -- I -- I heard a statement, and I think I followed
13 the entire statement.  I was listening for a question and
14 then -- but it was a statement, that you're asking me if
15 you -- that I agree.
16     And there's much that Dr. Mobley describes about his
17 comprehendible, so, I mean, you have an opinion about what
18 that means.  I don't know that I do or don't agree with
19 that.  I think that a person who is mumbling can still
20 communicate their symptoms in most cases or in many cases.
21 There's no reason to believe he could not.
22     And there's much that Dr. Mobley describes about his
23 appearance and what he's doing.  He's eating and drinking.
24 He's not in any distress.  So I believe there is much more
25 communicated in that note than just, I can't understand

56

1  him, and, therefore, I can't make anything out about
2  what's going on.  No.  I don't agree that that's what the
3  note says.
4      Q.  Well, okay.  So when the note says that,
5  Mr. Wesley has been hiding under the cover and not talking
6  at all, and then when he starts to talk, he's mumbling and
7  not comprehendible, you -- you believe that -- that
8  Mr. Wesley was still able to adequately communicate his
9  symptoms to Dr. Mobley?
10     A.  I -- what I said was that, I believe, that those
11 things -- Dr. Mobley was observing him and was interacting
12 with him either ver- -- verbally and/or non-verbally and
13 was -- did not make an assessment that he was short of
14 breath.
15     So, in other words, someone who is sitting there, you
16 can tell whether they're short of breath.  You can tell
17 whether they're passed out or not.  Those things were not
18 present, and so I -- I was saying that -- to say that
19 there's no communication or no ability to comprehend
20 what's going on despite the fact that his speech is not
21 understandable, I don't agree with that.
22     Q.  Why do you believe that Mr. Wesley was not short
23 of breath?
24     A.  I believe that the record does not indicate that
25 he's short of breath and that Dr. Mobley was there doing

57

1  an assessment of him, and had he noticed something like
2  shortness of breath, he would -- he would -- more likely
3  than not would have recorded it.  The record doesn't
4  reflect that he was --
5      Q.  Why do you believe --
6      A.  -- short of breath.
7      Q.  -- why do you believe that Mr. Wesley was not
8  dizzy at the time that he was evaluated by Dr. Mobley on
9  the 15th?
10     A.  I believe that the record does not reflect that
11 he was dizzy.  There is no evidence in the record that he
12 was dizzy.
13     Q.  Would you agree that it was possible that
14 Mr. Wesley was both short of breath and dizzy, unable to
15 communicate that to Dr. Mobley such that it was not put
16 down in the records?  Is that a -- is that something that
17 you find even remotely possible?
18     A.  Well, I'm asked to develop opinions to a
19 reasonable degree of medical certainty, and I would say to
20 a reasonable degree of medical certainty, the record does
21 not reflect those and there is no indication in the record
22 that he was either of those two things.
23     Q.  Conversely the record does not indicate that he
24 wasn't those two things.
25     Would you agree with that?

58

1      MR. SEAGLE:  This is Scott.  Object to form.
2      A.  I -- I will agree that the record does not
3  indicate that he is either of those two things.
4  BY MR. BRIDGES:
5      Q.  So when I -- when I take that back to Page 13 of
6  your report when -- when we say, there were no symptoms of
7  an arrhythmia or any other cardiac condition when the
8  provider is evaluating Mr. Wesley, that is your opinion
9  because you assume that if there were those conditions,
10 they would have been noticed and documented; is that
11 right?
12     A.  Well, it is a -- bit more than that.  It is
13 that none of those symptoms or -- or evidence of those
14 symptoms are in the record.  The record does not reflect
15 any evidence of Mr. Wesley having symptoms or
16 complaining of them or being noted to have those symptoms,
17 so the record does not show indications that he had those
18 symptoms.
19     Q.  Okay.  And would you agree that one -- one aspect
20 that is used to generate those records is a provider's
21 ability to communicate with their patient?
22     A.  Well, I believe that those records are the
23 totality of a provider's interaction with the patient,
24 communicating with them verbally, non-verbally during an
25 assessment.  All -- all of those things go into the

59

1  production of a medical record, medical note.
2      Q.  And -- and you would agree, though, that if
3  you -- and -- and -- and this is not -- I -- I'm not
4  trying to imply that a provider has abilities beyond that
5  of any other individual.
6      But my -- my point is this, that a patient's ability
7  to communicate to a healthcare provider, would you agree
8  that that directly influences what is put into the medical
9  records?
10     In other words, if I'm able to communicate my symptoms
11 clearly to you, your note may reflect what I'm
12 communicating.  If I lack the ability to do so, you may
13 not be able to document the full extent of my complaints
14 because of my inability to communicate; is -- is that
15 right?
16     A.  Well, I -- I -- I don't necessarily agree with
17 that entire premise because -- so you -- you would -- if a
18 provider -- if in a provider's judgment they are unable to
19 perform an adequate history and physical, they should
20 record that and do something about it.
21     So taking that to the extreme, if a person is
22 unconscious and is in a coma, it would be a bit
23 disingenuous to say they have no complaints.  While
24 technically true, you know, you wouldn't write, no
25 complaints.  They're unconscious.

60

1    So if you're -- so the provider has to make a judgment
2    about whether they can adequately determine what's going
3    on with the patient, and if so, they make a record of it,
4    which is done in this case.
5    And there's no indication that Dr. Mobley didn't feel
6    he could adequately determine what was going on, so he --
7    he made a determination as to what he felt was going on.
8    He made an assessment and he documented that assessment.
9    Q.   And so if Dr. Mobley didn't think that he could
10   understand what Mr. Wesley was saying, he would document
11   that, right?
12   A.   Or he would take some other -- or -- or he would
13   take some action to indicate, you know, that he couldn't
14   tell what was going on and -- and -- and he wasn't able to
15   do an adequate assessment.  He might take some other
16   steps.
17   Q.   Yeah.  Like, I mean, I want to -- I'm -- that
18   brings us full circle, I think, back to what Dr. Mobley
19   puts in his note, that Mr. Wesley is mumbling in a manner
20   that is incomprehensible to him, correct?
21   A.   That is one of the statements.  The other
22   statements are that he's eating a sandwich and drinking
23   okay and he appears -- he appears okay and he -- he --
24   he's -- so in other words, there's more to it than just --
25   what he's saying is his speech is mumbling and he's

62

1    Q.   -- what conclusions have you drawn about that
2    lab?
3    A.   I've drew no conclusions about that lab.
4    Q.   What assumptions have you made, if any, about the
5    ord- -- the lab referenced by Dr. Mobley?
6    A.   I've not made any assumptions.  The only
7    assumption is I -- I didn't see any other evidence of --
8    of labs being ordered in the record, and I don't know of
9    any labs that would be necessary to evaluate EPS.  So I
10   don't know what that refers to, and I don't have an
11   opinion about it.
12   Q.   Do you believe that Dr. Mobley believed that the
13   medical staff had ordered labs on Mr. Wesley?
14        MR. SEAGLE:  This is Scott.  Object to form.
15   A.   I don't know.
16   BY MR. BRIDGES:
17   Q.   Was Mr. Wesley -- when he was in the infirmary,
18   was he a patient of the mental health group or of the
19   medical group?
20   A.   It was my understanding that he was what is
21   called mental health housed meaning his primary provider,
22   primary caregivers were the mental health team, which was
23   Dr. Mobley and his mental health providers.  That was his
24   primary care team.
25   Q.   Did you read Dr. Mobley's deposition?

61

1    having -- he's unable to understand his speech or -- I'm
2    not sure all of the time or some of the time.
3    But in any event, there's more to the note than that.
4    There's more to the assessment than that.  He asked him to
5    stick out his tongue and he sticks it out, so he follows
6    commands.  He's eating and drinking.  His swallowing is
7    intact.  He's sitting up on a bed, so he's not
8    unconscious.
9    There's no record -- there's no record that he's short
10   of breath or in any other distress, so those things are --
11   the -- the notes is more than just that -- that one
12   portion to it.
13   Q.   What labs were ordered on Mr. Wesley on the day
14   he -- that he passed?
15   A.   I'm -- I'm not aware any labs were ordered.
16   Q.   Well, what labs was Dr. Mobley referencing in his
17   note as being ordered by the medical staff?
18   A.   I don't know.
19   Q.   Is that a mistake in Dr. Mobley's report?
20   A.   I don't know.
21        MR. SEAGLE:  This is Scott.  Object to form.
22   A.   I don't know to what --
23   BY MR. BRIDGES:
24   Q.   What conclusions --
25   A.   -- that references.

63

1    A.   I did.
2    Q.   Did -- is -- is your review of Dr. Mobley's
3    deposition, that -- that Dr. Mobley had a different
4    opinion about that?
5    A.   No.  It's not my recollection that he had a
6    different opinion about that.  I -- I re- -- my
7    recollection was that he said, perhaps, he didn't know or,
8    perhaps, he would have to look.  I don't know.  If you
9    could point me to his deposition testimony about that,
10   I'll be glad to give you an opinion about it.
11   Q.   As we sit here right now, you don't have one,
12   though, correct?
13   A.   I -- I do have an opinion that Mr. Wesley was
14   housed by the mental health providers, but he was also
15   being seen by the medical providers because -- in -- in
16   chronic care clinic, et cetera.  But he was primarily
17   mental health housed and not medical housed.
18   Q.   Who was to follow up on Mr. Wesley from the
19   medical staff, if anyone, after Nurse Lewis saw him?
20   A.   I -- I -- I -- I believe that Nurse Lewis said it
21   was -- it would be her responsibility or the nurse
22   practitioner, who was rounding in the infirmary the next
23   week.
24   Q.   When Nurse Lewis saw Mr. Wesley that day, what
25   conditions should have been on her differential diagnosis

1 when evaluating him?

2  A.  Well, so, obviously, one of them was EPS, which

3 is -- or medication side effect, which is what she felt

4 that he had and which is why she referred him to

5 Dr. Mobley.

6  Are you asking me what other -- what other

7 possibilities would be in the differential diagnosis at

8 that time; is that -- is that correct?  Is that what

9 you're asking me?

10  Q.  Yes.

11  A.  And stroke would be one of them that would come

12 to mind and that they looked for.  Any other type of

13 neur- -- neurolo- -- other neurologic conditions, so that

14 would be the primary one, that I can think of.

15  Q.  What other neurological conditions?

16  A.  Well, the development of tardive dyskinesia,

17 which I think that we -- we -- we said that -- the words

18 she used, so that is a distinct entity from EPS and,

19 perhaps, that she felt that he was developing or -- or she

20 should have considered him developing tardive dyskinesia.

21 But primarily stroke and side effects from the

22 medications.

23  Q.  So stroke, EPS.  You then mentioned neurological

24 conditions and tardive dyskinesia.

25  Is that or is that not on the differential diagnosis?

1  A.  Yes.

2  Q.  How does nurse -- does Nurse Lewis rule out

3 stroke based upon your review of the records?

4  A.  I'm going to turn to her note for a moment.

5 (Examining document).  Well, she describes that his mental

6 status is alert.  She describes that his -- his range of

7 motion is normal.  He's able to reach out upon request and

8 no tremors are noted.

9  So, in other words, she doesn't see any neurologic --

10 any focal neurologic deficits and she feel that that's --

11 that -- that's not what she lists amongst the things that

12 she feels is likely, and she refers him to Dr. Mobley.

13  Q.  So I'm -- I'm sorry.  How -- how does -- how does

14 she rule out stroke again, in your opinion?

15  A.  She doesn't find any focal neurologic deficits.

16  Q.  Such as?

17  A.  Such as altered range of motion and so inability

18 to -- inability to move extremities, abnormal mental

19 status so not alert.

20  Q.  Anything else?

21  A.  Not that's documented in the note.

22  Q.  As far as abnormal mental status, when -- when

23 Nurse Lewis is seeing Mr. Wesley, he's both non-verbal and

24 not responding to que- -- questions, correct?

25  A.  I don't know -- I don't know that I believe --

1 no.  I don't know that I agree with that.

2  Q.  Okay.  I'm looking at the subjective and

3 objective part of the note.

4  A.  (Examining document).  Well, it says, speech

5 garbled and unclear.  It doesn't say that he was

6 non-verbal.  You -- you said he was non-verbal, so, speech

7 garbled and unclear, is not the same as non-verbal.

8 (Short pause.)

9  (Examining document).  And it -- I -- I'm sorry.  I

10 didn't mean to interrupt -- I mean, I didn't mean to add

11 on so late, but he also says, patient -- she also says,

12 patient is able to reach out upon request, so, in other

13 words, he's following commands.

14  Q.  I'm talking about Nurse Lewis.

15  A.  I -- I think that's the note I -- that's the note

16 I'm looking on.  I'm on Page 7 of my report.

17  Q.  I'm -- when I look at -- well, I'm not -- does --

18 anything other than, altered -- altered mental status and

19 altered range of motion to rule out neurological deficits?

20  A.  No focal neurologic deficits noted.

21  Q.  Okay.  How would you rule out tardive dyskinesia?

22  A.  Well, it's -- it -- it -- the symptoms aren't

23 consistent with tardive dyskinesia, for one thing, so it's

24 -- it's more consistent -- the time course and -- and the

25 symptoms are not consistent with tardive dyskinesia.

1  Tardive dyskinesia has more abnormal movements, which

2 he's not demonstrating.  Smacking of lip, sticking out

3 tongue repetitively, et cetera, those are more tardive

4 dyskinesia, abnormal mo- -- motions, and he doesn't have

5 it -- them described.

6  Q.  Well, I -- I -- I -- I wonder, though -- Nurse

7 Lewis puts specifically in her assessment that she's --

8 that she's noted speech deficits and then to rule out

9 tardive dyskinesia, and so in her assessment she says, I'm

10 going to rule tardive dyskinesia.

11  How does Nurse Lewis rule of tardive dyskinesia?

12  A.  By asking --

13  Q.  I mean, I understand you think it's not there but

14 she does, so what does she do?

15  A.  What she does is she asks an expert in that area,

16 a psychiatrist who is an expert in tardive dyskinesia, to

17 evaluate Mr. Wesley.

18  Q.  Can EPS -- can EPS progress or get worse?

19  A.  I -- I am certain that, yes, I -- it -- it can

20 get worse.

21  Q.  How does it get worse?

22  A.  The rigidity which starts out as mild and become

23 more -- more significant so more severe rigidity.

24  Q.  If EPS muscle rigidity increases or becomes more

25 severe, does that change the way in which it is treated?

1    A.   No.
2    Q.   If EPS symptoms increase and become more severe,
3  although, the treatment remains the same, does the -- does
4  that change the healthcare provider's level of monitoring?
5    A.   I believe that the -- the actions would -- the
6  actions would be the same and you would -- you would give
7  the medications, and in a person like this, it would not
8  change.  They're already housed in an infirmary.  They're
9  already on hourly checks, so I wouldn't -- I wouldn't
10  think it would requi- -- require any change in the
11  monitoring from that standpoint.
12    So it might require -- in other words, if a person
13  developed EPS and they were general population, you might
14  bring them to the infirmary, but in this case, he's
15  already in the infirmary and already on one-hour checks.
16    Q.   So if -- if -- if you have a patient who -- and,
17  again, I'll use a facetious example.  Let's assume that
18  he's seen by not just a corrections officer but a medical
19  professional and he's seen on the hour, every hour, and on
20  the hour, every hour, he has EPS symptoms that continue to
21  progress.  His stiffness increases.  All of his symptoms
22  progress by the -- the -- the examination of the medical
23  professional.
24    Does that change the treatment plan, the level of
25  monitoring, or does it remain the same; I'll see you every

1  hour.  As it gets worse, take your Benadryl?
2    A.   You're -- you're asking me a hypothetical
3  question?
4    Q.   Correct.
5    A.   Well -- well, I would need to know all -- all of
6  the -- I mean, there's more than just progress -- I don't
7  understand what you mean.  I said it could progress and
8  the rigidity could get worse, but are they developing any
9  distress?  Do they have any respiratory distress?  Do they
10  have any other problems, and what is the status?  So
11  there's -- there's more to the -- to the hypothetical than
12  just it can get worse.
13    Q.   Okay.  So you've got -- you've got the potential
14  that EPS gets worse.
15    What, as the healthcare provider, are you looking for
16  in order to gauge the -- the severity of this patient's
17  condition?  So you've mentioned distress.  You've
18  mentioned breathing.  What else would you, as a healthcare
19  provider, be looking for in this patient?
20    A.   Well, as -- as I mentioned before and as you
21  asked me before, there is no scale for the severity of EPS
22  because EPS is treated the same way no matter its
23  severity.  So I don't know -- I -- I don't believe that
24  there is any particular reason to do anything differently
25  with more severe rigidity or more severe tremors.

1    There's certainly ak- -- akathisia, which is a part of
2  EPS and which Mr. Wesley didn't have, but if akathisia got
3  worse, you might want to give them some medicine to calm
4  them down.  So, in other words, they're -- but we don't
5  see any evidence of that, that he's pacing about and that
6  he has, you know, increased motor movements.  But those --
7  those things could get more severe and would require
8  monitoring and treatment if they developed.
9    Q.   What is akathisia?  I think you described it as
10  increased motor movements and pacing around.
11    A.   That's right.  There's three -- there's three
12  parts to -- there's three components to EPS.  There are
13  three presentations, I should say.  One of them is
14  dystonia, which is the muscle contraction, muscle spasms
15  of the neck, tongue.  That's he -- which -- which he did
16  have.
17    The other -- the second presentation is called
18  parkinsonism symptoms or cogwheel rigidity, as how it's
19  often described, which he had as well.  And then the third
20  component of EPS is akathisia --
21    THE WITNESS:  I think that's spelled,
22  A-K-A-T-H-I-S-I-A.
23    A.   -- which is --
24    THE WITNESS:  I believe that's right.  You might
25  have to check me.

1    A.   -- is increased move -- movement so essentially
2  the inability to sit still so fidgeting around, for lack
3  of a better word, pacing, restlessness, which I don't see
4  any evidence in the --
5  BY MR. BRIDGES:
6    Q.   So if he's --
7    A.   -- record that he had.
8    Q.   Okay.  So if -- let's -- if you have a patient
9  who has EPS and over the course of the day their dystonia,
10  their cogwheel rigidity and their akathisia in- -- excuse
11  me -- increase, the treatment plan does not change.
12    A.   I -- I -- I think you would have to give me more
13  specifics about how severely increased.  Were they having
14  any other distress?  What -- what distress was it causing
15  them?  So it would -- it would -- you would have to give
16  me specifics about, you know, what they were -- what symp-
17  -- signs and symptoms they were showing more than just
18  incre- -- but just simply increasing rigidity, no, I don't
19  believe it would change the treatment plan.  Because you
20  would expect that --
21    Q.   And so what other --
22    A.   -- you --
23    Q.   -- signs and symptoms --
24    A.   -- you would --
25    Q.   -- would you need to know?

72

1   A.   Well, to what -- to what oth- -- other extent
2   they're having symptoms and to what other extent they're
3   having distress or what other problems that they're
4   having.  Just the -- the mere fact of having increased
5   rigidity, increased muscle stiffness, you've already done
6   the treatment, which is to take away the offending drug,
7   and to give them an antihistamine to resolve the symptoms.
8        And you've also prescribed a -- a relax -- a medicine
9   which relaxes the muscles and decreases agitation, so
10  those things are going to take some amount of time to
11  work.  So even with the increased severity, you've done
12  the things that -- that are necessary to treat the
13  condition, and as long as there's no other -- no other
14  problems developing, there's noth- -- there's nothing else
15  to treat.
16       MR. SEAGLE:  This is Scott and --
17  BY MR. BRIDGES:
18       Q.   What --
19       MR. SEAGLE:  -- but I have an objection to the
20  question that preceded that answer.
21  BY MR. BRIDGES:
22       Q.   So what other signs of distress could be commonly
23  associated with the increasing of the muscle rigidity, the
24  dystonia, the akathisias?  You mentioned how much distress
25  a person was in.  You mentioned that I needed to give you

73

1   other information.
2        What other information would I need to give you about
3   that patient to determine how they are responding?
4        MR. SEAGLE:  Objection.  Assumes facts.
5        A.   Well, that -- I -- I don't know the answer to
6   that, either, because in general EPS is not a life-
7   threatening condition.  It needs treated in the manner
8   that we described, and so in the absence of something else
9   occurring, I don't know what else you would -- what else
10  you would do.  That -- that's my point.
11       I don't know that there -- you -- you don't expect EPS
12  to be life-threatening.  You don't expect that it would --
13  that it would cause any other problems, and you've
14  delivered the treatment.  So you would have to tell me
15  what other stress would develop; some other condition
16  developing.
17       I mean, so for as -- as a for instance, there is the
18  rare -- I -- I believe there is -- you know, there are --
19  there are rare consequences of developing neurole- --
20  neuroleptic malignant syndrome and other things that --
21  that there's no evidence that they occurred here, so I --
22  I'm not aware of what they would be.
23  BY MR. BRIDGES:
24       Q.   Let's talk about Mr. Wesley's death.  You -- you
25  believe -- well, tell me what you believe caused

74

1   Mr. Wesley's death.
2        A.   A cardiac arrhythmia.
3        Q.   And what is a cardiac arrhythmia?
4        A.   An arrhythmia is the lack -- is -- is -- it
5   literally means lack of rhythm, so it -- it's probably
6   better to describe it as a dysrhythmia.  But basically a
7   -- an irregular heartbeat that progressed to death --
8   progressed to stoppage of the heart and death.
9        Q.   Let's assume -- and you may not have an opinion
10  on this, but let's assume that Mr. Wesley is not in the
11  Escambia Ja- -- County Jail.  He's at a hospital.  He's --
12  he's not under arrest.  And let's assume that he's hooked
13  up to various machines that make noises in the hospital.
14       Is a cardiac arrhythmia something that can be treated
15  in an Emergency Room or a hospital in an inpatient
16  setting?
17       A.   So you're -- you're --
18       MR. SEAGLE:  This is Scott.  (Unintelligible).
19       A.   All right.  You were -- you were saying that he
20  vi- -- he happens to be visiting in a hospital, or what --
21  tell me what you're -- what are you presu- -- I mean,
22  you're presuming that he happens to be in an intensive
23  care unit at the time and is hooked up to a monitor or
24  that he's visiting at a hospital --
25  BY MR. BRIDGES:

75

1        Q.   Yes.
2        A.   -- or what?  Which one?  What?
3        Q.   No.  He's an inpatient at a hospital.  Let's
4   assume he's hooked up to monitoring devices.
5        A.   So sometimes when you develop arrhythmia, is you
6   die, and sometimes they're successfully treated.
7   Sometimes they are not successfully treated and you die.
8   Your chance of surviving are improved if you happen to be
9   hooked up at a monitor at the time that you have your --
10  your dysrhythmia -- your fatal dysrhythmia.
11       But only a -- but -- but in general people who have
12  cardiac arrest in the hospital have very poor survival,
13  too, because normally they're sicker, so you -- you have a
14  pretty high chance of dying if you suffer cardiac arrest,
15  whether you're in a hospital setting or not.
16       Q.   Do you have an opinion as to -- and -- and let's
17  assume that Mr. Wesley has the conditions that you believe
18  he had or didn't have on -- on the date that he died.
19       If he was in the hospital hooked up to a monitoring
20  device, do you have an opinion as to whether or not he
21  would have survived the cardiac arrythmia that you believe
22  caused his death?
23       A.   I do not have an opinion.
24       Q.   Does the EKG that was performed in 2015 have any
25  bearing on any of the opinions you have in this case?

76

1    A.   Yes.
2    Q.   Okay.  Tell me about that.
3    A.   So that EKG was done when Mr. Wesley was on
4  Risperdal, and it does not show a prolonged QT.  So what
5  that tells us is two things.  Number one, that Mr. Wesley
6  does not have a congenital prolonged QT, which would occur
7  whether or not you're on Risperdal, but in addition,
8  there's no evidence that the use of Risperdal was causing
9  a prolonged QT in Mr. Wesley's case.
10    Q.   How long is a -- is -- is an EKG medically valid
11  on an individual?  In other words, if I had an EKG today,
12  how long into the future would you draw conclusions about
13  my condition based upon that EKG?
14    A.   I -- I don't believe that que- --
15         MR. SEAGLE:  Object --
16         THE WITNESS:  I'm sorry.  I know there was an
17  objection coming, so I'll -- I'll stop -- I will stop and
18  let somebody make the objection.
19         MR. SEAGLE:  Yeah.  This is -- this is Scott, and
20  I just objected to the form of the question.  You can go
21  ahead with your answer.
22    A.   I -- I don't believe that's a question that I can
23  answer.  There is no such thing as an expiration date.
24  There are -- for lack of a better term, on an EKG.  So
25  there are some things like, for instance, congenital

78

1  The baseline EKG you're referring to is the 2015,
2  correct?
3    A.   In -- in March of 2015 less than a year before
4  his death, yes.
5    Q.   You've read the EMS strips in this case?
6    A.   I -- I saw the EMS strips, yes.
7    Q.   Okay.  It's your opinion that torsades was not
8  present; is that correct?
9    A.   That's not entirely true.  It's -- it -- it is my
10  opinion that you -- one cannot -- or that I could not
11  diagnose -- could not say conclusively that that was or
12  was not torsades from that very short -- those very short
13  strips.
14    Q.   Okay.  So you don't have an opinion.
15    A.   I -- I -- I have an opinion that one cannot
16  conclusively say that that was torsades.  I also have an
17  opinion that he, more likely than not, did not have
18  torsades at the time he was at the Escambia County Jail
19  and hooked up to the E- -- AED machine because it did
20  not -- the AED did not deliver a shock.
21    Q.   When you say that you weren't able to, you then
22  expounded that to, one is not able to.
23    You were not able to determine whether or not torsades
24  was present based upon the strips, correct?
25    A.   I could not say conclusively that that was --

77

1  prolonged QT that you can know forever that the person
2  doesn't have.
3    So, in other words, if congenital QT -- prolonged QT
4  is present since birth and it's not present on an EKG,
5  then by the very nature of a congenital condition, it
6  won't come -- come later.  On the other hand, if you are
7  not having a heart attack right now on an EKG, that might
8  change in 30 minutes from now if you start having crushing
9  chest pain, so I don't believe there is an expiration date
10  to an EKG.
11  BY MR. BRIDGES:
12    Q.   The fact that -- that he had a -- an EKG in 2015,
13  which you read to be normal or not showing evidence of a
14  prolonged QT while he was on the Risperdal medication,
15  does that have -- what -- what bearing, if any, does that
16  have on whether or not he could develop prolonged QT a
17  year later while still on the same medication?
18    A.   I -- I -- I think the short answer is I don't
19  really have an opinion.  I don't have an opinion about --
20  about that.
21    Q.   Okay.  Let's talk about torsades.  I'm looking at
22  Page 15 where you -- where you begin to discuss torsades,
23  and it mentions at the top of Page 16, he did not have
24  prolongnat- -- prolongnation of the QT interval on his
25  baseline EKG.

79

1  that those strips represented torsades, no.
2         MR. SEAGLE:  And this is Scott.  We're talking
3  about the EMS strips, correct?
4         MR. BRIDGES:  Yes.
5         MR. SEAGLE:  Okay.
6    A.   There -- yes.  And I want to -- I want to be
7  clear, also, that there are -- there are three different
8  times when there are potential strips or three different
9  rhythm situations, and maybe I should clarify them now
10  or -- or I'm not trying to --
11  BY MR. BRIDGES:
12    Q.   Sure.
13    A.   So, first of all, Mr. Wesley had a cardiac
14  arrest, and I believe that the -- the cardiology expert
15  for the plaintiff -- and I don't recall his name -- but
16  said that there was no AED applied at the jail.  So, in
17  other words, they only did CPR, and that was not correct.
18  They -- they did apply an AED, and the AED did not advise
19  a shock.
20    So torsades is a rhythm that AED are designed to
21  shock, so, in other words, if AED -- if the AED had
22  detected torsades, it should have shocked it.  Because no
23  shock was advised, no shock was delivered.  More likely
24  than not, torsades was not that rhythm.  We don't have
25  those strips with us, or we don't have the strips printed

1 or part of the record.
2    Do you want me to keep --
3    Q.   You do have strips --
4    A.   Go -- go --
5    Q.   Go ahead.
6    A.   I was going to say do you -- I -- I -- I should
7 pro- -- I'm -- I'm -- I'm talking without really answering
8 a question, so you probably -- it's better if you -- if I
9 -- you just tell me what -- you ask a question.
10    Q.   Well -- well, no, no.  I -- I appreciate you
11 explaining your opinion.  The -- the question I've got is
12 that, obviously, there is a doctor in this case that --
13 now, Dr. -- I'm going to butcher his name -- but
14 Dr. Videau, who is the defendant's cardiologist, he
15 testified regarding the rhythm strips and -- and -- and
16 the care that the EMS provided or how the strips were
17 read -- I think that deposition was last week -- and he
18 had some opinions on torsades.  And then the plaintiffs
19 have a cardiologist who says that the strips do represent
20 torsades.  You said you weren't able to make a
21 determination.
22    Does that extend beyond your personal reading of those
23 strips to say a cardiologist could not make that
24 determination?  In other words, plaintiff's cardiologist
25 is wrong.

1    A.   Well, we're talking about separate things here.
2 So I was just now talking about the AED at the jail, but
3 with regard to specifically the EMS rhythm strips, which
4 are present in the chart, I did not -- I did not see
5 evidence that you could say to a reasonable degree of
6 medical certainty that was torsades.
7    So I'm not saying that someone could not come to that
8 conclusion, but it -- it did not appear to me that I could
9 be able to say that.  I also could not conclusively say it
10 was not torsades --
11    Q.   Okay.
12    A.   -- which is --
13    Q.   By the way, am I imposing on something you've got
14 scheduled?  I had it on my books for only two hours and
15 I'm rambling.
16    Do you have somewhere to be?
17    A.   Are you -- you're asking me?
18    Q.   Yeah.  Am I still good?  I don't know if --
19    A.   Oh, no.  I'm -- I'm -- I'm -- you can -- you can
20 talk all day.  I'm good.
21    Q.   As long as I'm paying, you're staying?
22    A.   That's right.
23    Q.   There we go.  Let me see.  We've been going for
24 two hours -- another hour.  Why don't we take another --
25 another five-minute break, and I'll come in and then --

1 and we'll keep going.  Hopefully not that long.  I
2 appreciate it.
3    A.   Okay.  Thank you.
4    MR. RETTIG:   Okay.
5    THE VIDEOGRAPHER:   All right.
6    MR. RETTIG:   Thank you.
7    THE VIDEOGRAPHER:   We're going off the record --
8 oh, watch your microphone, Doctor.  We're going off the
9 record at 11:10 a.m.
10    (WHEREUPON, THERE WAS A SHORT BREAK, AND THE
11 PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
12    THE VIDEOGRAPHER:   We are now back on the record.
13 The time is 11:21 a.m.
14 BY MR. BRIDGES:
15    Q.   I want to turn to Page 16 of your report.  At the
16 bottom of Paragraph Number 5 it says, the standard of care
17 would not require that they -- meaning Dr. Mobley and
18 Nurse Lewis -- take any other action -- other actions than
19 those which were taken, i.e., stop the Risperdal, treat
20 the EPS, keep the patient under observation and follow up
21 to ensure that the EPS has resolved and to restart another
22 anti-psychotic.
23    When you say, keep the patient under observation,
24 what -- what type of observation and how frequently was it
25 required to be done and by whom?

1    A.   Well, so it would not even necessarily require
2 them to be in an infirmary setting or to have hourly
3 checks, so I don't believe that was required by the
4 standard of care.  I believe that exceeded the standard of
5 care.
6    So certainly an infirmary setting in a jail with
7 hourly checks would exceed the level of observation
8 required.  You would not need to be admitted to a hospital
9 or certainly EPS can be treated on an outpatient basis by
10 sending the person home and following up with them, so the
11 -- the level of observation and care in this case exceeded
12 the standard of care required.
13    Q.   Would the standard of care have been met, in your
14 opinion, if Mr. Wesley had been discharged back into the
15 general population on the 15th?
16    A.   I am -- I am -- I -- I don't necessarily have an
17 opinion about that.  That isn't what occurred, and so I
18 don't necessarily have an opinion about that.  I -- there
19 are some jails -- there are some jails which don't have an
20 infirmary, so certainly it could be within the standard of
21 care for somebody to be housed in a general population and
22 to be checked on.  So there -- it -- it could be within
23 the standard of care, yes, but that didn't occur in this
24 case.
25    Q.   I understand that it didn't -- excuse me -- that

84

1  it did not occur in this case.
2      In the setting of the Escambia County Jail, though,
3  what -- could Mr. Wesley have been discharged into general
4  population and Dr. Mobley or Nurse Lewis continue to meet
5  the standard of care had they done so?
6      A.   I am certain there are circumstances which they
7  could have, yes.  I don't know what they were
8  specifically.  I don't know about the Escambia County
9  Jail, the details of that to the extent that a person
10 could be in general population and, yet, still be under
11 some heightened observation.  I don't know to what extent
12 that is or isn't available.
13     Q.   At the time that -- that Mr. Wesley was seen on
14 the 15th, do you know why he was being monitored with --
15 why he was being housed in the infirmary?
16     A.   Yes.
17     Q.   Why?
18     A.   Because of his mental health condition, he -- he
19 had had outbursts of psychotic behavior and was -- it was
20 essentially for his protection because he had been non- --
21 non-compliant or -- not just non-compliant, but he had
22 been, you -- you know, having agitation and outbursts and
23 he wasn't able to get along with the other inmates in his
24 pod.  So he was housed in mental health for his mental
25 health condition.

86

1  pretty typical for a chronic schizophrenic with
2  exacerbation.
3      If you're not used to dealing with that, you might
4  consider that to be difficult.  If you were, it would be a
5  run-of-the-mill patient.  Does that answer your question
6  at all?
7      Q.   It -- it does.  And it allows me to hopefully be
8  more artful in this follow-up question.
9      What are some of the -- the changes in -- in a way
10 that a prudent healthcare provider deals with and treats a
11 chronic schizophrenic versus a -- a patient who is not a
12 chronic schizophrenic and who does not have a mental
13 health condition?
14         MR. SEAGLE:  This is Scott.  Object to form.
15     A.   Well, that's a pretty broad question, but to
16 answer it in context of this case, one houses them in
17 mental health housing in the infirmary.  One meets with
18 them regularly; has mental health roundings weekly; tries
19 medications and assesses the effectiveness of it, which by
20 all indications was beginning to work.  He seemed better
21 in the few days prior to this.  So in short, the -- one
22 does all of the things that they did for Mr. Wesley in
23 this case.
24 BY MR. BRIDGES:
25     Q.   You mentioned that the med- -- you -- you -- I

85

1      Q.   I'm going to use the word, difficult.  You may
2  say, that's an inartful word.  I have a different word.
3      But was Mr. Wesley -- given his mental health
4  condition, was he a difficult patient to treat?
5      A.   (No response).
6      Q.   And I'll use -- I'll use this.  I think of myself as
7  pretty easy to treat because I can generally relay my
8  symptoms, and I don't take any medications and I think to
9  think that I'm mild mannered.  I -- I look at Mr. Wesley's
10 presentation and think he was presenting differently than
11 I would.  Maybe he was a difficult patient to treat.
12     A.   One has to take in -- I -- so that -- that's a
13 question or your -- your -- your -- your question to me
14 is:  Do I believe he was a difficult patient?
15     Q.   Yes.
16     A.   Well, I would -- I would answer that maybe with
17 a -- a -- maybe not the way you would prefer me to answer,
18 but I would say he probably wasn't any more difficult to
19 treat than your average chronic schizophrenic who was in
20 the jail.  I mean, the -- he's -- he appears pretty
21 typical.  This is the way they -- you would accept a
22 chronic schizophrenic.
23     I'm quite certain that -- that Dr. Mobley -- this is
24 -- he would tell you he -- he didn't see this as being
25 different.  I -- I would see Mr. Wesley's presentation as

87

1  think you said the medication was working for Mr. Wesley.
2      A.   I did say that.  What -- what -- what I meant by
3  that was the notes that were -- that preceded this day
4  indicated that he seemed much better.  He had been doing
5  poorly a couple of weeks prior to this, and it appeared in
6  the -- in the mental health rounds prior to the 15th that
7  he seemed to be doing better.
8      Q.   So he had been doing poorly, improving and then
9  would you agree with me that at least by the 13th, he
10 was -- he -- his condition was deteriorating?
11     A.   Well, I was talking most about his mental health
12 status and his -- his psy- -- psychosis.  This is a
13 development of a side effect, which is different than --
14 so he wasn't necessarily worse from a psychotic standpoint
15 or -- or -- we don't know if he was or wasn't, but I was
16 talking about his psy- -- psychosis appeared to be
17 improving.
18     Q.   What -- what -- what -- what complications does a
19 person or -- and -- and I'm struggling to find the right
20 words, so maybe you'll be able to help me with this.
21     But a healthcare provider who is trying to treat a
22 chronic schizophrenic in -- in either obtaining patient
23 history or coop- -- cooperation with examinations, what --
24 what difficulties in that sense does -- does chronic
25 schizophrenia have when you're trying to treat a patient

1  like that?
2      A.    (No response).
3      Q.    In other words, are they good historians?  Are
4  they able to communicate?  Are their words clear?  Ara
5  they able to understand the practitioners?
6      A.    I think that their -- the record in Mr. Wesley's
7  case exactly demonstrates a -- a typical -- the typical
8  difficulties, the typical presentation of the chronic
9  schizophrenic with exacerbation.  I mean, this is -- you
10  -- you read -- you read it in the records.  It's exactly
11  what you see here.
12      Q.    Such as?  Can you lay them out for me, though?
13      A.    The difficulties?  Such as he was uncooperative
14  with exam.  He was -- you know, he was -- he got agitated
15  and he couldn't get along with other people.  He was
16  having delusions.  He was hallucinating from time to time.
17  He was eating trash one day.  He was hygienically
18  challenged.  All of the things that you see in here are --
19  are typical chronic schizophrenic presentation.
20      Q.    Do you have any reason to believe that those --
21  those same symptoms or presentations were not president --
22  present on the 15th?  In other words, the agitation, the
23  delusion, the hallucinations.
24      A.    Well, to the extent the -- the -- the mental
25  health notes from a few days prior said he was improving,

---

1  I -- to the best of my knowledge, those things were
2  improving as we got closer to the 15th.
3          THE WITNESS:  I keep forgetting to look at the
4  camera.  That -- that may help.
5  BY MR. BRIDGES:
6      Q.    Did Mr. Wesley's speech deteriorate from the 13th
7  through 15th?
8      A.    I -- I don't know for certain, but it appears to
9  me that he had EPS.  He had dystonia of the tongue, which
10  made his speech more difficult, yes.  It was certainly
11  more present on the -- the 15th, yes.
12      Q.    Do you agree that by the 15th, Mr. Wesley was
13  blatantly psychotic?
14      A.    No, no.  I don't -- I don't think I would
15  agree -- agree with that.  He was chronically psychotic
16  and his symptoms had been more residual in nature.  He had
17  an exacerbation during this -- during this incarceration,
18  and he was clearly psychotic earlier.  And I -- I would
19  defer to the opinion of Dr. Mobley or the other
20  psychiatrist about whether he was or wasn't psychotic at
21  that -- at that particular moment.
22      I would -- I would say that he probably likely
23  was -- still had some degree of psychosis, but I -- I
24  don't know that for certain.  I'm not saying that to a
25  reasonable degree of medical certainty.

---

1      Q.    If he was blatantly psychotic on the 15th when he
2  was examined, what -- what -- what could that manifest
3  itself as in Mr. Wesley?
4      A.    I'm -- I'm sorry but I don't -- I'm -- I'm sorry
5  but I don't understand the question.  Meaning I -- I
6  don't -- it could manifest itself as a psychotic person
7  with EPS.  I don't -- I'm -- I'm not trying to be smart
8  alecky, but I -- I don't know what you -- what you're
9  getting at.
10      Q.    Well, and -- and -- no, no, no.  You're not.
11  What I'm trying to get is all of the different -- all --
12  all of the different ways that somebody would -- would
13  present.  In -- in other words, you've got somebody who is
14  psychotic.  In what ways would that present itself?  In
15  other words, an inability to speak, an inability to focus.
16      A.    Well, it would present itself in all of the ways
17  that Mr. Wesley had been presenting himself over the
18  course of the last couple of weeks; the uncooperative,
19  vital signs, talking to himself, mumbling, standing at the
20  door eating trash.  It would present all of those things.
21      And then in addition to that, he developed EPS, which
22  is -- often happens in chronic schizophrenics and people
23  who are psychotic because they're the ones on anti-
24  psychotics and, therefore, people on anti-psychotics are
25  the ones that develop EPS.

---

1      So I'm not trying to talk around in circles, but, I
2  mean, it was a psychotic guy who was maybe getting some
3  better or -- you know, and -- and maybe was or wasn't
4  still psychotic and now has EPS on top of that.
5      Q.    Could Mr. Wesley have been referred to an
6  Emergency Room that day?
7          MR. SEAGLE:  This is Scott.  Object to form.
8      A.    Well, I would have to answer the question, of
9  course, could -- anything -- I mean, could -- yes.  He
10  could have been.  It was not necessary or not required by
11  the standard of care, and he should not have been.  But,
12  obviously, could is a -- is a -- is a ans- -- a question
13  that requires a, yes, answer.
14      (WHEREUPON, THERE WAS A SHORT PAUSE, AND THE
15  PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
16  BY MR. BRIDGES:
17      Q.    You described how medical monitoring was in place
18  at the infirmary.
19      The medical monitoring, is that the hourly checks by
20  correction officers?
21      A.    In -- in addition to that, 24-hour-a-day presence
22  of nurses.
23      Q.    But the presence of nurses is not active mon- --
24  is not monitoring a patient, correct?  It's merely their
25  presence.

1    A.   I would disagree.

2    Q.   Okay.  Explain that to me.

3    A.   Well, you're in an infirmary, which is a confined
4    space, for lack of a better term.  I mean, it's set up --
5    it is not a -- it is not a licensed healthcare facility.
6    It's not like a hospital but set up similar to that, in
7    that in the center of them, most of them -- and I believe
8    the description of the Escambia County Jail is similar --
9    there is a nurses' station in the middle.

10   There are cells surrounding that, which are housed
11   infirmary patients.  Nurses -- more than one nurse or, at
12   least, more than one medical personnel present around the
13   clock along with officers, who are trained to work in that
14   medical environment, who are keeping inmates who are
15   housed in the infirmary under either relatively or -- or a
16   -- in some cases actual constant observation.

17   So, in other words, there is glasswork where you can
18   see into cells often.  There is -- the nurses are present
19   within steps and within sight and sound of the inmates, so
20   they can easily call for assistance if they need it.  So I
21   -- I would -- would say it's much more than just pre- --
22   physical presence of the nurses.

23   Q.   Are -- are -- are you aware, though, of the --
24   the location of the nurses in -- in the Escambia County
25   infirmary?

---

1    A.   I have not ever visited there.  It is my
2    understanding that there is a central nursing station or
3    office and the cells that go around that in a U-shaped
4    fashion.  That's my understanding of it.

5    Q.   So you just -- and I want to make sure that I'm
6    using your terms correctly.

7    When you say, medical monitoring, that -- in your
8    mind, that encompasses hourly checks by correctional
9    officers in cells located within the infirmary staffed by
10   medical professionals?

11   A.   Well, not just that.  It is my understanding
12   that -- that there were -- there are certain protocols
13   which are followed for mental health housing patients; for
14   other protocols that are followed for suicidal patients
15   and then, at least, a couple of levels of medical
16   monitoring, so the -- the amount of monitoring would be, I
17   think, dependent upon the condition.

18   So, for instance, a person who is actively suicidal
19   might have constant one-to-one observation, and, again,
20   I'm using examples.  I'm not saying the specifics.  But so
21   if a person required medications multiple times a day,
22   they would receive them.

23   There are certain routine medication times, though.
24   There's routine medication dispensing, but the level of --
25   of monitoring and care could to some extent depend on the

---

1    patient and their condition.

2    Q.   What was the medical monitoring, as you
3    understand, that Mr. Wesley was receiving on the day he
4    died?

5    A.   He was under the mental health housing, it was my
6    understanding, and they had a particular protocol for the
7    frequency with which mental health professionals would
8    visit -- visit Mr. Wesley and would record -- you know,
9    make notations about him.

10   He -- it was also my understanding that he was to have
11   blood pressure checks once a week; that he was to have
12   observation by an officer who was trained to work in the
13   infirmary on an hourly basis and to record Mr. Wesley's
14   condition and activities, and that there were nurses
15   present 24 hours a day to respond to his medical needs.

16   Q.   In your opinion, was there a change in
17   Mr. Wesley's condition between his January 13th
18   examination and his January 15th examination with Nurse
19   Lewis?

20   A.   To the best of my recollection -- and I -- and I
21   probably should come back to that -- but to the best of my
22   recollection, the -- the notation made on the 13th was
23   made not by a provider but by a nurse in the infirmary,
24   and so I -- I don't think those evaluations were
25   equivalent.

---

1    What I can say is that on the 15th, he had EPS.  I --
2    I don't know for certain what his condition was.  If you
3    want me to read that nurse's notation and see what I can
4    make from her -- that nursing assessment, I will, but it
5    was not a provider's assessment on that date.

6    Q.   I would like you to, yes, please.

7    A.   (Examining document).  (Short pause).  So, in my
8    opinion, yes, there was a change in his condition between
9    the 13th and the 15th.

10   Q.   Can you tell me what that change was?  And also
11   can you speak up.  It got a little quiet there for a
12   second.

13   A.   Okay.  So remember that I said on the 13th --
14   this is a mental health note and it's written by a nurse,
15   and I don't have her credentials on the -- the paper that
16   I'm looking at but a -- an RN or an LPN.  She says,
17   patient alert and oriented times three.  No signs and
18   symptoms of distress.  As patient states, quote, I'm doing
19   good.  I'm cold, end quote.  Patient had blanket around
20   him at the time.  Patient drooling and speech is slurred.
21   Still able to understand him, and it goes on.

22   So it -- that is a different description than, you
23   know, Dr. Mobley saying he could not understand what he
24   was saying that morning, and it says, I'm doing good, et--
25   et cetera.  So there's -- he's developed EPS.  He may have

1 had mild EPS on this day, but he's developed more
2 significant EPS by the 15th.
3    Q.   Any changes -- and -- and -- and I'm talking
4 about Nurse Lew- -- Lewis's note right now.  Any -- any
5 changes in his vital signs or physical examination between
6 the 13th and the 15th?
7    A.   Again, you're comparing apples and oranges.  One
8 of them is a nursing note in the infirmary and one of them
9 is a provider assessment, so I can't -- I don't think
10 those are equivalent to be able to make that comparison.
11    Q.   You don't believe a nurse's physical exam and an
12 ARP's physical exam can be compared?
13    A.   Well, I -- I just -- I just did.  I mean, I just
14 told you that -- it says one of -- I just said -- I'm
15 saying that she said -- one of them said that they could
16 understand her (sic), and then Dr. Mobley says they can't.
17 So, I mean, there's some change in his condition, but that
18 is a nurse's description versus a -- a nurse practitioner
19 and then a doctor's assess- -- assessment.
20    And those are different levels of assessment, and I
21 don't know they're equivalent.  Maybe I need to shut up
22 and then you ask the question again.  I don't -- I don't
23 seem to remember what -- what the question was.
24    Q.   Sure.  I mean, my -- I -- I guess, my -- my
25 question is:  And -- and -- and, look, you may tell me

1 that's -- I can't answer the question because I can't
2 compare the two, and that's a -- that's a fine answer.
3 What I'm trying to understand, though, is we've got an
4 exam that takes place on -- we've got an exam that takes
5 place on the 13th by a -- a -- a nurse who ultimately
6 makes the decision this patient needs to be referred to
7 ARNP Pease and now ARNP Lewis.  And so I'm wondering is
8 there a difference -- and -- and you -- you've mentioned
9 the speech has changed.
10    Is there anything different on the remaining physical
11 examination between the nurse's encounter on the 13th and
12 Nurse Lewis's encounter on the 15th?
13    A.   About the best that I'm going to be able to
14 answer that is to say I can't tell for certain to what
15 extent the 13th is Mr. Wesley's baseline over the last
16 couple of weeks versus him starting to development mild
17 EPS.  But what I can say is by the 15th, he had developed
18 the symptoms of EPS, so that's about the best that I'm
19 able to answer.
20    Q.   What changes, if any, are there between Nurse
21 Lewis's examination, physical, objective, subjective, and
22 Mr. -- I mean, Dr. Mobley's examination on the 15th?
23    A.   I -- I don't have an opinion that there were any
24 differences.  If you want me to look at the exact
25 language -- I mean, you can look at the language exactly

1 as I can and see to what extent there is a difference in
2 the languages, but I don't have an opinion that there was
3 any difference in his condition between those two times.
4    Q.   Okay.  And we've talked about how you -- you
5 don't read supp- -- supple neck to be exclusion of stiff
6 neck, and so I want to make sure that there aren't any
7 other descriptors in the notes between Nurse Lewis and
8 Dr. Mobley that you either equate as a -- you know, as --
9 as -- as the same thing or different.  You're --
10    MR. SEAGLE:  I -- I object to --
11 BY MR. BRIDGES:
12    Q.   That's what I'm trying to figure out.
13    A.   (No response).
14    MR. SEAGLE:  And I will also interpose an
15 objection of best evidence.
16    A.   (Examining document).  So Nurse Practitioner
17 Lewis -- that -- that would be a -- sort of a futile
18 exercise because I'm just looking at -- straight at the
19 language, but, I mean, it says -- Nurse Practitioner Lewis
20 says, tongue mobile.  Protruding from mouth at rest.
21 Speech garbled and unclear.
22    And Dr. Mobley says, has an abrupt change.  Doing
23 fairly well in conversation with superficial but he's not
24 blatantly psychotic.  Recently has started mumble with
25 thick tongue protruding through the lips.  Has also been

1 hiding under cover and not talking at all.  Then he
2 describes him eating and drinking, and I'm going on -- I'm
3 skipping further down, and he starts to talk in mumbles
4 that are not comprehendible.
5    So, I mean, those are different slightly in wording.
6 My interpretation of that is -- is not significantly
7 different condition one time to the next.  There is the
8 potential that -- that he has more -- more clearly
9 apparent EPS at the time Dr. Mobley saw him than at the
10 time Nurse Practitioner Lewis saw him, but that's the only
11 real difference that I can see.
12    Q.   Do you have an opinion as to whether or not
13 Mr. Wesley's blood pressure was elevated on the 15th as
14 compared to the last reading that was done on the 13th?
15    A.   I -- I have no -- I have no reason to believe
16 that it would have been different.  I -- I'm not aware of
17 any literature that connects to the development of EPS
18 with elevated blood pressure, and I have no reason to
19 believe it would have been.
20    Q.   Do you believe that Mr. Wesley was at risk for a
21 cardiac arrest given his EPS symptom -- or given the
22 symptoms that he was exhibiting when he was seen by Nurse
23 Lewis or Dr. Mobley?
24    A.   I -- I believe that Mr. Wesley was at risk of
25 cardiac arrest due to his age and his -- having

100

1  schizophrenia and his having coronary artery disease, but
2  that was -- is unrelated to his development of EPS.
3      I am aware of no literature which connects the
4  development of EPS and the development of cardiac
5  arrthymia, so those are unrelated.  But, yes, Mr. Wesley
6  was certainly at risk of cardiac arrest on that day and
7  every other day due to his -- due to his risk factors.
8      Q.   Any other opinions you have in this case, or is
9  there anything else that -- as you sit here you think if
10 only he was smart enough to ask me this question, I would
11 tell him this?  Anything like that?
12     MR. SEAGLE:  This is Scott.  Object to form.
13     A.   I -- I have -- I have one thing that I think
14 we should continue my answer or finalize.  We talked about
15 the torsades and the three different times where there
16 were rhythm obtained.  In other words, where there were
17 analysis of rhythms.
18     The AED at the facility, which we do not have the
19 strips of, the EMS strips, which we have already talked
20 about and then the strips at the hospital and/or the
21 hospital records.  So if you don't mind, I would like to
22 tell you about the -- my opinions about the -- the
23 hospital.
24     Q.   Sure.
25     A.   Which is that, that code summary which we're --

101

1  the code summary describes two places at which there was
2  described to be torsades, and we don't know for certain
3  who it was that made that analysis or who made the
4  decision to put that down.
5      There are in the Baptist Hospital records some rhythm
6  strips, which were obtained at the hospital, and the
7  rhythm strips, which are present in the -- in the hospital
8  record do not show torsades.  They show that torsades was
9  not -- or that the rhythm strips that are present in the
10 chart do not show torsades.
11     Q.   Anything else?
12     A.   That's all that I can think of at this moment.
13     MR. BRIDGES:  I appreciate your time, Doctor.  I
14 think those are all of my questions.
15               EXAMINATION
16 BY MR. SEAGLE:
17     Q.   Doctor, this is Scott Seagle.  I've got just one
18 or two quick follow-ups.  You already hit one of them, I
19 think, there at the end.
20     But just in generalities, Doctor, have you seen and
21 treated EPS in your practice in the past?
22     A.   Yes.  Hundreds of times.
23     Q.   Okay.  That was my next question.
24     How many times?
25     A.   A -- a lot.  We used to -- so when we used to use

102

1  first interation (sic) -- first generation anti-
2  psychotics, we used to see it much more frequently, so it
3  was -- and in a jail setting, it's not at all uncommon to
4  see and treat EPS.
5      Q.   Okay.  I think you said -- you said hundreds of
6  times, correct?
7      A.   Yes.  Of not thousands.
8      Q.   Okay.  And -- and -- and what is the standard and
9  accepted treatment for EPS, what procedure?
10     A.   The first thing to do is to remove the offending
11 anti-psychotic, at least, temporarily, if possible.  Then
12 treat -- treat the EPS directly with some medication such
13 as an antihistamine such as Benadryl and then provide some
14 other medication to provide muscle relaxation and/or
15 decrease in agitation such as the Ativan that was
16 prescribed in this case.
17     And then to expect the symptoms to resolve over the
18 next couple of days so there is no indication to send the
19 person to the Emergency Department for the development of
20 EPS.
21     Q.   And is -- is that how you have treated the
22 patients that you have evaluated with EPS, is with a
23 procedure like that?
24     A.   Absolutely.
25     Q.   And a doctor employing a similar procedure would

103

1  be acting within the standard of care and treatment of EPS
2  symptoms, correct?
3      A.   Absolutely.
4      Q.   Are all of the symptoms -- the physical symptoms
5  that Mr. Wesley presented with on the 5th attributable to
6  EPS?
7      A.   Yes.
8      Q.   Okay.  That -- does that include the tongue that
9  is described in the records?
10     A.   Yes.  That is a --
11     Q.   And that --
12     A.   -- dystonic -- that is a dystonic reaction, which
13 is a part of EPS.
14     Q.   Okay.  Is that a -- a -- a rare dystonic
15 reaction, to have that type of thing, or is that something
16 that was -- is -- is --
17     A.   I --
18     Q.   -- not by EPS?
19     A.   -- act- -- actually, the -- the tongue and -- the
20 tongue protruding and the neck -- or what we call
21 torticollis, the neck twisting to the side, are the two
22 classic dystonic reactions.
23     Q.   Are any of those EPS symptoms emergent in nature?
24     A.   No.
25     Q.   Based upon your review of the record, do you

104

1 agree that EPS was the correct diagnosis for Mr. Wesley?

2   A.   I do.  Not only based on the records but based on

3 the Autopsy Report, there was -- none of the other

4 possibilities were, in fact, present.

5       MR. SEAGLE:  Doctor, that's all I have.  Thank

6 you for your time.

7       MR. RETTIG:  This is Greg Rettig.  I don't have

8 any questions.

9       THE VIDEOGRAPHER:  All right.  Is that

10 everything?

11       THE WITNESS:  What about the -- my ability to

12 read and sign the transcript?

13       MR. SEAGLE:  Amy, we will read and sign.

14       THE REPORTER:  Okay.

15       MR. SEAGLE:  If you'll send it to me, I will take

16 care of getting it to Dr. Fowlkes.

17       THE VIDEOGRAPHER:  Well, this concludes the

18 deposition of Dr. Fowlkes.  We are going off the record at

19 11:56 a.m.

20       (WHEREUPON, AT THIS TIME, THE TESTIMONY CONCLUDED

21 AT 11:56 A.M.)

---

106

1           C E R T I F I C A T E

2 STATE OF MISSISSIPPI   )
                         )
3 COUNTY OF _____   )

4

5       I, Amy D. McCullough, CCR #1653, Certified Court
Reporter, in and for the State of Mississippi do hereby
6 certify that the above deposition was reported by me, and
the transcript is a true and accurate record to the best
7 of my knowledge, skills, and ability.

8       I further certify that I am not related to nor an
employee of counsel or any of the parties to the action,
9 nor am I in any way financially interested in the outcome
of this case.

10       I further certify that I am duly licensed by the
Mississippi Board of Certified Court Reporters and as a
11 Certified Court Reporter as evidenced by the CCR number
and expiration date following my name below.

12

13       I further certify that this transcript is the
work product of this court reporting agency and any
14 unauthorized reproduction and/or transfer of it will be in
violation.

15

16

17       AMY D. McCULLOUGH,
         CCR #1653 (MS)
18       Expiration Date 12-31-19
         ALPHA REPORTING
19       CORPORATION
         236 Adams Avenue
20       Memphis, Tennessee 38103

21

22

23

24

25

---

105

1         ERRATA SHEET FOR THE TRANSCRIPT OF:

2 I, the undersigned, _____, do hereby certify
that I have read the foregoing examination and that, to
3 the best of my knowledge, said deposition is true and
accurate with the exception of the following corrections
4 listed below:

5               CORRECTIONS

6 Page Line Now Reads   Should Read   Reasons Therefore

7 ____ ____ _____  _____    _____

8 ____ ____ _____  _____    _____

9 ____ ____ _____  _____    _____

10 ____ ____ _____  _____    _____

11 ____ ____ _____  _____    _____

12 ____ ____ _____  _____    _____

13 ____ ____ _____  _____    _____

14 ____ ____ _____  _____    _____

15 ____ ____ _____  _____    _____

16 ____ ____ _____  _____    _____

17 ____ ____ _____  _____    _____

18 ____ ____ _____  _____    _____

19 ____ ____ _____  _____    _____

20 ____ ____ _____  _____    _____

21 ____ ____ _____  _____    _____

22

23

24         _____
          Signature of Deponent

25         _____
                  (Date)

---

**1**

**2018** 8:1
**2019** 6:2
**12** 22:19
**14** 27:6 94:15
**24-hour-a-day** 91:21
**2:00** 20:11 22:2
**2:15** 24:19 28:11
**2:30** 21:6 22:19 24:14, 19
**3** 10:20,22
**30** 77:8
**35** 6:25
**4** 45:10 48:17
**5** 82:16
**50/50** 12:12
**55** 49:22,23
**5th** 103:5
**6** 19:12 46:1,3 50:5
**7** 66:16
**8** 46:3
**9** 9:10 6:2

**1** 10:21
**10:11** 48:9
**10:20** 48:13
**11** 48:17
**11:00** 41:17
**11:10** 82:9
**11:21** 82:13
**11:56** 104:19,21
**12** 50:5
**13** 51:5,12,14 58:5
**13th** 6:2 19:14 27:5 49:14,16 87:9 89:6 94:17,22 95:9,13 96:6 97:5,11,15 99:14
**14** 19:13
**14th** 43:20 44:5
**155** 49:19,21,23
**15th** 19:19 24:17 31:24 43:21,25 44:4,8,12 46:14 50:1,11 51:23 52:8,24 53:10 57:9 83:15 84:14 87:6 88:22 89:2,7,11,12 90:1 94:18 95:1,9 96:2,6 97:12,17,22 99:13
**16** 19:24 45:11 46:2 77:23 82:15
**18** 17:4,5
**1983** 13:15,25

**2** 10:21 14:2 44:23 45:12,18,21 46:1,3
**2015** 75:24 77:12 78:1, 3
**2016** 31:24

**A**

**A-K-A-T-H-I-S-I-A** 70:22
**a.m.** 6:2 48:9,13 82:9, 13 104:19,21
**abilities** 59:4
**ability** 52:13,20 56:19 58:21 59:6,12 104:11
**abnormal** 65:18,22 67:1,4
**abrupt** 98:22
**absence** 73:8
**absent** 19:6
**absolutely** 22:11,13 25:8 102:24 103:3
**absurd** 34:23 35:13,15
**abuse** 14:5,10,21 15:25 16:2,6
**accept** 85:21
**accepted** 102:9
**acknowledge** 19:7
**act-** 103:19
**acting** 103:1
**action** 60:13 82:17
**actions** 13:5,15 68:5,6 82:18
**active** 91:23
**actively** 93:18
**activities** 94:14
**actual** 92:16
**ad-** 53:20
**add** 66:10
**addiction** 16:1,11
**addition** 24:22 76:7 90:21 91:21
**additional** 7:7,24 20:4 35:9
**address** 9:10

**addresses** 9:12
**adequate** 31:3 36:14 40:11,15 59:19 60:15
**adequately** 53:20 56:8 60:2,6
**adjacent** 26:19
**administrative** 13:7 15:19
**admitted** 83:8
**adopt** 23:10
**Adrian** 6:17 44:6
**advertise** 17:25 18:1
**advise** 79:18
**advised** 79:23
**AED** 78:19,20 79:16, 18,20,21 81:2 100:18
**af-** 9:23
**afraid** 41:5
**afternoon** 20:11 21:6
**age** 99:25
**agitated** 49:3 88:14
**agitation** 72:9 84:22 88:22 102:15
**agree** 20:10,12 21:4,7, 10,12,14,19,23 22:18 24:11,13,14 25:5 27:11 37:5,8,22 57:3,5,15,16 54:15 55:7,10,15,16,18 56:2,21 57:13,25 58:2, 19 59:2,7,16 66:1 87:9 90:2,12,15 104:1
**ahead** 7:11 14:17 21:13 26:11 51:19 76:21 80:5
**aid** 52:14
**AIMS** 43:2
**ak-** 70:1
**akathisia** 70:1,2,9,20 71:10
**akathisias** 72:24
**alecky** 90:8

alert 65:6,19 95:17
altered 65:17 66:18,19
ameliorate 44:14 47:3
amelioration 46:22
amount 31:8,20 36:14 72:10 93:16
Amy 104:13
analysis 100:17 101:5
and/or 54:2,3 56:12 100:20 102:14
ans- 91:12
answering 80:7
anti- 90:23 102:7
anti-psychotic 82:22 102:11
anti-psychotics 90:24
anticipate 46:11,12
antihistamine 72:7 102:13
apologize 35:19 41:10
apparent 99:9
apparently 10:21
appearance 54:6 55:23
appeared 21:2,15 23:2 87:5,16
appearing 45:19
appears 12:11 21:5,20 22:1 28:6 60:23 85:20 89:8
apples 96:7
applied 79:16
applies 9:11 24:6
apply 79:13
appreciated 11:9
appropriately 9:6 16:21 17:2,4,8 20:11

21:6 47:13
Ara 88:4
area 16:23 67:15
areas 8:13
ARNP 27:7 97:7
ARP's 96:12
arrest 74:12 75:12,14 79:14 99:21,25 100:6
arrhythmia 51:7,23 58:7 74:2,3,4,14 75:5
arrived 27:17
arrhythmia 100:5
arrythmia 75:21
artery 100:1
artful 86:8
asks 67:15
aspect 58:19
assess- 96:19
assesses 86:19
assessment 33:12,13, 21 43:8 56:13 57:1 58:25 60:8,15 61:4 67:7,9 95:4,5 96:9,19, 20
assistance 92:7
assume 56:18 102:1 74:10,12 75:4,17
Assumes 7:4
assumption 22:21 62:7
assumptions 22:7 54:20 62:4,6
Ativan 12:15
attack 77:7
attributable 101:9
auto-populated 20:14 28:12
auto-populates 20:14
Autopsy 104:3

average 85:19
avoid 8:12
aware 10:3,5,14,17,25 40:22,23 54:22,23 61:15 73:22 92:23 99:16 100:3

## B

back 6:24 24:12 28:3 40:2,24 47:23 48:12 58:5 60:18 82:12 83:14 94:21
bad 12:12 44:11 49:9
Baptist 101:5
barriers 52:25
based 8:7 24:13,15 25:24 27:24 28:16,19 29:3,8 38:22 42:4 65:3 76:13 78:24 103:25 104:2
baseline 77:25 78:1 97:15
basically 74:6
basis 41:19 83:9 94:13
beeping 11:4 75:25 77:15
bed 61:7
began 17:23
begin 77:22
beginning 25:2 86:20
behalf 6:18 11:18,20 12:6,23 14:9
behavior 84:19
believed 22:25 30:8 62:12
believes 30:24
Benadryl 47:2,9,16 69:1 102:13
birth 77:4
bit 19:8 33:2 58:12 59:22

blanket 95:19
blatantly 89:13 90:1 96:24
blood 48:20 49:15,22, 25 94:11 99:13,18
Board 14:22,23
bodies 12:7
body 12:8
books 81:14
bore 28:8
bottom 19:13,20 48:19 82:16
BP 48:24,25 49:6
break 11:17 48:7,10 81:25 82:10
breaking 14:25
breath 52:1 54:4 76:14,16,23,25 57:2,6, 14 61:10
breathing 54:10 69:18 97:15
Bridges 6:12,17 25:21 28:25 31:6 32:25 37:25 38:10 40:19 41:1,4,11 44:10,21 45:9 47:1 48:6,14 55:6,9 58:4 61:23 62:16 71:5 72:17,21 73:23 74:25 77:11 79:4,11 82:4 86:24 89:5 91:16 98:11 101:13
bring 68:14
brings 60:18
broad 10:9 86:15
broadly 8:17
brought 6:18
bulk 7:19 16:15
bullet 38:21
butcher 80:13

## C

ca- 15:6

---

75:17
conduct 23:25
confined 92:3
confirm 18:22
confirmed 18:19
congenital 76:6,25 77:3,5
connect 41:6
connects 99:17 100:3
consequences 73:19
considered 64:20
consistent 35:21 50:13 66:23,24,25
constant 92:16 93:19
consultant 35:12,16 36:6
context 23:6 86:16
continue 68:20 84:4 100:14
CONTINUED 40:24 45:8 48:11 62:11 91:15
contraction 71:14
controlled 45:18
conversation 30:15 98:23
Conversely 57:23
convey 30:17,19 34:14,18 35:24 36:16 37:13
conveyed 30:5,12 34:5 54:20
coop- 87:23
cooperation 87:23
coronary 100:1
Corr- 27:21
correct 7:8,9 11:25 15:5,16 18:10,11 21:21,22 22:22 26:8,9 27:12,21 28:16 29:3 31:23 35:9 42:5 43:22 44:9,25 48:2,4 51:4

deal 11:13
dealing 86:3
deals 86:10
correction 91:20
correctional 9:17 12:5,12 13:1,13 16:16, 18,19 17:11,22 20:23 42:16 93:8
corrections 68:18
corrective 46:9,11
correctly 15:21,22 21:14 33:19 93:6
County 6:19 24:6
consistent 50:13
couple 17:12 38:12 40:8 41:14,15 87:5 92:8 93:15 97:16 102:18
court 6:4 12:6,7 14:21 32:23 40:19 41:5
cover 8:12 56:5 99:1
CPR 79:17
created 21:6,7,15,24
credentials 95:15
crushing 77:8
current 11:10
cut 10:21 19:15 41:2
CV 7:1 11:1

## D

daily 45:11
date 75:18 76:23 77:9 95:5
day 18:6,16 20:17 21:17 29:10 30:18 40:6 43:16 45:12 50:10 61:13 63:24 71:9 81:20 87:3 88:17 91:6 93:21 94:3,15 96:1 100:6,7
days 46:22 47:3,11,14, 18 86:21 88:25 102:18

depositions 7:3,14, 16 21:22,8 23:20 27:25 37:5
deps- 7:22
describe 74:6
describes 30:21 50:20 70:13
description 7:2 92:8 50:25 65:6 99:2 101:1
descriptors 98:7
designed 79:20
details 84:9
detected 79:22
deteriorate 89:6
deteriorating 87:10
determination 33:13 60:7 80:21,24
determine 24:15 60:2, 6 73:3 78:23
determining 18:15
develop 57:18 73:15 75:7 76:10 86:9
developed 68:13 70:8 90:21 95:25 96:1 97:17
developing 64:19,20 83:17 96:2 97:10
development 43:3,16 64:16 87:13 97:16 99:17 100:2,4 102:19
deuce 75:20
devices 75:4
diagnose 78:11
diagnosis 52:14 63:25 64:1 72:25 104:1
die 75:6,7
difference 50:25 97:8 98:1,3 99:11
differences 97:24

---

call 6:15 13:8 18:2 92:20 103:20
called 62:21 70:17
calls 17:14
calm 70:3
camera 65:4
capacity 12:17,22,25
cardiologist 8:25 80:14,19,23,24
cardiologists 8:13
cardiology 9:1 79:14
care 9:11,14 12:19 31:10,14,17,19,25 25:3 35:3,6,21,22,25 36:16 37:15,21,24 38:2 62:24 63:16 74:23 80:16 82:16 83:4,5,11, 12,13,21,23 84:5 91:11 93:25 103:1 104:16
caregivers 62:22
case 6:22 7:3,5 8:10, 14,17 11:5,15,22,24 12:18 13:13 14:3,19 15:3,7,14 17:18,21,22, 23 21:3 23:18 28:19 36:9 60:4 68:14 73:25 76:9 78:5 80:12 83:11, 24 84:1 86:16,23 88:7 100:8 102:16
cases 11:11,12 12:4, 11,14,16 13:1,7,8,9,10, 12,13,17,22,23,24 14:19 15:1,19,23 16:6, 9,11,13,16,17,21 17:12,17,24 23:7 55:20 92:16
caught 10:14
causation 12:20
caused 7:25 17:17 73:25 75:22

18:22
causing 71:14 76:8
cell 42:13 49:12
cells 26:18,19,24 92:10,18 93:3,9
center 92:7
central 93:2
certainly 7:8 19:19, 20 81:6 89:25
cetera 63:16 67:3 95:25
challenged 88:18
chance 9:19 75:8,14
change 7:25 8:3,6 10:12 17:17 19:21 21:20 22:2 28:20 30:22 31:13 36:12,17 38:18 47:20,25 50:10,13,19, 25 51:4 67:25 68:4,8, 10,24 71:11,19 77:8 94:16 95:8,10 96:17 98:20
changed 9:7 9:14
charge 7:2
chart 81:4 101:10
charted 23:6,14
charting 22:1 84:7
check 70:25
checked 43:2
checks 42:17 68:9,15 63:3,7 91:19 93:8
chest 51:25 54:9 77:9
chronic 63:16 85:19,
chronically 89:15
chronological 22:25 23:1
circle 60:18
circles 91:1
circumstances 8:21 11:14 84:6

civil 12:4 13:9,17 14:4
claim 6:18
claims 13:25
clarification 43:13
clarifies 33:1
clarify 10:5 79:9
clarifying 27:24
classic 103:22
clear 10:9 79:4 96:2
cleared 47:18
clinic 63:16
clinical 45:1,17
close 17:21
closer 17:5 89:2
code 100:25 101:1
cogwheel 70:18 71:10
cold 95:19
com- 53:17
coma 92:22
comfortable 44:25 45:16
commands 61:6 66:13
commented 12:19
commit 23:11
commonly 72:2
communicate 52:21 53:18 54:9,12 55:20 56:8 57:15 58:21 59:7, 10,14 88:4
communicated 36:3 40:14 55:25
communicating 53:24 58:24 59:12
communication 33:9 34:8 35:1,3 36:3 40:8, 11 52:25 56:19
compare 97:2

compared 96:12 99:14
comparing 96:7
comparison 96:10
complaining 58:16
complaint 51:25
complaints 53:25 59:13,23,25
complete 54:25
complications 87:18
component 38:23,24 70:20
components 70:12
comprehend 53:13 56:19
comprehendible 53:2,12,17 54:24 55:2, 17 56:7 99:4
comprehensible 52:10 54:14
comprehensive 7:20
computer 20:22 34:24 40:3
computers 20:24
concerned 24:25 27:2
conclude 19:5,9
concluded 18:19,25 29:23 104:20
concludes 104:17
conclusion 30:2 81:8
conclusively 78:11, 16,25 81:9
condition 47:25 48:1 51:8 58:7 69:17 72:13 73:7,15 76:13 77:5 84:18,25 85:4 86:13 87:10 93:17 96:17 98:3 99:7
conditions 52:6 58:9 63:25 64:13,15,24

---

differential 63:25 64:7,25
differently 9:25 69:24 85:10
difficult 12:17 53:10 55:3 85:1,4,11,14,18 86:4 89:10
difficulties 52:25 87:24 88:8,13
difficulty 38:11
direction 29:12
directly 26:17 27:1 29:12,16,17,21 37:2,13 59:8 102:12
directories 18:2,4
disagree 25:12,17 33:6 35:10 46:24 92:1
discharged 83:14 84:3
disclosed 83:7
discuss 19:21 28:20 30:22 36:12 38:18 77:22
discussing 50:6
discussion 24:9
disease 100:1
disingenuous 59:23
distinct 64:18
distinguishing 12:15
distress 54:3 55:24 73:16 74:17 102:18 103:4
dizziness 52:1
dizzy 54:5 57:8,11,12, 14
doctor 6:13 12:20 14:7,8 27:21 33:4 38:11 48:15 55:10 80:12 82:8 101:13,17, 20 102:25 104:5

doctor's 96:19
document 10:19 12:2 14:1 17:20 19:12 21:2 45:15 48:18 50:16 53:6 50:13 60:1 65:5 64:6 19:7 98:16
documented 42:18 58:10 60:8 65:21
documenting 20:21 21:16 24:23 25:3
documents 20:22 52:19
door 40:20
dosage 44:15,23 45:14
dose 43:16 45:11,13, 19,22,24,25 46:1,3,5,6
dramatically 50:3
draw 76:12
drawn 30:7 62:1
drew 62:3
drinking 55:23 60:22 6:19
drooling 35:20
drug 12:6 14:20,21
discussion 24:9
due 99:25 100:7
duly 6:9
duration 44:5
dying 75:14
dyskinesia 42:24,25 43:4,6,9,12 64:16,20, 24 66:21,23,25 67:1,4, 10:3 88:4
dysrhythmia 78:11, 16,25 81:9
dysrhythmia 74:6 75:10
dystonia 70:14 71:9
dystonic 103:12,14,22

## E

E- 78:19
earlier 20:17,20 21:17 22:22 89:18
early 27:18
easily 92:20
easy 85:7
eating 55:23 60:22 61:6 88:7 90:20 99:2
effect 30:11,25 33:17, 22 34:2 46:9 47:17 59:8 102:12
effective 44:15,23 45:11,14,20 46:1,3,5
effectiveness 44:14 86:19
effects 27:2 64:21
efficacy 87:4
EKG 75:24 76:3,10,11, 13,24 77:4,7,10,12,25 78:1
elements 30:4
elevated 49:3 99:13,18
emergency 13:5 74:15 91:6 102:19
emergent 103:23
employing 10:25
EMS 78:5,6 79:3 80:16 81:3 100:19
encompasses 7:1
encounter 97:11,12
end 22:14 46:4 95:19 101:19
enjoyed 10:22
enroll 22:14
entail 36:10,11
entailed 16:23
enters 24:14

entire 55:13 59:17
entirety 10:10
entry 64:18
entry 23:20
environment 92:14
EPS 42:21,23,24 43:12 46:7,15 50:13 62:9 64:2,18,23 67:18,24 68:2,13,20 69:14,21,22 70:2,12,20 71:9 73:8, 11 82:20,21 83:9 89:9 90:7,21,25 91:4 95:1, 25 96:1,2 97:17,18 99:9,17,21 100:2,4 102:13,18,23,20 104:1
equate 88:8
equivalent 94:25 96:10,21
error 49:23
Escambia 6:19 24:6 74:11 78:18 84:2,8 82:8,24
essence 30:12 36:2
essentially 14:5 33:9 71:1 84:20
estimation 23:20
et- 95:24
evaluate 30:11 43:12 46:7,15 50:13 62:9 62:9 67:17
evaluated 18:23 28:5 51:8,24 57:8 102:22
evaluates 19:20
evaluating 21:25 64:1
evaluation 14:6,10 30:9
evaluations 94:24
event 61:3
events 18:15 20:2
evidence 57:11 58:13, 15 62:7 70:5 71:4

73:21 76:8 77:13 81:5 98:15
exacerbation 86:2 88:9 89:17
exact 42:1 97:24
exam 28:14,15 34:17 50:6 88:14 96:11,12 97:4
examination 6:11 30:18 31:10 34:17 37:14 38:22 44:3 50:10 68:22 94:18 96:5 97:11,21,22 101:15
examinations 24:1 87:23
examine 30:4
examined 6:9 24:16 53:11 90:2
examining 10:19 12:2 14:1 17:20 19:12 25:13 43:19 45:15 48:18 50:16 53:6 65:5 66:4,9 95:7 98:16
examples 83:7
exceed 83:7
exceeded 83:21
exchange 31:20
exclude 12:9
excludes 53:23
exclusion 98:1
exclusive 50:22
excuse 71:10 83:25
exercise 98:18
exhibiting 99:22
expect 46:21 47:4,8,16 71:20 73:1,12 102:17
expert 16:10,12,22 17:10,15 18:1,4 31:1 44:19 67:15,16 79:14
experts 7:16,17 9:10 46:21
experts' 8:7

expiration 76:23 77:9
explain 32:8 92:2
explaining 80:11
expound 7:25
expounded 78:22
expression 13:5
extend 80:22
extent 11:23 59:13 72:1,2 84:9,11 88:24 93:25 97:15 98:1
extra 42:21
extreme 59:21
extremities 16:8

**F**

facetious 38:15 68:17
facility 9:17 13:24 16:1,12 20:23 92:5 100:18
fact 21:1 56:20 72:4 77:12 104:4
factors 100:7
facts 11:13 73:4
failed 40:6
fairly 98:23
familiar 23:5
fashion 43:15 44:3
fast 41:5,8,9
fatal 75:10
fault 38:13 40:18
February 11:10
Federal 11:22,24 13:13,15 15:1,6
feel 22:6 60:5 65:10
feels 22:14 65:12
fees 7:2,3
felt 30:10 33:12,14 60:7 64:3,19

fidgeting 71:2
figure 34:12 35:2 98:12
final 7:5
finalize 100:14
find 42:1 57:17 65:15 87:19
finding 50:11
findings 24:4 31:12
fine 22:11,13 97:2
five-minute 81:25
Florida 14:3,4,9
focal 65:10,15 66:20
focus 20:5 90:15
focused 23:7
follow 51:12 63:18 82:20
follow-up 44:7 86:8
follow-ups 11:8
forever 77:1
forgetting 89:3
form 10:2,13 15:20 25:11 28:17 30:19 35:5 37:18 38:3 39:7,8 44:18 46:17 48:3 55:5 58:1 61:21 62:14 76:20 66:14 91:7 100:12
found 42:12 49:11,13 50:1
foundation 25:7
Fowlkes 6:3,8,15,16 104:16,18
frequency 44:7
frequently 42:24 102:2
Friday 19:15
full 6:14 59:13 60:18
futile 98:17
future 76:12

**G**

garbled 66:5,7 98:21
gauge 69:16
general 9:3 23:7 24:5 68:13 73:6 75:11 83:15,21 84:3,10
generalities 101:20
generally 85:7
generate 58:20
generation 28:13
get along 40:22
give 6:21 7:3 36:4,22 37:21 63:10 68:6 70:3 71:12,15 72:7,25 73:2
glad 63:10
glassware 92:17
gleaned 27:23
good 6:13 22:16,17 81:18,20 88:3 95:19,24
grand 45:21
great 17:8
Greg 24:14 46:16 104:7
Greg's 32:16
group 62:16,19
guess 96:24
guy 91:2

**H**

ha- 44:14
hallucinating 88:16
hallucinations 88:23
hand 6:7 77:6
happen 75:8
happened 39:22
health 9:17 19:14,22

---

**K**

keeping 11:16
kinds 17:24
knowledge 7:18 11:16 46:10 89:1

**L**

lab 62:2,3,5
labs 61:13,15,16 62:8,5,7,15,22 16:5,9,24 17:21 39:23
lack 37:6 59:12 71:2 74:4,5 76:24 92:4
language 36:23,24 37:5 97:25 98:19
languages 38:2
late 23:20 66:11
lay 25:6 88:12
leave 68:4,24 83:7,11 93:24
level 68:4,24 83:7,11 93:24
levels 93:15 96:20
Lew- 96:4
Lewis 6:19 7:15 18:23 19:1,16,18,20 22:2,21 23:25 24:14,16 25:15,19 26:7,14,19,25 27:7,14 29:2,12,15 30:10,17 31:9,24 34:10,13 35:24 36:16 37:12 40:9 41:19 42:9 43:8 50:16 51:9,21 54:20 63:19,20,24 65:2,23 66:14 67:7,11 68:3 88:8,14 89:9,12,16,22 92:11 96:4 97:9 98:7,17,19 99:10,23
licensed 9:21
Licensure 14:22
life- 73:6

life-threatening 73:12
limit 12:2 52:22
limited 12:3,4 15:18 17:15
lines 40:20 42:2
lip 67:2
lipid 48:21
lips 98:25
list 7:2,11 11:10,22,24 12:1 13:6,13,20 15:1,5,7,15,22 16:5,9,24 17:21 39:23
listed 15:4 16:5 17:19,20,21 39:8
listening 55:11,13
lists 11:1 15:7 65:11
literally 74:5
literature 17:7 100:3
located 93:9
location 32:4
long 17:22 46:11,12 47:6,8,19 52:18 72:13 76:10,12 81:21 82:1
looked 19:9 23:4 64:12
lot 101:25
lots 36:23
loud 22:6
low 45:22,24 46:4
low-maintenance 45:25
lower 45:25
LPN 95:16

**M**

med- 86:25
medical 12:9 13:9,14,23 16:12 20:1 23:6 25:14,18 26:6,8 27:10 29:6,11 42:8 57:20 63:15,17 62:13,19 65:3,17 69:18 68:22 81:6 89:25 91:17,19

92:12,14 93:7,10,15 94:2,15
medically 76:10
medication 20:16 22:20,24 23:21,22 24 30:11,25 33:16,17,22 43:21 44:8 46:9,12,13 48:20,21 64:3 77:14,17 87:1 93:23,24 102:12,14
medications 20:14 31:2 33:23 64:22 68:7 85:8 86:8 89:19 93:21
medicine 12:5,12 13:1 16:16,19,20 17:11,12,16,18 30:18 34:6 70:3 72:8
meet 39:25 84:4
means 31:3 89:17 90:2
member 29:11
memory 20:13
mental 9:17 19:14,22 28:20 30:22 36:13 62:18,21,22,23 63:14,17 65:5,18,22 66:18 66:19,23 71:12,24 78:10 83:22 86:12,17,18 87:6,11 88:24 93:4 94:5,7 95:14
mention 50:17
mentioned 4:22 64:23 69:17,18,20 72:25 89:10 91:8
mentions 50:18 77:23
mere 72:4
met 40:16 83:13
microphone 92:8
middle 92:1
mild 48:20 67:22 85:9 96:1 97:11
milligrams 44:23 45:12,18,21 46:2,4
mind 12:3,10,22 93:8 14:21 44:12 100:21

---

28:20 30:22 62:12,21,22,23 63:14,17 84:18,24,25 85:3 86:13,17,18 87:6,11 88:25 93:13 94:5,7 95:14
health-dr 36:13
healthcare 59:7 68:4 69:15,18 86:10 87:21 92:5
hear 40:25
heard 23:8,9 55:12
heart 49:19,21,22 74:8 77:7
heartbeat 74:7
heightened 44:1
hiding 56:5 99:1
high 45:22 46:2 48:7
historians 88:3
history 59:19 87:23
hit 101:18
hold 23:16
home 82:10
hooked 74:12,23 75:4,9,19 78:19
hospital 74:11,13,15,20,24 75:3 76:1,12,19 83:8 92:6 100:20,21,23 101:5,6,7
hour 64:18 68:19,20 69:1 81:24
hourly 42:17 68:9 83:2,7 91:19 93:8 94:13
hours 40:19 41:16 47:23 81:14,24 94:15
housed 42:14 62:21 63:14,17 68:8 83:21 84:15,24 92:10,15
houses 86:16
housing 86:17 93:13 94:2
hundreds 101:22

hurting 54:10
hygienically 68:10
hypertensive 48:24 49:1,17,20
hypothetical 99:6

**I**

i.e. 82:19
identified 9:12
identifies 29:8
identify 10:18 19:8 27:11 32:12 39:2 51:19
imagine 34:5
impact 46:8 52:12,20
implies 35:11
imply 59:4
important 35:18,20 39:16,19
imposing 81:13
impossible 29:1,4
improved 15:9
improvement 47:25
improving 87:8,17 88:25 89:2
in- 71:10
inability 59:14 65:17,18 71:2 90:15
inadequate 40:7
inartful 85:2
incarceration 49:2,5 89:17
include 37:16 39:18 103:8
included 37:6 39:20
includes 13:7
incomprehensible 60:20
incorrect 43:23

incre- 71:18
increase 68:2 71:11
increased 70:6,10 71:1,13 72:4,5,11
increases 67:24 68:21
increasing 71:18 72:23
indication 23:14,22,20 54:8 57:21 60:5 102:18
indications 58:17 86:20
indicative 49:17
indirectly 27:1
individual 27:9,12 29:9 59:5 76:11
individuals 28:5
infirmary 20:23 23:19,21 26:12,23 42:14 62:17 63:22 68:8,14,15 83:2,6,20 84:1 85:16,17 91:18 92:3,11,15,25 93:9 94:13,23 96:8
influences 58:3
information 14:18 19:5,8 23:23,25 24:7 29:13 30:13,17 31:4,8,16,20 34:12 35:9,24 39:3,5 40:15 52:14 73:1,2
injury 13:10
inmates 84:22 90:14,16
input 10:11
inpatient 74:15 75:3
input 10:11
instance 73:17 76:25 93:18
intact 61:7
intend 8:25 9:13
intensive 74:22
intention 8:16,19 9:18
interacting 56:11

interaction 58:23
interation 102:1
interested 17:23
intermediary 29:18,21
intermediary 29:18,21
interpose 98:14
interpret 26:1
interpretation 26:1
interrupt 66:10
interval 77:24
involve 12:4 13:1,13 15:18 16:6,10,11
involved 34:11,14
involves 14:3
involving 14:22 15:19 16:6,11 17:10,19
ipad 32:24
irregular 74:7
issue 16:2
issued 14:9
issues 8:15,17 11:4,13,14 13:14
issuing 7:8,12
item 10:12
items 34:4 39:15

**J**

Ja- 74:11
jail 13:8,24 20:21 26:5,27 9:28 15:4 44:3 47:13 50:6,9 53:1 54:19 61:19 62:25 63:2 97:22
January 19:13,19 31:24 49:14 94:17,18
join 46:18
judgment 59:18 60:1

---

Mine 67:4
minimal 45:14 46:3,5,6
minimum 45:14
minor 10:14
minute 41:3
minutes 77:8
Mississippi 14:23
mistake 61:19
mixed 43:12
mo- 67:4
mobile 98:20
Mobley 6:20 7:15 9:6,11,13,22,23,24 23:3 24:17 25:4 26:14 20:25 27:9,11,13 28:13,21,22,23 29:2,6,9,15 30:5,11,13,25 34:5 38:9,22 39:14,23 40:5,6,9,10,12 41:15 42:9,19 43:15 46:13,23 48:1 51:10,21 52:7,23 53:1,11,13,25 54:23 55:3,22 56:9,11,25 57:8,15 60:25 61:18 62:5,25 69:17 62:3,6,19 65:6 82:17 84:4 85:23 89:19 95:23 96:16 98:8,22 999:9,23
Mobley's 23:2 25:8 26:5 27:9 28:15 44:3 47:13 50:6,9 53:1 54:19 61:19 62:25 63:2 97:22
modify 8:1
moment 45:3,15 46:6 101:12
mon- 55:12
monitored 84:14
monitoring 68:4,11,25 70:8 75:4,19 91:17,19,24 93:7,16,25 94:2

months 16:22
months 6:13 7:11 19:1,2,4,19 20:20 24:24 25:4 27:17,18 39:9 41:22,24 42:3 95:24
motion 65:7,17 66:19
motions 67:4
motor 70:6,10
mouth 98:20
move 50:19 65:18 71:1
movement 71:1
movements 67:1 70:6,10
moving 48:16
mumble 98:24
mumbles 52:9 53:17 99:3
mumbling 52:17 54:12,13 55:19 56:6 60:19,25 90:19
muscle 46:7,15 67:24 70:2,12,23 102:14
muscles 72:9
mutually 50:22

**N**

nature 77:5 89:16 103:23
necessarily 17:10 23:16 39:5,16 59:16 83:1,16,18 87:14
neck 50:8,11,17,18,20,23,25 67:1,12,13 103:20,21
needed 24:25 41:23 72:25
negligence 13:10,14,23 16:13 23:7

neur- 64:3
neurolep- 73:19
neurolo- 64:15
neurologic 64:15,23 65:9,10,15 66:20
neurological 64:15,23 66:19
night 27:15,16 41:23 42:3 94:5,9
noises 74:13
non-compliant 84:21
non-jail 16:12
non-verbal 65:23 66:6,7
non-verbally 56:12 58:24
normal 23:18 59:14 45:22 46:1,5 65:7 77:13
notation 94:22 95:3
notations 94:9
note 19:14,15,21 20:16,18 21:24 22:19 23:1 24:13,15 25:8,24 26:5 27:5,10 28:11,13,20 29:18 30:19 31:14 36:1 38:14 40:2,7,12 50:14,15 51:15 53:1,4,7 55:25 56:3,4 59:11 60:9 61:3,17 65:4,21 66:9 91:3,15 95:4,24,21 94:9,16 98:8

number 8:9 10:20 11:1,17 17:8 19:13,24 24:18 50:4 76:5 82:16
numbering 10:16
nurse 6:19 7:14 12:20 18:23,25 19:14,16,17,19 20:10 22:1,18,21 23:1,25 24:14,16 25:9,15,19 26:7,13,19,25 27:4,5,7,14,15,16,17 28:10 29:2,11,15 30:4,5,17 34:10,13 35:24 40:3,9 41:19,23 42:9 43:8 50:15,16 51:9,21 54:20 63:19,20,1,24 65:2,23 66:14 67:7,11 68:3 88:14 89:9,12,16,22 95:3 96:11,18 97:11
nurse's 95:3 96:11,18 97:11
nurses' 92:9
nursing 14:22 42:18 32:13 92:21 93:11 18,22,24 94:14

**O**

object 25:1 28:17 30:19 32:5,15,20 37:18 38:3 44:18 46:17 48:3 55:5 58:1 61:21 76:20 76:15 66:14 91:7 98:10 100:12
objected 30:20
objecting 32:13 38:4
objection 32:16 46:18
objective 34:17 38:24 66:3 97:21
observation 82:20,23,24 83:7,11 84:11 92:16 94:12

**observing** 56:11
**obtained** 100:16 101:6
**obtaining** 87:22
**occasion** 16:14
**occasionally** 16:17
**occur** 76:6 83:23 84:1
**occurred** 21:3,17 26:10 29:24 54:21 73:21 83:17
**occurring** 73:9
**October** 28:3
**offending** 72:6 102:10
**offer** 9:18
**offered** 8:14
**offering** 12:21
**office** 20:25 93:3
**officer** 68:18 94:12
**officers** 42:16 91:20 92:13 93:9
**one-hour** 68:15
**one-to-one** 93:19
**open-ended** 19:7
**opened** 20:15
**operating** 23:21 24:5 39:10
**opinion** 9:5 10:20 11:13 14:10 26:3 29:5 31:8, 16 35:25 41:18 44:20 45:16,23 46:25 47:11, 12,21,24 48:5 49:15,24 50:4 55:17 58:8 62:11 63:4,6,10,13 65:14 74:9 75:16,20,23 77:19 78:7,10,14,15,17 80:11 83:17,18 89:19 94:16 95:8 97:23 98:22 99:12
**opinions** 6:21 8:1,4,6, 10,14,24 9:1,2,3,7,18 12:20 13:4 48:16 57:18 75:25 80:18 100:8,22
**oranges** 96:7

**ord-** 62:5
**order** 16:25 18:21 22:25 23:2 28:5 33:14,23 24:24 39:5 69:16
**ordered** 61:13,15,17 62:8,13
**Ordinarily** 47:4
**oriented** 95:17
**oth-** 72:1
**outbursts** 84:19,22
**outpatient** 83:9

### P

**pacing** 70:5,10 71:3
**pages** 6:25 13:12
**pain** 51:25 77:9
**palpitations** 35:9
**paper** 39:23 95:15
**paragraph** 10:21,22 46:14,18 47:50:5 51:5, 14 82:16
**parcel** 38:25
**parkinsonism** 70:18
**part** 17:15,16 38:25 43:11 66:3 70:1 80:1 103:13
**partially** 55:2
**parts** 70:12
**passed** 18:7 54:5 56:17 61:14
**passing** 52:1
**past** 52:24 53:10 54:21 101:21
**pasted** 10:22 19:15
**patient** 19:25 23:25 25:14 28:13 29:2,16 31:18 32:2 34:15 51:23 52:8 58:21,23 60:3 62:18 66:11,12 68:16 69:19 71:8 73:3 82:20, 23 85:4,11,14 86:5,11 87:22,25 91:24 94:1 95:17,18,19,20 97:6
**patient's** 23:1 84:11
**patients** 23:22 24:2 27:2,4 29:5,22,25 42:3 92:11 93:13,14 102:22
**pause** 43:19 45:7 53:6 66:8 91:14 95:7
**paying** 81:21
**Pease** 27:7 97:7
**people** 75:11 88:15 90:22,24
**per-** 35:11
**percentage** 44:10
**perfectly** 26:16
**perform** 59:19
**performed** 22:22 75:24
**person** 25:20 26:20 27:8 35:12 55:19 59:21 68:7,12 72:25 77:1 83:10 84:9 87:19 90:6 87:2,8
**personal** 13:10 80:22
**personnel** 92:12
**pharmacokinetics** 44:20 45:2
**pharmakine-** 44:19
**phonetic** 27:5 38:16
**phrase** 31:14 38:12, 20 53:23
**phrased** 9:24
**phrasing** 37:9
**physical** 34:16 38:23 59:19 92:22 96:5,11,12 97:10,21 103:4
**physician** 14:3
**physicians** 8:21 23
**piece** 31:23

**pieces** 38:24
**Place** 28:15 91:17 97:4,5
**places** 20:22 101:1
**plaintiff** 9:9 11:19,24 12:13 14:8 79:15
**plaintiff's** 7:16 10:16 80:24
**plaintiffs** 12:23 80:18
**plan** 68:24 71:11,19
**pod** 84:24
**point** 45:3 59:6 63:9 73:10
**pointed** 34:7
**points** 38:21
**poor** 75:12
**poorly** 87:5,8
**population** 68:13 83:15,21 84:4,10
**portion** 61:12
**position** 6:21
**possibilities** 64:7 104:6
**possibility** 53:24
**potential** 33:17 69:13 79:8 99:8
**potentially** 36:24
**practice** 71:15,23 101:21
**practitioner** 7:15 19:1, 16,18,20 23:1 25:15,19 26:14,19,25 27:14 29:12 30:10 40:9 37:22 39:13,18 40:13 65:7 66:12
**practitioners** 88:5
**pre-** 42:11 92:21
**preceded** 72:20 87:3
**prefer** 85:17
**premise** 59:17

---

**recorded** 57:3
**records** 16:18,20,21 96:15,23 15:11,13 24:10 27:23 28:3,8 36:10 45:20 59:57:16 58:20,22 59:9 65:3 101:9 102:16 103:10 103:9 104:2
**refer** 19:16 27:6 32:2 43:18 51:18
**reference** 25:9
**referenced** 62:5
**references** 10:23 61:25
**referencing** 11:1 61:16
**referral** 19:17 27:6,8 31:3 33:19,23 34:3 35:5,7,9,10,18,22 36:1, 5,22 37:15,20,23 38:1, 14,19,20 39:1,8,17,22 104:3
**referrals** 17:13
**referred** 25:1 64:4 91:5 96:16
**referring** 19:11 49:1 50:14,24 51:20 78:1
**refers** 34:15 62:10
**reflect** 21:22 52:5 57:4, 10,21 58:14 59:11
**regard** 81:3
**regularly** 81:4
**regulatory** 12:7,8 14:22
**relate** 12:12
**related** 12:5 14:20
**relates** 9:16 28:10
**relative** 24:1
**relax** 72:8
**relaxation** 12:14
**relaxes** 72:9
**relay** 29:21 30:20 85:7

**relayed** 30:8 31:16 38:25
**relevance** 11:4
**relevant** 11:14
**relied** 18:18
**rely** 18:12,13,14,17
**remain** 68:25
**remaining** 97:10
**remains** 68:3
**remember** 62:5 95:13 96:23
**remotely** 57:17
**remove** 102:10
**repeat** 33:3
**repeatedly** 67:3
**rephrase** 33:5
**report** 7:1,4,5,8,12 8:1 9:12,20,22 10:2,9,10, 13,20 13:19,19 11:1 28:4 44:23 45:10 48:16 58:6 61:19 66:16 82:15 104:3
**represent** 49:19 51:4 80:19
**represented** 79:1
**represents** 50:25
**request** 19:1,3,25 25:10,14 26:6,7,22 27:10,12 29:22 30:9 37:22 39:13,18 40:13 65:7 66:12
**requested** 19:3 99:9
**requi-** 68:10
**require** 31:17 34:13 68:10,12 70:7 82:17 83:1
**required** 30:17,20

**31:21** 32:1 33:8,25 36:16 39:21 82:25 33:8,12 91:10 93:21
**requires** 35:8 91:13
**residual** 89:16
**resolve** 72:7 102:17
**resolved** 82:1
**respiratory** 69:9
**respond** 94:15
**responding** 44:9
**response** 19:24 24:3 31:2 51:14 55:6 88:2 98:13
**responsibilities** 40:4
**responsibility** 63:21
**rest** 98:20
**restart** 82:21
**restarted** 48:21
**restlessness** 71:3
**result** 33:16 46:7 48:20
**retained** 8:13 9:1 14:9
**Rettig** 32:5,8,11,14,15 46:16 82:4,6 104:7
**review** 9:19 16:18,21, 23 18:8 24:9 28:8 29:8 53:4 63:2 65:3 103:25
**reviewed** 17:18 18:10, 21 20:9 29:14
**reviewing** 9:22 10:10 18:12,20,22 20:5,6,8 24:8 28:1,11 32:4 33:23 54:21
**rhythm** 74:5 79:9,20, 24 80:5 81:3 100:16
**rhythms** 100:17
**rights** 14:14

**risk** 99:20,24 100:6,7
**Risperdal** 43:17,24 44:3,12,15 45:1,22 46:6 76:4,7,8 77:14 82:19
**Rm** 95:16
**rounded** 10:21
**rounding** 20:23 23:21 84:24
**roundings** 86:18
**rounds** 20:25 87:6
**rule** 43:9 65:2,14 66:19,21 67:8,10,11
**run-of-the-mill** 86:5

### S

**sandwich** 60:22
**satisfied** 53:23
**satisfies** 32:3 35:3,5 37:20,24 38:2 40:3
**satisfy** 31:10,14,24 34:18,25 35:25 36:15 37:14 39:1,6
**scale** 43:2 60:21
**scheduled** 81:14
**scheme** 45:21
**schizophrenia** 87:25 100:1
**schizophrenic** 85:19, 22 86:1,11,12 87:22 88:9,19
**schizophrenics** 90:22
**scope** 13:24,25
**Scott** 32:17 38:5 46:19 48:3 55:8 58:1 61:21 62:14 67:6 94:19 74:2 76:24 85:9 94:1 91:7 100:12 101:17
**screaming** 72:1

---

**preparation** 9:20
**preparing** 18:13
**prescribed** 33:18 45:13 46:13 7:2 102:16
**presence** 91:21,23,25 92:22
**present** 26:14,15 42:15,16 75:7 78:6, 24 81:4 88:22 89:11 90:13,14,16,20 92:12, 18 94:15 101:7,9 104:4
**presentation** 70:17 85:10,25 88:8,19
**presentations** 11:21 70:13 88:21
**presented** 10:5
**presenting** 85:10 90:17
**president** 88:21
**pressure** 48:20 49:16, 22,25 94:11 99:13,3,8
**presu-** 74:21
**presume** 26:16
**presuming** 74:22
**pretty** 35:15 75:14 85:7,20 86:1,15
**primarily** 63:16 64:21
**primary** 62:21,22,24 64:14
**printed** 79:25
**prior** 16:22 20:6 22:20 23:24 24:9 27:2 28:24, 15 29:8 42:9,12 43:15 44:3 47:11 85:21 86:21 87:5,6 88:25
**pro-** 80:7
**probable** 33:14
**problematic** 33:17
**problems** 69:10 72:3, 14 73:13
**procedure** 23:21 24:5 39:11 102:9,23,25

**PROCEEDINGS** 40:24 45:8 48:11 82:11 91:15
**produced** 55:1
**production** 59:1
**professional** 68:19,23
**professionals** 42:9 93:10 94:7
**progress** 67:18 68:21, 22 69:6,7
**progressed** 74:7,8
**prolonged** 76:4,6,9 77:1,3,14,16
**prolongat-** 77:24
**prolongation** 77:24
**protection** 84:20
**protocol** 94:6
**protocols** 93:12,14
**protruding** 98:25 103:20
**provide** 16:10 52:13 102:13,14
**provided** 6:24 7:21,10 8:23 9:12,14 11:9 23:23 24:7 80:16
**provider** 12:9 58:8 59:4,7,18 60:2 62:21 69:15,19 86:10 87:21 94:23 96:9
**provider's** 58:20,23 59:18 68:4 95:5
**providers** 37:21 51:8, 9,17,20 62:23 63:14,15
**provision** 9:16
**prudent** 86:10
**psy-** 87:12,16
**psychiatric** 30:25 33:17 34:6 46:21 49:8 51:6
**psychiatrist** 25:1 31:1 67:16 89:20
**psychosis** 87:12,16 89:23

**psychotic** 54:19 87:14 89:13,15,18,20 90:1,6, 14,23 91:2,4 98:24
**psychotics** 90:24 102:2
**publications** 61:23
**put** 38:21 39:24 43:8 57:15 59:8 101:4
**puts** 54:23 60:19 67:7

### Q

**QT** 76:4,6,9 77:1,3,14, 16,24
**quality** 9:14
**que-** 65:24 76:14
**question** 9:4,8 10:9 11:7 12:3 13:11,16 14:16,19 16:8 19:7 22:5 32:10 33:2 33:11 33:3,7 34:9 37:11 42:12 44:1,7,11 48:25 49:9 52:22 53:7,8 54:18 55:11,13 69:3 72:20 76:24,22 80:18, 11 85:13 86:5,8,15 90:5 91:8,12 96:22,23, 25 97:1 100:10 101:23
**questions** 6:5 10:4,11 27:22 65:24 101:14 104:8
**quibble** 24:18
**quick** 101:18
**quiet** 40:17 41:4,13 95:11
**quote** 95:18,19

### R

**raise** 62:1
**rambling** 8:15
**range** 66:6,10 67:6
**rare** 73:18,19 103:14
**rate** 49:19,21,22

**re-** 24:12 28:10 63:6
**reach** 65:7 66:12
**reaction** 103:12,15
**reactions** 103:22
**read** 7:22 20:4 25:14 26:23 42:25 50:18 53:7 62:25 77:13 78:5 80:17 88:10 95:3 98:5 104:9,23
**reading** 7:24 9:23 23:3 24:22 25:2 49:6,18 50:3 54:19 80:22 99:14
**readings** 48:24,25 49:25
**real** 40:17 99:11
**reason** 27:3 35:12,16 36:4,5,22 37:22 39:13, 18 46:24 50:2 54:17 55:21 69:24 88:20 99:15,18
**reasonable** 14:11 26:16 29:5 45:13 52:4 74:15 84:2,6
**recall** 24:8,10,19 79:15
**recalled** 29:20
**receive** 43:21,24 44:3, 7,12 93:22
**received** 7:7,12,14,15, 17,19,21 43:16
**receiving** 44:16 94:3
**Recently** 98:24
**recheck** 49:4
**recollection** 27:13 29:19 63:5,7 94:20,22
**record** 6:1,14 7:20 20:14 21:5,7,15 23:3 29:3,8 40:23 48:9,12 58:2,14,17 59:1,20 60:3 61:9 62:8,9 7:7 82:9,12 88:6 94:8, 13 101:8,10 103:25 104:18

---

**Seagle** 24:8 25:11 28:17 30:19 32:16,17, 19 37:18 38:3,5 44:6, 18 46:18 48:3 55:8,8 58:1 61:21 62:14 70:16 75:19 79:2,6 86:14 91:7 98:10,14 100:2 101:16,17 104:5,13,15
**section** 10:21 48:16
**sections** 10:2
**secure** 20:24
**security** 13:2,3
**see** 19:25 26:25 28:13 29:2
**send** 102:18 104:15
**sending** 83:10
**sense** 87:24
**sentence** 93:13 48:2 50:6 51:6
**separate** 15:3 26:18 81:1
**sequence** 18:15 20:1
**serves** 20:13
**services** 9:17 16:10 17:25 18:2,3
**set** 20:23,24 92:4,6
**setting** 20:21 74:16 75:15 83:2,6 84:2 29:2
**severe** 67:23,25 68:2 69:25 70:7
**severely** 71:13
**severity** 42:21,23,24 43:3 48:23 69:16,21,23 72:11
**shape** 15:20
**shift** 27:15,16 41:23
**shock** 78:20 79:19,21, 23
**shocked** 79:22
**short** 43:19 45:7 48:10 53:6 54:4 56:13,16,22,

**shortness** 51:57:2
**shoulders** 50:8,17,21, 24
**show** 58:17 76:4 102:10
**showing** 71:17 77:13
**shut** 96:21
**sic** 49:19 96:16 102:1
**sicker** 75:13
**side** 27:2 30:11,24 33:17,22 34:1,6 64:3, 21 87:13 103:21
**sides** 8:13
**sight** 92:19
**sign** 104:12,13
**significant** 67:23 96:2
**significantly** 99:6
**simply** 25:25 27:10 31:2,13 71:18
**sit** 63:11 71:2 100:9
**sitting** 56:15 61:7
**situations** 79:9
**skipping** 19:3
**slaps** 34:3
**slightly** 99:5
**slurred** 95:20
**small** 45:19
**Smacking** 67:2
**sort** 98:17
**sound** 22:7,10 92:19

**sounds** 15:7 16:11
**space** 92:4
**spasms** 70:14
**spattering** 9:9
**spea-** 32:13
**speak** 29:21 90:15
**specialties** 8:24
**specific** 10:4 24:12 25:10 27:8 31:4,20 36:23 37:6
**specifically** 9:10 11:21 15:25 16:6,24 24:6 25:18,23 27:6 28:10,21 31:15 36:3 37:12 39:2 53:2 67:7 89:4
**specifics** 30:14 71:13, 16 93:20
**speculation** 43:10,11
**speech** 19:21,22 28:12 35:11 38:13, 18 38:18 52:18 53:9,15, 20,22,25 36:11 37:6,4, 4,4,7 47:4,16 62:25 56:20 60:25 61:1 66:4, 4,6,7 89:6,10 95:20 97:9 98:21
**spoke** 29:16,17 37:3
**staff** 13:3 26:8 29:11 61:17 62:13 63:19
**staffed** 93:9
**stand** 9:2,3
**standard** 9:11,14 23:20 24:4 31:10,14, 17,19,25 32:2,3 33:25 34:13,19,20,25 35:3,6, 20,22,25 36:15 37:14, 17,21 40:1,4,16 82:6
**standing** 90:19
**standpoint** 88:6 87:14

**stands** 14:2
**start** 18:6,8 45:25 48:17 77:8
**started** 17:11 98:24
**starting** 19:12 51:6
**starts** 51:14 53:16 56:6 60:12 67:2
**state** 6:13
**stated** 55:3
**statement** 23:11 45:3 56:12,13,14
**statements** 18:10,14, 22 19:6 20:7 22:20 23:20 24:22 28:24 29:14 34:15 42:12
**states** 95:18
**stating** 44:25
**station** 92:9 93:2
**statistics** 65:6,19,22 66:18 69:10 87:12
**stay** 35:21
**staying** 81:21
**steps** 49:16 97:1
**stick** 61:5
**sticking** 67:2
**sticks** 61:5
**sticky** 34:24 36:1
**stiff** 50:11,20,23 98:5 34:16 40:2,7
**stiffness** 50:7 68:21
**stop** 76:2 97:10
**stoppage** 74:8
**stopping** 22:5
**straight** 98:16
**straightforward** 37:11
**stress** 73:15
**strips** 78:5,6,13,24

79:1,3,8,25 80:3,15,16,
19,23 81:3 100:19,20
101:6,7,9

**stroke** 64:11,21,23
65:3,14

**struggling** 87:19

**sub-** 14:21

**subjective** 38:23 66:2
97:21

**submission** 7:20

**substance** 10:2,13,17
14:5,10,21 15:25 16:2,
6

**substantive** 10:15

**successfully** 75:6,7

**sued** 14:4

**suffer** 75:14

**suffering** 46:7

**suggesting** 30:1

**suicidal** 93:14,18

**summarize** 26:4 31:22

**summarizing** 15:21,
22

**summary** 54:25
100:25 101:1

**superficial** 98:23

**supp-** 98:5

**supple** 50:17,18,23
98:5

**supposition** 33:8

**surrounding** 92:10

**survival** 75:12

**survived** 75:21

**surviving** 75:8

**swallowing** 61:6

**swear** 6:6

**switch** 18:6

**sworn** 6:4,9 15:7,24

**symp-** 48:23 71:16

**symptom** 99:21

**symptoms** 43:5 45:17
46:14,22 47:3,17,20
48:23 51:7,22 52:19,21
53:25 54:7 55:20 56:9
58:6,13,14,15,16,18
59:10 66:22,25 68:2,
20,21 70:18 71:17,23
72:2,7 85:8 88:21
89:16 95:18 97:18
99:22 102:17 103:2,4,
23

**syndrome** 73:20

---

**T**

**takes** 28:15 97:4

**taking** 17:24 59:21

**talk** 18:5 48:15,19
53:17 56:6 73:24 77:21
81:20 91:1 99:3

**talked** 26:17 98:4
100:14,19

**talking** 18:6 22:6 32:1
41:8,9 50:7 51:9 52:8,9
56:5 66:14 79:2 80:7
81:12 87:11,16 90:19
96:3 99:1

**tardive** 42:24,25 43:4,
6,9,12 64:16,20,24
66:21,23,25 67:1,3,9,
10,11,16

**te-** 45:4

**team** 62:22,24

**technically** 59:24

**telling** 35:11

**tells** 20:1,18 76:5

**temporarily** 102:11

**term** 43:12 76:24 92:4

**terms** 93:6

**test** 14:21 42:25

**testified** 6:9 11:11,12,
18 12:15,16,23 13:18
15:4,14 80:15

**testify** 8:16 9:13

**testifying** 12:6,8,17
16:9

**testimony** 7:1 8:8,14
11:10 13:6 15:1,5,8,18,
24 18:19 27:20 29:15,
20 42:5 46:23 47:16
63:9 104:20

**testing** 14:21

**tests** 42:20,22,23

**thick** 98:25

**thing** 32:1 35:18 39:16
66:23 76:23 98:9
100:13 102:10 103:15

**things** 26:9 33:2,20
39:20 41:14 45:21
54:6,12 56:11,17
57:22,24 58:3,25 61:10
65:11 70:7 72:10,12
73:20 76:5,25 81:1
86:22 88:18 89:1 90:20

**Thomas** 6:3,8,15

**thought** 34:6

**thousands** 102:7

**threatening** 73:7

**time** 6:2,4 10:3,6,25
20:7,9,10,15 21:16,18,
22 22:1,19 23:4 24:19,
21,23 35:4 40:23 41:18
42:19 46:8 47:22 48:9,
13 49:6,13 57:8 61:2
64:8 66:24 72:10 74:23
75:9 78:18 82:13 84:13
88:16 95:20 99:7,9,10
101:13 104:6,20

**timeframe** 39:13,19

**times** 11:17 54:20 79:8
93:21,23 95:17 98:3
100:15 101:22,24
102:6

**timestamp** 20:12

**today** 6:2,18,22 9:20
39:12,24 76:11

**told** 24:4 34:9 41:23
96:14

**tongue** 61:5 67:3
70:15 89:3 98:20,25
103:8,19,20

**top** 51:5,14 77:23 91:4

**torsades** 77:21,22
78:7,12,16,18,23 79:1,
20,22,24 80:18,20
81:6,10 100:15 101:2,
8,10

**torticollis** 103:21

**totality** 58:23

**tough** 20:3

**track** 43:3

**trained** 92:13 94:12

**transcript** 104:12

**transmitted** 31:5 39:5

**trash** 88:17 90:20

**treat** 72:12,15 82:19
85:4,7,11,19 87:21,25
102:4,12

**treated** 67:25 69:22
73:7 74:14 75:6,7 83:9
101:21 102:21

**treatment** 9:11,14
16:1 47:13,19 68:3,24
70:8 71:11,19 72:6
73:14 102:9 103:1

**treats** 86:10

**tremors** 65:8 69:25

**trial** 13:18 15:8

**trouble** 54:10

**true** 23:13,16 54:2
59:24 78:9

**turn** 53:4 65:4 82:15

**twisting** 103:21

**type** 9:8 14:19 15:3,14
39:18 64:12 82:24
103:15

**types** 12:16 13:2,17,22
14:25 16:5

**typical** 85:21 86:1
88:7,8,19

---

**typo** 10:14 50:8

---

**U**

**U-SHAPED** 93:3

**ultimately** 40:2 97:5

**unable** 57:14 59:18
61:1

**unclear** 66:5,7 98:21

**uncommon** 102:3

**unconscious** 59:22,
25 61:8

**uncooperative** 88:13
90:18

**understand** 13:11,15
28:1,6 32:23 35:8
38:14,17 42:14 52:17,
24 53:8,10 55:3,25
60:10 61:1 67:13 69:7
83:25 88:5 90:5 94:3
95:21,23 96:16 97:3

**understandable**
56:21

**understanding** 27:20
41:16 50:8 62:20 93:2,
4,11 94:6,10

**Unintelligible** 74:18

**unit** 74:23

**University** 14:4,9

**unrelated** 100:2,5

**unresponsive** 42:13
49:11

**unsworn** 18:10,14,19,
22 19:6 20:6 22:20
22:19,24 24:24 28:9 29:14

**unusual** 20:21,25

**updated** 11:9

**urgency** 48:24 49:1,
17,20

**usual** 45:11

**V**

**VA** 7:20

**valid** 76:10

**vast** 16:15,19

**ver-** 23:15 56:12

**verbally** 56:12 58:24

**versus** 11:24 12:13
86:11 96:18 97:16

**vi-** 74:20

**vice** 23:15

**vicinity** 42:16

**Videau** 80:14

**violations** 14:4

**visit** 94:8

**visited** 93:1

**visiting** 74:20,24

**visits** 19:9

**vital** 90:19 96:5

**W**

**watch** 82:8

**ways** 38:8,9,12 90:12,
14,16

**week** 63:23 80:17
94:11

**weekly** 86:18

**weeks** 87:5 90:18
97:16

**Wes-** 53:25

**Wesley** 6:19 18:7,23
19:4,23 20:15,19
24:16,24 25:9 27:18
29:3 30:10,14 31:11,25
33:13 34:24 36:17
38:23 39:9 40:3 41:18,
24 42:8 43:5,15,16
44:16,24 45:12 46:6
47:23 51:8,23 52:3,9,
16 53:2,9,13,24 55:1,2
56:5,8,22 57:7,14 58:8,

15 60:10,19 61:13
62:13,17 63:13,18,24
65:23 67:17 70:2 74:10
75:17 76:3,5 79:13
83:14 84:3,13 85:3
86:22 87:1 89:12 90:3,
17 91:5 94:3,8 99:20,
24 100:5 103:5 104:1

**Wesley's** 8:18 18:15
39:25 46:14 47:20
48:20 49:7 50:10 52:13
73:24 74:1 76:9 85:9,
25 88:6 89:6 94:13,17
97:15 99:13

**wondering** 24:5 97:7

**word** 71:3 85:1,2

**wording** 42:2 53:19,20
99:5

**words** 12:18 24:4
25:25 26:3,13,21 30:24
33:7 34:11,21 35:20
36:15,40 43:17 47:22
55:2,16 56:15 59:10
60:24 64:17 65:9 66:13
68:12 70:4 76:11 77:3
79:17,21 80:24 87:20
88:3,4,22 90:13,15
92:17 100:16

**work** 12:6 16:12,19
17:10,16 18:3 72:11
86:20 92:13 94:12

**worked** 17:18

**working** 26:13,24 87:1

**worse** 67:18,20,21
69:1,8,12,14 70:3
87:14

**wr-** 24:20

**write** 41:5 59:24

**written** 25:25 53:1
95:14

**wrong** 24:20 31:23
80:25

**Y**

**y'all** 22:7 32:22,23

**year** 6:25 11:10 16:14
39:12 77:17 78:3

**years** 15:9,13,18 17:5,
7,12,21

**yelling** 22:6,14

**Z**

**Zadi** 27:6,14,16,17

**Zadi's** 27:4

---